IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CPM CONSULTING, LLC and<br>MARTINO RIVAPLATA,<br><br>       Plaintiffs,<br><br>v.<br><br>CAPSUGEL US, LLC,<br><br>       Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 3:17-cv-03059-S |

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

/s/ Talley R. Parker
Talley R. Parker
State Bar No. 24065872
talley.parker@jacksonlewis.com
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201
PH:  (214) 520-2400
FX:  (214) 520-2008

**ATTORNEYS FOR DEFENDANT
CAPSUGEL US, LLC**

**TABLE OF CONTENTS**

I. STATEMENT OF THE ISSUES TO BE DECIDED BY THE COURT ........................... 1

II. STATEMENT OF UNDISPUTED MATERIAL FACTS .................................................. 2

    A. Capsugel's Business. ................................................................................................ 2

    B. Capsugel Agrees To Utilize Rivaplata's Services. ...................................................... 3

    C. Plaintiffs' Agreement With Robert Half To Provide Capsugel With Rivaplata's Services ........................................................................................................................ 5

    D. Rivaplata's Assignment With Capsugel ..................................................................... 6

III. SUMMARY JUDGMENT STANDARD ........................................................................ 7

IV. ARGUMENT & AUTHORITIES ..................................................................................... 8

    A. Capsugel Did Not Tortiously Interfere With CPM's Agreement. ........................... 8

        1. Legal Framework For Analyzing Plaintiffs' Tortious Interference With Contract Claim. ................................................................................................... 8

        2. Plaintiffs' Tortious Interference With Contract Claim Cannot Escape Summary Judgment. ............................................................................................ 9

    B. Rivaplata Cannot Pursue A Discrimination Claim Under The NJ LAD. ............. 11

        1. Capsugel Is Not Liable To Rivaplata Under The NJ LAD Because It Was Not His Employer ................................................................................................. 11

        2. Legal Framework For Analyzing Rivaplata's Discrimination Claim. ...... 12

        3. Rivaplata Cannot Establish a *Prima Facie* Case Of Discrimination Or Show Pretext. ...................................................................................................... 14

V. CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*,
  271 F.3d 624 (5th Cir. 2001) ....................................................................................................7

*Amigo Broad., LP v. Spanish Broad. Sys., Inc.*,
  521 F.3d 472 (5th Cir. 2008) ..........................................................................................8, 9, 10

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................................................................7, 8

*Beatty v. Farmer*,
  366 N.J. Super. 69 (App. Div. 2004) .....................................................................................13

*Carney v. Dexter Shoe Co.*,
  701 F. Supp. 1093 (D.N.J. 1988) ............................................................................................11

*Chrisanthis v. Cnty. of Atlantic*,
  361 N.J. Super. 448 (App. Div. 2003) ...................................................................................11

*DeMoss v. The ARC of Somerset County*,
  NO. A-2927-13T4, 2015 N.J. Super LEXIS 278 (App. Div. Feb. 17, 2015). ........................13

*Dixon v. Rutgers, The State Univ. of New Jersey*,
  110 N.J. 432 (1988) ..................................................................................................................12

*El-Sioufi v. St. Peter's Univ. Hospital*,
  382 N.J. Super. 145 (App. Div. 2005) ...................................................................................12

*Fulton v. Sunhillo Corp.*,
  No. A-2021-11T4, 2013 N.J. Super. Unpub. LEXIS 2770 (App. Div. Nov. 18,
  2013) ...................................................................................................................................12, 13

*Greenberg v. Camden Cty. Vocational and Technical Schools*,
  310 N.J. Super 189 (App. Div. 1998) ....................................................................................13

*Hoffman v. L&M Arts*,
  774 F. Supp. 2d 826 (N.D. Tex. 2011) ....................................................................................8

*J.S. v. Borough of Englewood Cliffs*,
  2015 N.J. Super. Unpub. LEXIS 1151 (N.J. App. Div. May 18, 2015) ................................12

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973)..................................................................................................................12

*Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*,
   29 S.W.3d 74 (Tex. 2000) ...................................................................................................8

*Royal v. CCC & R Tres Arboles, L.L.C.*,
   736 F.3d 396 (5th Cir. 2013) ..............................................................................................8

**Statutes**

N.J.S.A. § 10:5-12 ....................................................................................................................11

N.J.S.A. § 10:5-12(a) ...............................................................................................................11

**Other Authorities**

Fed. R. Civ. P. 56(a) ..................................................................................................................7

Federal Rule of Civil Procedure 56 ..........................................................................................7

Defendant Capsugel US, LLC ("Capsugel" or "Defendant") moves the Court to grant summary judgment on all of the claims asserted by Plaintiffs CPM Consulting, LLC ("CPM") and Martino Rivaplata ("Rivaplata") (collectively, "Plaintiffs").

## I. STATEMENT OF THE ISSUES TO BE DECIDED BY THE COURT

Rivaplata, by and through his company, CPM, performed work for Capsugel in Morristown, New Jersey for approximately three months in the Spring of 2017 pursuant to two separate services agreements. The first agreement was entered into by Capsugel and staffing firm Robert Half Technology & The Creative Group ("Robert Half") ("Capsugel's Agreement"). The second agreement was entered into by CPM and Robert Half ("CPM's Agreement"). The CPM Agreement included a work schedule and a personnel agreement for Rivaplata individually.

In this lawsuit, Rivaplata alleges that Capsugel tortiously interfered with CPM's Agreement when Capsugel decided not to extend its own agreement with Robert Half. Rivaplata also contends that Capsugel discriminated against him, on the basis of his nationality (U.S. citizen), in violation of the New Jersey Law Against Discrimination ("NJ LAD") when Capsugel did not extend the term of its own agreement with Robert Half and transitioned the project that Rivaplata was working on to its pre-existing team of contractors located in New Jersey and India.

Summary judgment on Plaintiffs' tortious interference with contract claim is proper because Capsugel acted within the terms of its own agreement with Robert Half, and it did not know the final details of CPM's Agreement with Robert Half; therefore, it could not willfully and intentionally interfere with CPM's Agreement. Capsugel's Agreement established that Rivaplata would provide services to Capsugel for three months and expressly stated that the agreement could be terminated at any time upon ten days' written notice. At the end of the

designated three-month period, Capsugel advised Robert Half that the tasks Rivaplata was working on were completed and that it no longer needed Rivaplata's services. CPM's Agreement was never provided to Capsugel; therefore, Capsugel was unaware that choosing not to extend its agreement with Robert Half would negatively impact CPM's Agreement. Given these facts, Plaintiffs cannot establish that Capsugel willfully or intentionally interfered with CPM's Agreement. Summary judgment is proper.

Summary judgment on Rivaplata's national origin discrimination claim is also warranted because independent contractor plaintiffs like Rivaplata can have no cause of action for bringing discrimination claims under the NJ LAD. Even if he could pursue a discrimination claim under the NJ LAD, Rivaplata would not be able to establish a *prima facie* case of discrimination because he cannot show that Capsugel took an adverse employment action against him, and he cannot identify any similarly situated employees who were treated more favorably. Rivaplata also would not be able to prove that Capsugel's stated reason for choosing not to extend its agreement with Robert Half is false.

For the reasons set forth above and detailed below, Capsugel requests that the Court enter summary judgment in its favor on Plaintiffs' claims and dismiss their lawsuit with prejudice.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

The deposition excerpts and exhibits relied upon by Capsugel and referenced herein are contemporaneously submitted to the Court as part of Capsugel's Appendix in Support of its Motion for Summary Judgment.[1]

### A.   Capsugel's Business.

Capsugel designs, develops, and manufactures a wide range of innovative dosage forms

---

[1] Citations in the form "App." followed by a number refer to the consecutively paginated pages of the accompanying appendix.

for the biopharmaceutical and consumer health and nutrition industries. Capsugel's IT Department has utilized third party staffing agencies for two different purposes. (App. 009, Deposition of Muralidhar Nuggehalli ("Nuggehalli Dep.") 17:12-25). First, Capsugel has engaged contractors for new projects such as a merger where the company may bring new pieces of work such as onboarding a new site to a new system. (*Id.*) Second, Capsugel has long-standing master services agreements with two vendors, HTC and PwC, under which it staffs its existing maintenance and support team. (App. 009-010, Nuggehalli Dep. 16:5-19:11). Capsugel typically operates with a lean employee base and is supported by an offshore IT team. (App. 031, Nuggehalli Dep. 103:15-105:13).

### B.  Capsugel Agrees To Utilize Rivaplata's Services.

In 2017, Capsugel was being acquired by Lonza, an organization focused on integrated solutions for pharma and consumer healthcare customers along the healthcare continuum. (App. 011, Nuggehalli Dep. 22:1-11). As a result, Capsugel's Senior Director of Global Applications, Danny Dupont ("Dupont"), and the Director of Finance and Reporting Applications, Muralidhar Nuggehalli ("Nuggehalli"), determined that their IT team needed additional external IT help to consolidate reporting deliverables for the acquisition before the June/July 2017 deadline.[2] (App. 011, Nuggehalli Dep. 22:1-11; 23:16-21). Specifically, Dupont, Nuggehalli, and the Morristown, New Jersey IT team needed assistance with Capsugel's SAP HANA and SAP BPC systems, which are used for reporting and accounting, respectively. (App. 011, Nuggehalli Dep. 22:21-24:1).

Thereafter, Dupont and Nuggehalli contacted HTC, PwC, and select vendors on Capsugel's approved vendor list, including Robert Half, to potentially engage contractors with the skillset that was needed to handle the necessary deliverables. (App. 009-010, Nuggehalli

---

[2] The IT team consisted of local employees and offshore contractors. (App. 011, Nuggehalli Dep. 23:16-25:9).

Dep. 17:2-19:20). Robert Half's National Account Executive, Jarell Chavers ("Chavers"), was Nuggehalli's contact during the interview process. (App. 014, Nuggehalli Dep. 35:20-36:5). Nuggehalli never interacted with the Senior Recruiter for Robert Half, Barry Cormier ("Cormier").[3] (App. 014, 018, 023-024, Nuggehalli Dep. 36:4-5; 51:19-52:5; 73:24-74:2). Chavers presented Nuggehalli with Rivaplata's resume and, after conducting a technical interview, Nuggehalli indicated that he thought Rivaplata was the most qualified candidate for the position. (App. 013-016, Nuggehalli Dep. 33:23-38:20; 43:11-25; App. 039, 042, Deposition of Martino Rivaplata ("Rivaplata Dep.") 18:16-20:7; 32:8-33:11).[4]

Once Capsugel selected Rivaplata as the contractor, Dupont and Brett Healy, Capsugel's Director of Global Indirect Procurement, corresponded with Chavers regarding the statement of work details for Rivaplata, including the rate of pay, travel expenses, standard and overtime billing, termination, payment terms, and expenses.[5] (App. 060-063, Nuggehalli Deposition Exhibit 5, ("SOW Emails")). The final terms of Capsugel's Agreement included that Rivaplata was the assigned individual, Capsugel would be billed a standard billing rate of $223 per hour, the estimated assignment duration was *3 months*, and the total estimated cost of Rivaplata's services over the three-month period was $107,040.00. (App. 065, Nuggehalli Deposition Exhibit 6 at ¶ 2 ("Capsugel's Agreement")).

Capsugel's Agreement also included the general conditions of the engagement and stated that "[e]ither party may terminate this SOW at any time upon ten (10) days' prior written notice

---

[3] Cormier was Rivaplata's point of contact throughout his assignment to Capsugel. (App. 042, Rivaplata Dep. 31:2-13).

[4] Based upon either Rivaplata or Chavers's representations, Nuggehalli and Dupont also believed that Rivaplata was local to the New Jersey, New York, and Connecticut tri-state area, which was a factor in the decision making process because Capsugel did not want to pay a contractor's moving expenses for the short engagement. (App. 015-016, Nuggehalli Dep. 40:15-43:1).

[5] The statement of work ("SOW") identifies a specific piece of work for which a contractor is hired, and once the SOW is signed, then the purchase order is issued. (App. 010, Nuggehalli Dep. 18:1-17).

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**            **PAGE 4**

to the other party." (App. 065, Capsugel's Agreement at ¶ 4). Nuggehalli testified that, prior to engaging in this litigation, he had never seen CPM's Agreement and it would be atypical for Capsugel to provide a contractor like CPM/Rivaplata with Capsugel's agreement with its third-party staffing firm. (App. 017-019, Nuggehalli Dep. 48:1-51:1; 53:18-54:10). Once Capsugel and Robert Half agreed to the terms in Capsugel's Agreement, Nuggehalli and Dupont were prepared for Rivaplata to begin working on the designated deliverables.

### C.     Plaintiffs' Agreement With Robert Half To Provide Capsugel With Rivaplata's Services.

While Nuggehalli was working with Chavers at Robert Half to identify a contractor candidate, Rivaplata was working with Cormier at Robert Half to secure the Capsugel assignment. (App. 038-039, 042, Rivaplata Dep. 17:22-21:8; 31:18-32:7). Rivaplata testified that Cormier had contacted him, informed him that Capsugel and Lonza were merging, and stated that they needed someone with HANA and BPC skills. (App. 039, Rivaplata Dep. 20:13-21:8). Shortly after sending Cormier his resume, Rivaplata engaged in a technical phone interview with Nuggehalli to discuss Capsugel's needs. (App. 039, 042, Rivaplata Dep. 18:16-20:7; 32:8-33:11). Thereafter, Robert Half prepared and sent Rivaplata CPM's Agreement, which was signed by two individuals, Regional Manager Amy Phetkanya ("Phetkanya") on behalf of Robert Half and Rivaplata on behalf of CPM. (App. 040, 040-041, Rivaplata Dep. 24:15-25:10; 25:19-26:24; App. 070-080, Rivaplata's Deposition Exhibit 4 ("CPM's Agreement")).

Under section 3(b) of CPM's Agreement, the work schedule could be terminated at any time by Robert Half with or without cause for no reason or for any reason. (App. 042, Rivaplata Dep. 30:3-11; App. 071, CPM's Agreement at p. 2). CPM's Agreement also included an Exhibit A, which is entitled "Work Schedule", and an Exhibit B, which is entitled "Personnel

Agreement". (App. 040, Rivaplata Dep. 24:15-25:10; App. 077-080, CPM's Agreement at p. 8-11). The work schedule included in CPM's Agreement was also signed by Phetkanya on behalf of Robert Half and Rivaplata on behalf of CPM. (App. 040-041, Rivaplata Dep. 25:19-29:11; App. 077, CPM's Agreement at p. 8). Exhibit A to CPM's Agreement reflects that Rivaplata would be handling the SAP HANA data modular, his hourly rate would be $165, the project was expected to last "6 months +", and his start date would be April 3, 2017. (*Id.*) Finally, Exhibit B of CPM's Agreement included the personnel agreement between Robert Half and Rivaplata individually and addressed the restrictions of his services during his assignment with Capsugel. (App. 041-042, Rivaplata Dep. 29:12-30:2; App. 078-080, CPM's Agreement at p. 9-11).

Similar to Nuggehalli's experience, Rivaplata testified that he had never spoken with Chavers before, he had never seen Capsugel's Agreement prior to his deposition, and he had never provided CPM's Agreement to anyone at Capsugel. (App. 044-045, 047 Rivaplata Dep. 40:14-21; 41:2-9; 42:6-45:20; 50:12-52:2). Notably, Rivaplata speculates that Robert Half provided Capsugel with CPM's Agreement based on an alleged conversation between himself and Cormier, in which Cormier stated Capsugel knew his work was going to be six months plus; however, he has no evidence establishing that Cormier actually provided CPM's Agreement to Capsugel. (App. 044-045, Rivaplata Dep. 40:2-43:4).

D.      **Rivaplata's Assignment With Capsugel.**

Rivaplata began his assignment with Capsugel on Monday, April 3, 2017 in Morristown, New Jersey. (App. 038-039, Rivaplata Dep. 17:14-18). During his assignment, Rivaplata reported directly to Nuggehalli. (*Id.*) Rivaplata also regularly worked with three contractors on the IT team who had been assigned to Capsugel prior to Rivaplata's assignment, including Venugopal Nair ("Nair") and Karunankar Muppaneni ("Muppaneni") who worked on the HANA site, and Yokesh Sivakumar ("Sivakumar") who worked on the BPC system. (App. 011, 013,

Nuggehalli Dep. 24:2-25:9; 32:2-10). Nair and Muppaneni were offsite contractors located in the PwC Bengal office in India. (App. 011, Nuggehalli Dep. 25:2-8). This team had regular daily meetings via Skype and in person to determine the status of the deliverables in context with the entire project. (App. 016-017, Nuggehalli Dep. 45:4-46:1; 46:17-47:10).

At the end of Rivaplata's assignment, he had completed the various software deliverables on time and had performed to Nuggehalli's expectations. (App. 017, Nuggehalli Dep. 46:2-16). Therefore, on or about June 14, 2017, Nuggehalli and Dupont informed Rivaplata and Robert Half that Capsugel did not need to extend its agreement with Robert Half. (App. 020, 022, Nuggehalli Dep. 58:11-59:23; 66:6-67:19; App. 082-086, Nuggehalli Deposition Exhibits 12 and 13 – Emails Between Chavers and Nuggehalli Regarding an End Date for Rivaplata's Assignment). In order to ensure the pre-existing and acquiring IT team could maintain the deliverables Rivaplata had prepared, Nuggehalli asked Rivaplata to participate in a "Knowledge Transfer Meeting" to transfer his work back to the existing internal team on June 27, 2017. (App. 019-020, Nuggehalli Dep. 57:8-20; 58:5-15). Rivaplata's assignment with Capsugel ended on June 30, 2017. (App. 047, Rivaplata Dep. 50:6-11).

### III.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 mandates that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*, 271 F.3d 624, 626 (5th Cir. 2001). To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of

either party.  *See Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quoting *Anderson*, 477 U.S. at 248).

## IV.   ARGUMENT & AUTHORITIES

A.   **Capsugel Did Not Tortiously Interfere With CPM's Agreement.**

Capsugel did not tortiously interfere with CPM's Agreement when Capsugel chose not to extend its agreement with Robert Half, which resulted in the termination of Rivaplata's assignment.

### 1. Legal Framework For Analyzing Plaintiffs' Tortious Interference With Contract Claim.

Texas law requires four elements to establish a tortious interference with contract claim, including: (1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damages or loss.  *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).  Notably, "[i]t is not enough to allege that a defendant had 'knowledge' of a contract or 'intentionally' interfered because this is nothing more than a recital of some of the required elements for a claim of tortious interference with contract."  *Hoffman v. L&M Arts*, 774 F. Supp. 2d 826, 846 (N.D. Tex. 2011).  In order to sufficiently prove there was a willful and intentional act of interference, a plaintiff is required to show that "the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it."  *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 490 (5th Cir. 2008) (quoting *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992)).

Additionally, in order to satisfy the proximate cause element, a plaintiff must establish that "the defendant took an active part in persuading a party to a contract to breach it."  *Amigo Broad., LP*, 521 F.3d at 493 (citing *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139 (Tex. App.—

Eastland 1992, writ denied) (emphasis omitted)). "Merely entering into a contract with a party with the knowledge of that party's contractual obligations to someone else is not the same as inducing a breach." *Id.* Plaintiffs' tortious interference with contract claim fails because they cannot establish the second or third elements of their claim.

> **2. Plaintiffs' Tortious Interference With Contract Claim Cannot Escape Summary Judgment.**

Summary judgment on Plaintiffs' tortious interference with contract claim is appropriate because they have no evidence supporting the second or third elements of their claim. Specifically, Plaintiffs cannot show that Capsugel had the requisite knowledge of the terms of CPM's Agreement such that it could willfully or intentionally interfere with that contract. Accordingly, Plaintiffs have no evidence establishing that Capsugel knew the consequences of choosing not to extend its agreement with Robert Half. Additionally, Plaintiffs have no evidence to establish that Capsugel actively persuaded Robert Half to breach CPM's Agreement.

First, Plaintiffs' tortious interference with contract claim fails because they cannot show that Capsugel had the requisite knowledge to willfully and intentionally interfere with CPM's Agreement. Upon deciding to acquire Rivaplata's contractor services, Capsugel negotiated the terms of its agreement with Chavers and Rivaplata separately worked with Cormier to prepare CPM's Agreement. (App. 040, Rivaplata Dep. 24:15-25:10; App. 060-063, Nuggehalli Deposition Exhibit 5 ("SOW Emails")). Both Rivaplata and Nuggehalli indicated that they had never interacted with the other party's Robert Half point of contact, and they had never seen the other party's agreement with Robert Half. (App. 044-045, 047, Rivaplata Dep. 40:14-21; 41:2-9; 42:14-45:20; 50:12-52:2; App. 014, 017-019, 023-024, Nuggehalli Dep. 36:4-5; 48:1-52:5; 53:18-54:10; 73:24-74:2).

Furthermore, whether the parties discussed the duration of the assignment during an

initial telephone interview does not matter because each party then created and/or negotiated the terms of its own agreement with Robert Half. (App. 060-063, SOW Emails; App. 040, Rivaplata Dep. 24:15-25:10). Plaintiffs' claim is based wholly upon Rivaplata's *belief* that Cormier provided CPM's Agreement to Capsugel. (App. 044-045, Rivaplata Dep. 40:2-43:4). Aside from Rivaplata's speculative and unsubstantiated belief, Plaintiffs have no evidence to establish that Capsugel was privy to the *final* terms of CPM's Agreement. Therefore, Capsugel lacked the necessary knowledge about the final terms of CPM's Agreement, and it is impossible for Plaintiffs to establish that Capsugel willfully and intentionally interfered with CPM's Agreement. The Court should grant Capsugel summary judgment on Plaintiffs' tortious interference with contract claim for this reason alone.

The Court should also grant summary judgment on this claim because Plaintiffs have no evidence that Capsugel took an active role in persuading Robert Half to breach CPM's Agreement. As discussed above, Capsugel had to be privy to the final terms of the contract in order to "desire to cause the consequences of [its] act, or […] believe that the consequences [were] substantially certain to result from it." *Amigo Broad.*, 521 F.3d at 490 (quoting *Sw. Bell*, 843 S.W.2d at 472). As noted above, Plaintiffs only evidence of Capsugel's alleged knowledge regarding CPM's Agreement is Rivaplata's mistaken belief that Cormier had shared CPM's Agreement with Capsugel. (App. 044-405, Rivaplata Dep. 40:2-43:4). Capsugel knew that *its* contract was for a three month period, but it had no knowledge that CPM's Agreement was for "6 months +." (App. 010, 014, 018-019, Nuggehalli Dep. 20:4-21:5; 37:6-8; 50:2-22; 53:18-54:10; App. 065-068, Capsugel's Agreement; App. 070-080, CPM's Agreement). Therefore, Capsugel's decision not to extend its agreement with Robert Half does not amount to actively persuading Robert Half to breach CPM's Agreement. Additionally, Capsugel could not desire to

cause consequences from any alleged act because it did not know the final terms of CPM's Agreement. Summary judgment is appropriate.

### B. Rivaplata Cannot Pursue A Discrimination Claim Under The NJ LAD.

Independent contractors, such as Rivaplata, cannot maintain a cause of action for discrimination under the NJ LAD. But even if contractors could pursue discrimination claims under that statute, Rivaplata's claim would still be subject to summary judgment because Capsugel did not discriminate against Rivaplata on the basis of his national origin or any other protected characteristic.[6]

#### 1. Capsugel Is Not Liable To Rivaplata Under The NJ LAD Because It Was Not His Employer.

The NJ LAD's explicit language provides that its statutory proscriptions apply only to the acts of an *employer*. N.J.S.A. § 10:5-12(a) (stating that "[i]t shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination, for an employer" to engage in statutorily proscribed conduct). Put another way, a NJ LAD action lies against — and only against — the employer. Likewise, independent contractor plaintiffs can have no cause of action for bringing discrimination claims under the NJ LAD. N.J.S.A. § 10:5-12; *Chrisanthis v. Cnty. of Atlantic*, 361 N.J. Super. 448, 454-55 (App. Div. 2003) (*citing Pukowsky v. Caruso*, 312 N.J. Super. 171, 180 (App. Div. 1998)); *see also Carney v. Dexter Shoe Co.*, 701 F. Supp. 1093, 1098 (D.N.J. 1988) ("Because the proscriptions [of the NJ LAD] apply to an 'employer,' – as they do under the terms of ADEA – it is inescapable that the 'individual' on the receiving end of the employer's conduct must be an employee or prospective employee in order for the statutes to apply"). Since there was no employment relationship between Rivaplata and Capsugel,

---

[6] Rivaplata is the only plaintiff in this case who asserts a NJ LAD claim. *See* Plaintiffs' Second Amended Complaint (ECF No. 19 ¶¶ 15-16) and Plaintiffs' Response to Defendant's Motion to Dismiss Claims in Plaintiffs' Second Amended Complaint, or in the Alternative to Transfer Venue, and Brief in Support (ECF No. 21, fn. 2).

Rivaplata's national origin discrimination claim under the NJ LAD must be dismissed.

### 2. Legal Framework For Analyzing Rivaplata's Discrimination Claim.[7]

Claims under the NJ LAD are analyzed under the *McDonnell Douglas* burden-shifting framework, in which Rivaplata must first demonstrate a *prima facie* case of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Dixon v. Rutgers, The State Univ. of New Jersey*, 110 N.J. 432, 442 (1988); *El-Sioufi v. St. Peter's Univ. Hospital*, 382 N.J. Super. 145, 166 (App. Div. 2005). In order to establish a *prima facie* case of discrimination, Rivaplata must demonstrate that: (1) he belongs to a protected class; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) others not within his protected class did not suffer similar adverse employment actions. *J.S. v. Borough of Englewood Cliffs*, 2015 N.J. Super. Unpub. LEXIS 1151, at *22-23 (N.J. App. Div. May 18, 2015).

If Rivaplata is able to establish a *prima facie* case of discrimination, he must further demonstrate that Capsugel's proffered reason for taking an adverse employment action was not the real reason for the adverse employment action. In short, Rivaplata must demonstrate that discriminatory animus was the true reason for the adverse employment action. *See McDonnell Douglas*, 411 U.S. at 792; *Dixon*, 110 N.J. at 442; *El-Sioufi*, 382 N.J. Super. at 166. "To prove pretext . . . , a plaintiff must do more than simply show that the [defendant's] proffered legitimate, non-discriminatory reason was false; he or she must also demonstrate that the [defendant] was motivated by discriminatory intent." *Fulton v. Sunhillo Corp.*, No. A-2021-11T4, 2013 N.J. Super. Unpub. LEXIS 2770, at *20-22 (App. Div. Nov. 18, 2013). Therefore, it is Rivaplata's burden to identify competent evidence that Capsugel's legitimate, non-

---

[7] In the event the Court determines that Rivaplata can proceed on his NJ LAD claim, Capsugel will discuss why summary judgment on that claim is still warranted.

discriminatory reasons for choosing not to extend his assignment were pretextual.  Stated another way, Rivaplata's discrimination claim must be dismissed unless there is competent evidence from which a reasonable factfinder could determine that discriminatory animus "played a role in the decision making process and that it had a determinative influence on the outcome of that process."

> To establish pretext, [plaintiff] needed to establish 'that (1) a discriminatory reason more likely motivated the employer than the employer's proffered legitimate reason, or (2) the defendant's proffered explanation is 'unworthy of credence.' …
>
> The non-moving party must demonstrate such 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reason.

*Beatty v. Farmer*, 366 N.J. Super. 69, 77-78 (App. Div. 2004).

Notably, it is not enough to show that the employer made a 'wrong or mistaken' decision. *Fulton*, 2013 N.J. Super. Unpub. LEXIS 2770, at * 21.  Rather, the plaintiff must uncover 'weaknesses, implausibilities, inconsistences, incoherencies, or contradictions' in the employer's explanation that would allow a reasonable factfinder to believe that the employer did not truly act for the asserted reason." *Greenberg v. Camden Cty. Vocational and Technical Schools*, 310 N.J. Super 189, 200 (App. Div. 1998); *see also DeMoss v. The ARC of Somerset County*, NO. A-2927-13T4, 2015 N.J. Super. Unpub. LEXIS 278, at *17 (App. Div. Feb. 17, 2015) (affirming summary judgment dismissing age and race discrimination claims "based only on speculation" because "defendants articulated a legitimate, non-discriminatory reason for plaintiff's termination [and] plaintiff failed to sustain her burden of pretext by producing evidence that discrimination was more likely than not a motive or determining cause for her discharge").

### 3. Rivaplata Cannot Establish a *Prima Facie* Case Of Discrimination Or Show Pretext.

Here, Rivaplata cannot establish a *prima facie* case of discrimination because Capsugel did not take an adverse employment action against Rivaplata and because he cannot identify any similarly situated individuals who were treated more favorably. First, Capsugel acted within the terms of its agreement with Robert Half when deciding not to extend its contract for Rivaplata's services, and it did not take an adverse employment action against him because it believed the parties' respective agreements with Robert Half mutually ended after three months. (App. 065-068, Capsugel's Agreement). Rivaplata's allegation that Capsugel *intentionally* terminated its agreement with Robert Half so that it could transition the work to the IT team, who allegedly had cheaper rates than Rivaplata, is based on nothing more than rank speculation.[8] (App. 044-045, 047, Rivaplata Dep. 40:2-45:20; 50:12-52:2). Capsugel did not terminate its agreement with Robert Half. To the contrary, it completed it, and it had no way of knowing that Robert Half would not honor its own agreement with CPM by placing Rivaplata with another client for the duration of CPM's Agreement with Robert Half.

Next, Rivaplata cannot identify any person similarly situated who was treated more favorably under the same contractor relationship/situation. Rivaplata claims that the pre-existing IT team, comprised of three contractors of Indian descent, were treated more favorably than he was because they maintained their assignments with Capsugel after Rivaplata had completed his deliverables. (Plaintiffs' Second Amended Complaint, ECF No. 19 at ¶ 20). However, these individuals are not similarly situated because they were a part of a pre-existing support team who were contracted through Capsugel's two main vendors well before Rivaplata's assignment began. (App. 011, 013, Nuggehalli Dep. 23:22-25:9; 32:2-10). Stated differently, none of the

---

[8] This, of course, would not even be a discriminatory reason.

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**     **PAGE 14**

identified individuals were brought on for a limited project and period of time like Rivaplata; therefore, they are not proper comparators for purposes of assessing Rivaplata's discrimination claim. Further, to the extent Rivaplata alleges that these individuals, and others of Indian descent, were treated more favorably under their contractor relationship, there is no evidence, other than Rivaplata's subjective observations, to support that contention.

In regards to Rivaplata's pretext argument, his claim fails because he cannot establish that Capsugel's stated reason for choosing not to extend its contract with Robert Half was false. Specifically, Capsugel had engaged Robert Half in order to find a contractor who could provide a specific skillset and the services by the June/July 2017 deadlines. (App. 010-011, 013-015, Nuggehalli Dep. 19:2-20; 22:21-23:10, 33:23-34:5; 35:20-38:17). Rivaplata was then selected to provide those services, which aided in the transition during Capsugel's acquisition. (App. 016, Nuggehalli Dep. 44:2-17). Capsugel's contract with Robert Half stated it would last approximately three months. (App. 065-068, Capsugel's Agreement). Therefore, when the three-month period came to a close, Nuggehalli and Dupont determined that Rivaplata's deliverables were completed and the pre-existing IT team could handle the maintenance of those deliverables. (App. 020, Nuggehalli Dep. 58:5-60:11). Rivaplata has no evidence to establish that Capsugel's contract was for six months or that the reason for not extending its contract was pretext for discrimination; therefore, summary judgment is appropriate.

## V.     CONCLUSION

For the foregoing reasons, Capsugel respectfully requests this Court grant summary judgment in favor of Capsugel on all of Plaintiffs' claims and for such further relief as the Court deems just and proper.

DATED: June 28, 2019                            Respectfully submitted,

/s/ Talley R. Parker_____
Talley R. Parker
State Bar No. 24065872
talley.parker@jacksonlewis.com
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201
PH:  (214) 520-2400
FX:  (214) 520-2008

**ATTORNEYS FOR DEFENDANT
CAPSUGEL US, LLC**

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing brief was served electronically on counsel of record for Plaintiffs CPM Consulting, LLC and Martino Rivaplata under Federal Rule of Civil Procedure 5 on June 28, 2019.

Steven E. Clark
sclark@dfwlaborlaw.com
Amanda Todd-Thomas
atoddthomas@gmail.com
Clark Firm PLLC
5445 La Sierra Drive, Suite 415
Dallas, Texas 75231

/s/ Talley R. Parker_____
Talley R. Parker