IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CPM CONSULTING, LLC and<br>MARTINO RIVAPLATA,<br><br>    Plaintiffs,<br><br>v.<br><br>CAPSUGEL US, LLC,<br><br>    Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br><br><br><br>CIVIL ACTION NO.<br>3:17-cv-03059-S |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF**

# TABLE OF CONTENTS

Page

Table of Contents ................................................................................................ ii

Index of Authorities ............................................................................................ iii

I. Summary ..........................................................................................................1

II. Plaintiffs' Summary Judgment Evidence ......................................................2

III. Argument and Authorities.............................................................................3

    A.  Tortious Interference Claim ...................................................................3

    B.  Discrimination Complaint Under New Jersey Law Against Discrimination ...............5

        1.  Employee v. Independent Contractor Status............................................5

        2.  Proof of Elements of Discrimination Claim ............................................9

Conclusion .........................................................................................................14

Certificate of Service .........................................................................................15

# INDEX OF AUTHORITIES

**Cases**

*D'Annunzio v. Prudential Ins. Co. of America,*
192 NJ 110 A.2d 113 (2007).................................................................................... 5, 6, 7

*Desert Palace Inc. v. Costa*,
539 U.S. 90, 123 S.Ct. 2148 (2003)............................................................................. 10

*Marino v. Indus. Crating Co.*,
358 F.3d 241 (3d Cir. 2004)........................................................................................... 2

*McDonnell-Douglas Corp. v. Green,*
411 U.S. 792 (1973)........................................................................................................ 9

*Myers v. AT&T*,
882 A.2d 961, (NJ Super.Ct. 2005) ............................................................................. 10

*Price Waterhouse v. Hopkins,*
490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)............................................... 10

*Schwinge v. Deptford Tp. Bd. Of Educ.*,
2011 WL 689615 (D.N.J. Feb. 17, 2011) ...................................................................... 9

*Zive v. Stanley Roberts, Inc.,*
867 A.2d 1133 (NJ 2005).................................................................................... 2, 9, 13

**Statutes**

Immigration Reform and Control Act ("IRCA"), 8 U.S.C. § 1324b ....................... 9, 12

New Jersey Anti-Discrimination Statute (NJ LAD") .......................... 1, 2, 5, 6, 7, 9, 13

NJ Conscientious Employee Protection Act (CEPA), NJSA 34:19-1 et seq................. 6

**TO THE HONORABLE U.S. DISTRICT JUDGE:**

**COME NOW,** Plaintiffs CPM Consulting, LLC ("CPM") and Martino Rivaplata ("Rivaplata") (collectively "Plaintiffs") and submit their Response to Defendant Capsugel US LLC's ("Capsugel") Motion for Summary Judgment[1], with Supporting Brief as follows:

## I.
## Summary

1.   Defendant Capsugel has filed a motion for summary judgment on Plaintiffs' claims for relief under the New Jersey Anti-Discrimination Statute (NJ LAD") and for tortious interference with contract.

2.   With respect to Plaintiffs' discrimination claim, Capsugel submits that summary judgment is warranted because Rivaplata is an independent contractor and has no standing to bring a discrimination claim under the NJ LAD which only applies to employees.  Capsugel further argues that Rivaplata cannot establish Capsugel took an adverse action against him and cannot identify similarly situated employees who were treated more favorably, nor can he show that Capsugel's stated reason for not extending his time on the project is false.

3.   As to Plaintiffs' tortious interference claim, Capsugel asserts that it acted within the terms of its agreement with Robert Half, and because Capsugel didn't know the final terms of CPM's contract with Robert Half, it could not willfully or intentionally interfere with CPM's agreement with Robert Half, which provided that the term of the project was 6 months plus.

4.   Plaintiffs submit that summary judgment is inappropriate on both causes of action because Capsugel has failed to establish that Rivaplata was an independent contractor as a matter of law, and further because the summary judgment evidence raises material issues of fact on Rivaplata's status as an employee, a prima facie case of discrimination under the NJ LAD, and that Capsugel

---

[1] Document No. 47.

did take an adverse action against him by ending his project assignment early and reassigning the work to cheaper Indian nationals under Capsugel's business model to operate as lean as possible by using foreign workers.

5. With respect to Plaintiffs' tortious interference claim, there are material issues of fact based on Rivaplata's clear and direct testimony that the project length of six months plus was discussed during the interview process by the Capsugel person who made the decision to hire him and was his direct supervisor throughout the project, Muralidhar Nuggehalli, Capsugel's Director of Finance and Reporting Applications. Further, Rivaplata testified, contrary to Nuggehalli, that Capsugel received a copy of his agreement with Robert Half, creating a material fact issue on Capsugel's knowledge of the contract and interference with its term.

6. Because Capsugel has not demonstrated there are no issues of material fact remaining on Plaintiffs' claims for national origin discrimination under the NJ LAD and tortious interference with contract claim, summary judgment is inappropriate and should be denied.

## II.
## Plaintiffs' Summary Judgment Evidence

7. Plaintiffs rely on deposition excerpts and exhibits and declarations of Martino Rivaplata and Steven E. Clark which are being submitted in Plaintiff's Appendix filed contemporaneously with this Response.

8. In interpreting the parties' submitted summary judgment evidence, this Court should construe the evidence in the light most favorable to the non-moving parties, Plaintiffs. See, *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (the non-moving party's evidence is to be believed and all justifiable inferences are to be drawn in his favor); *Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1139-40 (NJ 2005) (plaintiff's prima facie case is to be evaluated solely on basis of evidence produced by plaintiff, irrespective of defendant's efforts to dispute that evidence).

## III.
## Argument and Authorities

**A. Tortious Interference Claim**

Like its arguments set forth in prior motions to dismiss filed with the Court[2], Capsugel now seeks a determination from its summary judgment evidence that Plaintiffs cannot establish the requisite elements of their tortious interference claim. The central basis on which Capsugel predicates its argument is that Plaintiffs have no evidence to establish that Capsugel persuaded Robert Half to breach CPM's agreement.

Rivaplata was initially contacted by Barry Cormier, a recruiter for Robert Half, who indicated to Rivaplata that the project with Capsugel was expected to last six months or more.[3] At that time, Rivaplata was considering other projects of similar length, but the Capsugel project interested him more because it involved financial reporting that would utilize both his HANA and BPC skills.[4]

While Capsugel continues to deny that it was privy to Plaintiffs' contract agreement with Robert Half, Capsugel ignores Rivaplata's direct deposition testimony[5] that the contract length of six months plus set forth in Plaintiff's contract with Robert Half was discussed in his interview with Muralidhar Nuggehalli ("Nuggehalli"), Capsugel's Director of Finance and Reporting Applications. This testimony starkly contrasts with Nuggehalli's deposition testimony that he never discussed the contract length with Rivaplata[6], although it was discussed with Robert Half's representative Jared Chavers.[7] Further supporting Rivaplata's testimony that Capsugel was aware

---

[2] Document Nos. 4, 11, 20 and 30.
[3] App. 15, Rivaplata Depo. 30:12-22.
[4] App. 11-12 Rivaplata Depo. 17:22-25, 18:3-11.
[5] App. 15-16, Rivaplata Depo. 34:13-19.
[6] App. 45, Nuggehalli Depo. 43:11-24.
[7] App. 43, Id. at 36:16 – 37:8.

that the contract length was six months plus is his testimony that after his interview, several Capsugel employees (which he would later work with on the project) recommended that he look for an apartment to rent for a year in Morristown, where he would be working for Capsugel.[8]

Although Capsugel's brief suggests that the parties' discussions about contract length were with separate Robert Half representatives, Rivaplata with Cormier, and Nuggehalli with Chavers (Brief at 4 & 5), Rivaplata clearly testified in his deposition that his contract with Robert Half was provided to Nuggehalli.[9]

Capsugel's brief points out (at p. 5) that under section 3(b) of CPM's agreement, Rivaplata's work schedule could be terminated by *Robert Half*, with or without cause. However, there is no summary judgment evidence that Rivaplata's work assignment was terminated by Robert Half. Instead, both Rivaplata and Nuggehalli testified that it was Capsugel who made the decision to terminate Rivaplata's work assignment after only three months, not the six months plus length that was discussed in the initial interview between Rivaplata and Nuggehalli.[10] Rivaplata testified he told both Dupont and Nuggehalli that he was surprised and shocked that the contract was ending early,[11] as was Barry Cormier at Robert Half.[12]

Capsugel submits that Plaintiffs cannot establish that Capsugel had the requisite knowledge to willfully and intentionally interfere with CPM's agreement with Robert Half.

---

[8] App. 22-24, Rivaplata Depo. 60:1-6, 61:3 - 66:1.
[9] App. 17-18, Id. at 40:2-13, 41:10-25, 42:8-13, and 42:19-22. Capsugel tries to characterize this as Rivaplata's speculation (Brief at 6), but his testimony is more direct and definite than rank speculation.
[10] App. 11, Rivaplata Depo. 17:3-9; App. 21, Id at 54:1-8; App. 48, Nuggehalli Depo. 55:3-6; App. 49, Id. at 59:3-5.
[11] App. 21, Rivaplata Depo. 55:7-25.
[12] App. 21, Id. at 55:20 - 56:10. One of the business records of Robert Half obtained by Capsugel indicated that because of this lawsuit, Robert Half should not use Rivaplata in the future, as the customer [Capsugel] had terminated the contract three months early. See App. 68, Ex. 21 of Nuggehalli's deposition.

A material issue of fact exists both on the issue of Capsugel's knowledge of the contract length and CPM's contract with Robert Half, when it made the decision to terminate Rivaplata from further involvement in the project, which cannot be resolved by summary judgment.

If, as Plaintiffs' summary judgment evidence suggests, Capsugel was aware of the six months plus term in the Robert Half agreement with CPM, then Capsugel's decision to end Rivaplata's employment after only three months, particularly when there was evidence that other work was available for Rivaplata to perform on the BPC side and to transition to his Indian workers on the HANA side[13], raises a fact question as to its intent in prematurely ending Rivaplata's employment under CPM's agreement with Robert Half, which was for six months plus.

**B.    Discrimination Complaint Under New Jersey Law Against Discrimination**

**1.    Employee v. Independent Contractor Status**

Capsugel next submits that it is not liable to Rivaplata under New Jersey's Law Against Discrimination ("LAD") because the statute's proscriptions apply only to acts of an employer (Brief at 11). Thus, Rivaplata has no standing because an independent contractor cannot bring discrimination claims under the LAD (Id.).

While Capsugel is correct that New Jersey court decisions have held that the LAD is not available to independent contractors, that does not end the inquiry, or compel granting summary judgment on this basis.

The Supreme Court of New Jersey addressed the independent contractor v. employee issue on a summary judgment record in *D'Annunzio v. Prudential Ins. Co. of America,* 192 NJ 110, 927 A.2d 113 (2007), where it reversed a summary judgment entered in Prudential's favor.

---

[13] App. 5, Rivaplata Declaration ¶s 16 & 17; App. 63-67, Nuggehalli Depo. Ex. 11; App. 15-16, Rivaplata Depo. 33:12 - 35:7.

*D'Annunzio* involved the NJ Conscientious Employee Protection Act (CEPA), NJSA 34:19-1 et seq., protecting whistleblowers, which is remedial social legislation like the LAD.

D'Annunzio was hired under a "Medical Director Consultant Agreement" in the name of his professional association, rather than as a licensed individual. He agreed to perform his services at a designated Prudential PIP claims office. The agreement recited that the relationship between Prudential and the Medical Director was that of independent contractor. D'Annunzio expected to perform his review functions in an independent manner, but Prudential sought to exert extensive control over him, including a list of duties, workflow instructions in reviewing PIP claims, and time sheets to record his billable hours. After being told his performance was not meeting expectations, Prudential gave him written notice it was terminating his agreement based on the contract's sixty day notice provision.

D'Annunzio filed an action against Prudential alleging he was fired for complaining about Prudential's "lack of regulatory and contractual compliance" in violation of CEPA. On cross motions for summary judgment, the trial court ruled in favor of Prudential, applying the "*Pulowsky* test[14]" to determine that D'Annunzio was an independent contractor who could not advance a claim under the CEPA.

On appeal, the Appellate Division reversed, using the same *Pulowsky* test, to hold that whether a professional person is an "employee" under CEPA's definition hinges on the degree of "control and directions" exercised by the employer under the circumstances, and less on the lack of financial arrangements which are more indicative of a traditional employee. It found the

---

[14] *Pulowsky* identified 12 factors to be considered in determining whether a plaintiff qualified as an employee under the LAD. The factors are listed at 927 A.2d 113, 121 [8]. The Court in *D'Annunzio* indicated that the *Pulowsky* test is a hybrid that reflects the common law control test and an economic realities test. Id. at 123.

summary judgment record showed evidence suggesting that Prudential controlled and directed D'Annunzio, which precluded summary judgment.

The NJ Supreme Court agreed with the Appellate Division, holding that the courts should look beyond the label attached to the relationship and look at three considerations in resolving whether the professional person is an employee or independent contractor under the statute: 1) employer control; 2) the worker's economic dependence on the work relationship; and 3) the degree to which there has been a functional integration of the employer's business with that of the person doing the work at issue.

Here, analyzing Plaintiff's summary judgment evidence under these three considerations results in the same conclusion: that material issues of fact exist which preclude determining that Rivaplata is an independent contractor as a matter of law, and therefore not entitled to bring an action for discrimination under the LAD.

Plaintiff's summary judgment evidence shows:

- Capsugel supplied the workplace where he and other Capsugel employees and contractors worked[15];
- Capsugel supplied the project details to Rivaplata to perform on the assigned project[16];
- Nuggehalli's initial interview of Rivaplata involved a detailed discussion of the technical requirements to integrate Capsugel's and Lonza's financial systems[17];
- There were daily (Nuggehalli) (MR Dec) meetings of the Hana project team which included Nuggehalli, and three other persons, Yokesh and two offshore workers who participated through Skype[18];
- There were daily progress meetings between Rivaplata and the BPC team (Mike Mars & Lynn Horowitz) on the financial side of the project[19];

---

[15] App. 75, Nuggehalli Depo. Ex. 3; App. 41, Nuggehalli Depo. 27:1-6.
[16] App. 5, Rivaplata Declaration ¶s 19-21; App. 36, Nuggehalli Depo. 9:10-17.
[17] App. 4, Rivaplata Declaration ¶s 7-8, App. 15-16, Rivaplata Depo 32:8 - 35:7; App. 45, Nuggehalli Depo 43:8-18.
[18] App. 4, Rivaplata Declaration ¶ 14; App. 45-46, Nuggehalli Depo. 45:4 - 47:17.
[19] App. 4, Rivaplata Declaration ¶ 13.

- Capsugel furnished the laptop with which Rivaplata performed his work[20];
- Capsugel issued Rivaplata a security badge in order for Rivaplata to access the building[21];
- Capsugel personnel told Rivaplata where he should try to find an apartment near the workplace[22];
- Capsugel approved Rivaplata's time before payment was issued[23];
- Capsugel's business model as a spinoff from Pfizer was to operate lean. Most personnel were either contract labor supplied or offshore, through two primary vendors, with only management level employees to supervise the work[24].

As to employer control, Capsugel exercised considerable control over Rivaplata's performance of the work, with daily or weekly meetings to discuss the progress of the work. Capsugel supplied the workplace, the computer, the technical specifications for the project, and required daily time entries before payment could be approved.

With respect to the worker's economic dependence, again the evidence shows that this was a fulltime job of Rivaplata during the project, and his time spent was the basis of revenue under CPM's contract, and that in reliance on the project being at least six months plus, Rivaplata incurred significant expense in relocating to New Jersey and renting an apartment for a year.

On the functional integration of the employer's business with the work being performed by Rivaplata, his task was to integrate the financial reports of both Capsugel and Lonza, which had acquired Capsugel. Further, Capsugel's business model was to expressly rely on contract and offshore labor to perform the IT related work under Nuggehalli's[25] supervision in order to maintain

---

[20] App. 56, Nuggehalli Depo. 86:20 - 87:7; App. 72, Email regarding Rivaplata's laptop and badge, Bates Nos. Capsugel 000025 - Capsugel 000027.
[21] App. 72, Email regarding Rivaplata's laptop and badge, Bates # Capsugel 000025 - Capsugel 000027.
[22] App. 22-23, Rivaplata Depo. 61:3 - 62:12.
[23] App. 47, Nuggehalli Depo. 52:9 - 53:14; App. 53, Nuggehalli Depo. 76:14 - 77:13.
[24] App. 60, Nuggehalli Depo. 103:9 - 105:18; App. 75, Nuggehalli Depo Ex. 3 List of Capsugel's IT Workers.
[25] Rivaplata testified in his deposition that Nuggehalli was an Indian national on a H1b visa. App. 27, Rivaplata Depo. 79:20 - 80:2. Nuggehalli testified that he initially came to the US on a H1b visa but had obtained his US citizenship while at Capsugel. App. 37, Nuggehalli Depo. 12:3-25.

the company's "lean" business model of having few [managerial] employees to supervise the contract and offshore labor.

All of these factors weigh towards a determination that material issues of fact still remain whether Rivaplata was an employee entitled to bring an action under the LAD, or an independent contractor lacking standing to do so, as argued by Capsugel.

**2.      Proof of Elements of Discrimination Claim**

The LAD prohibits discrimination in any job-related action, including discharge from employment. The statute also prohibits unlawful discrimination in business contracts. NJSA 10:5-1 *et seq*. The Immigration Reform and Control Act ("IRCA"), 8 U.S.C. § 1324b, prohibits employers from discriminating against US workers.

Courts analyze disparate treatment LAD claims of discrimination under the 3-part burden shifting analysis of *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Victor v N.J.*, 203 N.J. 383, 408-09 (2010); *Zive v. Stanley Roberts Inc.*, 867 A.2d 1133, 1139 (NJ 2005). Plaintiff's initial burden is to establish a prima facie case. Once a prima facie case is shown, the burden shifts to the Defendant to articulate a legitimate non-discriminatory reason for the adverse action. (Id.) Once demonstrated, the burden then shifts back to the Plaintiff to establish that the proffered reason is pretextual or discriminatory. This is shown through evidence that the "prohibited consideration played a role in the decision-making process which had a determinative influence on the outcome of the process." *Schwinge v. Deptford Tp. Bd. Of Educ.*, 2011 WL 689615 *3 (D.N.J. Feb. 17, 2011). As the New Jersey Supreme Court stated in *Zive v. Stanley Roberts, Inc.,* 867 A.2d 1133, 1144 (2005):

> [I]f the employer proffers a non-discriminatory reason, plaintiff does not qualify for a jury trial unless he or she can "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason

was more likely than not a motivating or determinative cause of the employer's action."

Under the mixed motive theory of discrimination, which the U.S. Supreme Court adopted as an alternative in Title VII cases, *Price Waterhouse v. Hopkins,* 490 U.S. 228, 252, 109 S.Ct. 1775, 1791-92 104 L.Ed.2d 268, 289 (1989), the plaintiff can demonstrate through direct or circumstantial evidence that a discriminatory reason was a motivating factor …even though other factors also motivated the practice." 42 U.S.C.A. § 2000e-2(m).  See, *Desert Palace Inc. v. Costa*, 539 U.S. 90, 99-100, 123 S.Ct. 2148, 2154 (2003).  See also, *Myers v. AT&T*, 882 A.2d 961, 971 (NJ Super.Ct. 2005).

Plaintiff's summary judgment evidence of national origin discrimination establishes these essential facts:

- Nuggehalli was generally aware that Capsugel's is legally obligated to give preference to US Citizens over foreign nationals for available work[26];
- Rivaplata is a US citizen[27];
- Rivaplata was the single (sole) member of CPM[28];
- Rivaplata was the only American worker on the HANA team[29];
- The vast majority of workers working at Capsugel's Morristown facility were of Indian descent[30];
- Nuggehalli testified that Capsugel's "lean" business model was predicated on use of H1b and offshore Indian nationals whose labor rates were significantly less than what Rivaplata was being paid[31];
- Nuggehalli was of Indian ancestry, and initially came to the US on a H1b visa[32];

---

[26] App. 58-59, Nuggehalli Depo. 96:16 - 98:24; App. 70, Nuggehalli Depo. Exhibit 23, 8 USC 1324b Unfair Immigration Related Employment Practices; App. 71, Nuggehalli Depo. Exhibit 24: Justice Department Cautions Employers Seeking H-1B Visas Not to Discriminate Against U.S. Workers
[27] App. 26, Rivaplata Depo. 76:11-24.
[28] App. 26, Rivaplata Depo. 76:1-6.
[29] App. 4, Rivaplata Declaration ¶ 14; App. 28, Rivaplata Depo. 83:18 - 84:11; App. 75, Nuggehalli Depo. Ex. 3 List of Capsugel's IT Workers.
[30] App. 28, Rivaplata Depo. 83:18 - 85:16, App. 75, Nuggehalli Depo. Ex. 3 List of Capsugel's IT Workers.
[31] App. 60, Nuggehalli Depo. 103:7 - 105:18.
[32] App. 37, Nuggehalli Depo. 12:3 - 12:15.

- The other team members with whom Rivaplata worked on the Hana side were all Indian nationals, and either on a H1b visa or offshore workers[33];
- Rivaplata testified that he was not made welcome at "all Indian" jobsite meetings, and that the Indian workers liked to keep to themselves[34];
- Three months into the work, Rivaplata was told in a brief meeting with Nuggehalli and Danny Dupont that his services were no longer needed[35], and told later that he should transition his work back over to Capsugel's IT team, who were all Indian nationals who worked at considerably lower wage rates[36];
- Nuggehalli acknowledged there was other work which Rivaplata was qualified to perform on the BPC side, and that he instructed Rivaplata to transition the remaining Hana work back to its internal IT team, who were all Indian nationals;[37]
- Rivaplata was aware from his daily interaction with both the Hana & BPC teams that there was more work to do that he could have performed when his employment was ended[38].

Plaintiffs' summary judgment evidence establishes a prima facie case of national origin discrimination by Capsugel's business plan of preferring Indian workers who work at lower wages over employing US workers at their Morristown facility[39]. In this case, Capsugel retained Rivaplata to assist its HANA IT team (who were either Indian H1b or offshore workers)[40] to integrate the financial systems of Capsugel and Lonza, using Rivaplata's HANA and BPC expertise.

---

[33] App. 4, Rivaplata Declaration ¶ 14; App. 40, Nuggehalli Depo. 23:22 – 25:8; App. 42, Id. at 32:23 – 33:22; App. 41, 26:14-28:18; App. 75, Nuggehalli Depo. Ex. 3 List of Capsugel's IT Workers.
[34] App. 28, Rivaplata Depo. 83:18 - 87:7; App. 4-5, Rivaplata Declaration ¶s 14-15.
[35] App. 21, Rivaplata Depo. 54:1 – 55:19; App. 5, Rivaplata Declaration ¶ 16.
[36] App.48-49, Nuggehalli Depo. 57:8 – 58:13; App. 62, Nuggehalli Depo Exhibit 9: Knowledge Transfer Meeting Calendar Event, App. 55-56, Nuggehalli Depo. 83:10 – 86:5; App. 80-85, Nuggehalli Depo Exhibit 17 (CONFIDENTIAL): Yokesh Sivakumar's Pay Rate; App. 86-87, Nuggehalli Depo Exhibit 18 (CONFIDENTIAL): CPM's Pay Rate.
[37] App. 63-67, Nuggehalli Depo. Ex. 11; App. 40, Nuggehalli Depo. 22:18 – 23:15; App. 13, Rivaplata Depo. 22:9 - 23:7; App. 48, Nuggehalli Depo. 57:8 - 58:15; App. 27, Rivaplata Depo. 81:22 – 82:25.
[38] App. 5, Rivaplata Declaration ¶ 16.
[39] App. 75, Exhibit 3 to Nuggehalli's deposition (marked CONFIDENTIAL) is a list of the IT workers who were either working at the Morristown NJ Capsugel headquarters, or working offshore. App. 41, Nuggehalli Depo. 26: 14 - 27:24. The IT team which Rivaplata worked with at this facility were all Indian nationals, one on a H1b visa, and the other two offshore. App. 60, Nuggehalli Depo. 104:11 – 105:15.
[40] App. 42, Nuggehalli Depo. 32:2-10; App. 42-43: Nuggehalli Depo. 33:6 – 34:5.

While Capsugel proffers that it simply terminated Rivaplata once the integration was accomplished, he was instructed by his supervisor, Nuggehalli, to use the remaining two weeks of his employment to transition his work over to the other team members, all of whom were Indian and worked at lower wages than Rivaplata.[41]  Rivaplata testified that there was remaining work for him to do for both the HANA database side (under Nuggehalli's supervision) and the BPC financial side (under Michael Mars leadership)[42].

Nuggehalli testified that Capsugel's normal practice was to use both employees and contract labor at its IT department at Morristown.[43]  Most of the workers came from two preferred vendors, one of which supplied Indian offshore workers [44] under master service agreements (MSAs).[45]  If those workers did not have the requisite skillsets (or weren't available) then Capsugel used other vendors to find the right person.[46]

For this project, Nuggehalli used Rivaplata, a US worker, the only external consultant, and their internal IT support team [47], who were Indian nationals-none were employees.[48] Nuggehalli acknowledged that Capsugel's business model as a spinoff from Pfizer was to operate lean by using offshore workers at lower wages as its preferred source for its IT support activities.[49]

Nuggehalli, as the person hiring personnel for the IT team, was not familiar with IRCA's statutory provision relating to the preferred use of US workers over foreign labor [50], but did have

---

[41] App. 27-28, Rivaplata Depo. 81:22 - 82:14; App.55, Nuggehalli Depo. 83:10 – 84:18.
[42] App. 5, Rivaplata Declaration ¶s 16 and 17.
[43] App. 38, Nuggehalli Depo. 16:5-9.
[44] App. 38, Id. at 16:25 – 17:11; App. 40, Id. 23:22 - 24:21.
[45] App. 39, Id. at 18:1-17.
[46] App. 39, Id. at 19:2-11.
[47] App. 40, Id. at 22:12-20.
[48] App. 40, Id. at 24:22 – 25:8.
[49] App. 60, Id. at 103:15 – 104:22; Id. at 105:2-18.
[50] App. 58, Id. 96:16-25.

a general understanding not to discriminate against US workers.[51]  Nonetheless, while Capsugel characterizes its decision to end Rivaplata's employment as simply the end of his needed involvement in the project[52], the reality was that this decision was consistent with its business practice of primarily relying on the use of Indian nationals at cheaper labor rates to do its IT work,[53] rather than to continue to use a more expensive US worker, Rivaplata, even though there was still remaining tasks to perform on both the HANA and BPC sides.

The foregoing evidence is sufficient not only to establish a prima facie case for national origin discrimination under the LAD, but also to create a material issue of fact on the pretext, or mixed motive element of discriminatory treatment, making summary judgment inappropriate.

Capsugel also asserts that Rivaplata cannot identify any similarly situated persons treated more favorably under the same/similar conditions[54]  This is a mischaracterization of Rivaplata's evidentiary burden:

> As we have said, the prima facie case on a termination claim-plaintiff's proof by a fair preponderance of the evidence that plaintiff (1) belongs to a protected class, (2) was performing in the position from which she was terminated, (3) nevertheless was fired, and (4) the employer sought someone to perform the same work after she left.

*Zive v. Stanley Roberts, Inc.,* 867 A.2d 1133, 1144 (2005):

Here, Rivaplata's summary judgment has met all four required elements:  He was an American worker performing his job in an excellent manner; nevertheless, he was terminated and instructed to turn over his work to Indian workers at lower wage rates, in accordance with

---

[51] App. 58, Id. 97:5-23.
[52] App. 59, Id. 99:10-19.
[53] This is more than the "rank" speculation Capsugel asserts in its brief (p.14).  App. 60, Nuggehalli Depo. 104:11 – 105:18.
[54] Brief at (p.14).

Capsugel's "lean" business model that preferred to use cheaper Indian workers to perform its IT work.[55]

## CONCLUSION

For all of these reasons, Plaintiffs submit that material issues of fact exist on their claims for tortious interference and national origin discrimination. Therefore, Defendant's motion for summary judgment should be denied in its entirety.

---

[55] While Capsugel submits it was only exercising its contractual right with Robert Half to end Rivaplata's work assignment after three months, it overlooks Rivaplata's testimony that Nuggehalli, who hired, supervised and notified Rivaplata of his termination, was aware of CPM's contract with Robert Half that specified a six months plus length of assignment.

Respectfully submitted,

Steven E. Clark
Texas Bar No. 04294800
sclark@dfwlaborlaw.com

CLARK FIRM PLLC
5445 La Sierra Drive, Suite 415
Dallas, Texas 75231
(214) 890-4066 office
(214) 890-4013 fax
(214) 853-5458 efax

ATTORNEYS FOR PLAINTIFFS
CPM CONSULTING, LLC and
MARTINO RIVAPLATA

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 26th day of July 2019, a copy of the foregoing was served by e-mail to the referenced attorneys in charge for Defendant Capsugel US, LLC.

Talley R. Parker
talley.parker@jacksonlewis.com
Melanie Uremovich
melanie.uremovich@jacksonlewis.com
Jackson Lewis P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201

Steven E. Clark