James W. Boyan III
PASHMAN STEIN WALDER HAYDEN
Court Plaza South
21 Main Street, Suite 200
Hackensack, New Jersey 07601
(201) 488-8200
Attorneys for Plaintiffs
Martino Rivaplata and CPM Consulting LLC

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MARTINO RIVAPLATA and CPM CONSULTING LLC<br><br>                    Plaintiffs,<br><br>v.<br><br>CAPSUGEL US, LLC,<br><br>                    Defendant. | Civil Action No.: 19-cv-16579 (JMV)<br><br>**CERTIFICATION OF JAMES W. BOYAN III** |

**JAMES W. BOYAN III**, of full age, hereby certifies as follows:

1.      I am an attorney at law of the State of New Jersey and a partner at Pashman Stein Walder Hayden, attorneys for Plaintiffs Martino Rivaplata and CPM Consulting LLC in this matter. I am fully familiar with the facts set forth herein.

2.      Attached as Exhibit A is a true and correct copy of the transcript from the May 14, 2019 deposition of Martino Rivaplata.

3.      Attached as Exhibit B is a true and correct copy of the transcript from the June 13, 2019 deposition of Muralidhar Nuggehalli.

4.      Attached hereto as Exhibit C is a true and correct copy of document produced by Capsugel in discovery (Bates stamped Capsugel 000900-000911) titled Robert Half Subcontractor Services Agreement.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**PASHMAN STEIN WALDER HAYDEN**
Attorneys for Plaintiffs
Martino Rivaplata and CPM Consulting LLC

Dated: February 18, 2020

/s/ James W. Boyan III
JAMES W. BOYAN III

Court Plaza South
21 Main Street, Suite 200
Hackensack, NJ 07601
Tel: 201) 488-8200
Fax: (201 ) 488-5556
jboyan@pashmanstein.com

# EXHIBIT A

**MARTINO RIVAPLATA**                                           **5/14/2019**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


CPM CONSULTING, LLC and          )
MARTINO RIVAPLATA,               )
                                 )
            Plaintiffs,          )
                                 )
VS.                              )    CIVIL ACTION NO.
                                 )    3:17-cv-03059-S
                                 )
CAPSUGEL US, LLC,                )
                                 )
                                 )
            Defendant.           )


ORAL DEPOSITION OF
MARTINO RIVAPLATA
TUESDAY, MAY 14, 2019
9:58 A.M.- 12:14 P.M.



        ORAL DEPOSITION of MARTINO RIVAPLATA, produced as a

witness at the instance of Plaintiff, and duly sworn,

was taken in the above-styled and -numbered cause on the

14th day of May, 2019, from 9:58 a.m. until 12:48 p.m.,

before Terri Etekochay, Certified Shorthand Reporter and

Notary Public in and for the State of Texas, reported by

machine shorthand at Clark Firm PLLC, 5445 La Sierra

Dr., #415, Dallas, Texas 75231, pursuant to Rules 26 and

30, Federal Rules of Civil Procedure, and the provisions

stated on the record or attached hereto, if any.

Signature reserved.

Exhibit
**C**

**APP. 007**

**MARTINO RIVAPLATA**                                          **5/14/2019**

---

Page 2

```
 1    APPEARANCES:
 2
 3    TALLEY PARKER           ATTORNEY FOR DEFENDANT
      Texas State Bar No. 24065872   Capsugel US, LLC
 4    Jackson Lewis P.C.
      500 North Akard
 5    Suite 2500
      Dallas, Texas 75201
 6    Telephone:  (214) 520-2400
 7
 8
 9    STEVEN CLARK           ATTORNEY FOR PLAINTIFFS
      Texas State Bar No. 04294800    Martino Rivaplata & CPM
10    Clark Firm PLLC
      5445 La Sierra Drive, Suite 415
11    Dallas, Texas 75231
      Telephone:  (214) 890-4066
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            INDEX
 2
 3    WITNESS:  MARTINO RIVAPLATA
 4
      Examination by Mr. Parker....................    4
 5    Changes and Signature.........................   90
      Court Reporter's Certificate.................   92
 6
 7          EXHIBITS
 8
      Exhibit 1......................................   13
 9
10    Exhibit 2......................................   14
11
      Exhibit 3......................................   16
12
13    Exhibit 4......................................   18
14
      Exhibit 5......................................   43
15
16    Exhibit 6......................................   45
17
      Exhibit 7......................................   48
18
19    Exhibit 8......................................   50
20
      Exhibit 9......................................   52
21
22    Exhibit 10....................................   67
23
      Exhibit 11....................................   70
24
25    Exhibit 12....................................   76
```

Page 4

```
 1            P R O C E E D I N G S
 2        TUESDAY, MAY 14, 2019, 9:58 A.M.
 3           MARTINO RIVAPLATA,
 4    having been duly cautioned and administered the oath,
 5    testified as follows:
 6             EXAMINATION
 7    Q.  (By Mr. Parker) :  Please state your name.
 8    A.  Martino Rivaplata.
 9    Q.  What is your current address?
10    A.  7410 Hundley Boulevard, Dallas, Texas, 75231.
11    Q.  Does anyone else live with you at that
12    address?
13    A.  My mom and her caregiver, Araceli.
14    Q.  Anyone else?
15    A.  No.
16    Q.  Do you own that residence?
17    A.  My mom does.
18    Q.  Do you consider that address to be your
19    full-time residence?
20    A.  Yes.
21    Q.  How long have you lived there?
22    A.  Twenty years.  1980 -- no.  Yeah, 20 years.
23    Q.  Do you personally own any real estate?
24    A.  No.
25    Q.  Are you married, sir?
```

Page 5

```
 1    A.  No.
 2    Q.  Have you ever been married?
 3    A.  No.
 4    Q.  Do you have any children?
 5    A.  No.
 6    Q.  No?
 7    A.  (Shakes head.)
 8    Q.  Are you currently employed, sir?
 9    A.  I am.
10    Q.  Where are you working now?
11    A.  I'm working in Colorado.
12    Q.  Are you working as a contractor or as an
13    employee?
14    A.  Contractor.
15    Q.  And who is the company you are providing
16    services to as a contractor?
17    A.  Newmont.
18    Q.  Can you spell that please?
19    A.  Newmont, N-E-W -- new, like Newmont Energy.
20    Newmont Energy.  That's the client.
21    Q.  Where in Colorado are they located?
22    A.  They are in Greenwood Village in the Denver
23    Technical Center.
24    Q.  Do you perform services for them remotely or
25    are you physically present in Colorado?
```

2  (Pages 2 to 5)

**MARTINO RIVAPLATA**                                      5/14/2019

Page 6

1      A. On-site person.
2      Q. When did you begin performing services for
3   Newmont?
4      A. May 1st.
5      Q. Of 2019?
6      A. This year, yes. May 1st.
7      Q. Are you performing those services as a
8   contractor through your company CPM Consulting?
9      A. Yes. Yes.
10      Q. Do you have an agreement directly with Newmont
11   Energy to provide services or are you going through a
12   staffing agency?
13      A. Yeah, a staffing agency. The staffing agency
14   name Kaygen, K-A-Y-G-E-N. That's what I'm going through
15   with, yeah.
16      Q. Approximately how many hours a week will you
17   be working for Newmont Energy as a contractor?
18      A. Forty. Forty hours a week.
19      Q. What is your hourly rate?
20      A. 135.
21      Q. How long are you expecting to perform services
22   for Newmont Energy?
23      A. The contract is until December, so it's like
24   eight months plus, but, you know, you never know.
25   They're always longer.

Page 7

1      Q. December of 2019?
2      A. Yes. But it's a plus, so it's like eight
3   months plus.
4      Q. Do you have an apartment in Colorado?
5      A. Yes, I do. I'm renting an apartment there,
6   yes.
7      Q. What type of services are you providing as a
8   contractor to Newmont Energy?
9      A. I am an SAP BPC senior solution architect.
10   That is the name of the role that I'm having for that
11   company. They recently merge with another company
12   called -- the name of the company is Goldcorp. It's a
13   merger, so there's a little work there so that's why
14   they hired me for eight plus months, and SAP BPC
15   architect is my role.
16      Q. Where did you work prior to going to work for
17   Newmont Energy in May of this year?
18      A. I worked for a company called -- it's in New
19   York. It's a company that does screens in New York.
20   It's not New York City. It's in New York up -- uptown.
21      Q. Uptown or upstate?
22      A. Upstate.
23      Q. What was the name of that company?
24      A. It's the company that does screens. It's
25   called New York -- it's -- hold on a second. New York

Page 8

1   Holding. New York Screens. New York Screens, yeah.
2   It's a company that's in New York, upstate. Yeah.
3      Q. And what kind of screens are you referring to?
4      A. The screens for the computer, for the
5   monitors, for the iPhones.
6      Q. And when did you perform services for that
7   company?
8      A. Like for six months before I join Newmont. So
9   it was like until -- probably from like six months prior
10   to April.
11      Q. So from approximately October of 2018 to April
12   of 2019?
13      A. Actually, earlier than that. Probably July.
14   July. It's was kind of a long project. The name of it
15   is Corning, C-O-R-N-I-N-G, Corning. They are located in
16   Corning, New York. And, yeah, that's what -- they do
17   screens for Apple. And HP's one of the clients.
18      Q. Just so the record is clear, you started
19   performing services as a contractor for Corning in or
20   about July of 2018?
21      A. Yes. Yes. Correct, July/August.
22      Q. Then you stopped performing services for
23   Corning in or about April of 2019?
24      A. Yes. Yes. That sounds about right, yeah.
25      Q. Was there anytime between when your engagement

Page 9

1   with Corning ended and your engagement with Newmont
2   began when you weren't working at all?
3      A. Probably a few weeks until I find a new
4   project. A few weeks.
5      Q. Do you recall what your hourly rate was at
6   Corning?
7      A. 135.
8      Q. And how many hours a week did you work there?
9      A. Same. Forty hours average, yeah.
10      Q. And were you providing services to Corning
11   through your company CPM Consulting?
12      A. Yeah. That is correct.
13      Q. And were you engaged through a staffing
14   agency?
15      A. Yes. Yes.
16      Q. Do you recall which agency?
17      A. It's called Next Ventures out of London, UK.
18      Q. Where did you work prior to going to perform
19   services for Corning in or about July of 2018?
20      A. I went to work for a company called Cardone
21   Industries in Philadelphia.
22      Q. Before we move onto that, when you were
23   performing services for Corning, were you performing
24   those remotely or on site in New York?
25      A. I was mostly remotely, but when they asked me

**ELITE DEPOSITION TECHNOLOGIES**                    **214-698-5199**

**APP. 009**

**MARTINO RIVAPLATA**                                            5/14/2019

---

Page 10

1    to go there for a week or two, I went.  So I was mostly
2    remotely, but I did on-site visits.
3        Q.   And when you worked remotely, were you working
4    from the address you gave us earlier in Dallas?
5        A.   Yes, sir.  7410 Hundley Boulevard.
6        Q.   When did you perform services for Cardone
7    Industries in Pennsylvania?
8        A.   That was like three months prior to Corning.
9    So it was probably February, March, April, May, June,
10   and then they overlap.  That was on-site.  I went there
11   to Philadelphia.  I moved there.
12       Q.   You had an apartment there?
13       A.   Well, they gave me a hotel.  It was a hotel
14   mostly, yeah.
15       Q.   Do you recall what your hourly rate was there?
16       A.   135.
17       Q.   Do you recall how many hours a week you worked
18   there?
19       A.   Forty hours plus.  Average 40 hours.
20       Q.   Were you engaged through a staffing firm?
21       A.   Yes.
22       Q.   Do you recall the name of the firm?
23       A.   The name of the firm, if I recall correctly,
24   was Stream IT Technologies.  Stream IT.
25       Q.   What's your best recollection as to the time

---

Page 11

1    period that you provided services to Cardone Industries?
2        A.   Oh, man, I think it was early in the year, so
3    probably February/March, all the way through
4    July/August.
5        Q.   And that's 2018?
6        A.   Yes.  Yes.  Correct.  Even more I think.  It
7    was through September maybe; February, March, April,
8    May, June, July.  Yeah, from March/April to
9    September/October timeframe.
10       Q.   Of 2018, correct?
11       A.   Yes, sir.  Yes.
12       Q.   What were you doing as a contractor for
13   Cardone Industries?
14       A.   In Cardone Industries I went to redesign the
15   consolidation system, re- -- redevelop the SAP
16   consolidation engine, and did a lot of contact with --
17       Q.   What was the word you said there, redesign
18   something?
19       A.   Redesign the consolidation engine.
20       Q.   Consolidation engine?
21       A.   Yeah.
22       Q.   And what were you doing when you were working
23   as a contractor for Corning?
24       A.   In Corning we implement a new product called
25   SAP BPC optimize for S/4HANA, and the reason they hired

---

Page 12

1    me was because I knew both skills.  The BPC is one
2    product, and the SAP HANA is another product.  It's kind
3    of hard to have those skills.
4            So, they hired me to implement that for
5    the company, so SAP, PCN and SAP.
6        Q.   And did you work anywhere prior -- where did
7    you work prior to performing services for Cardone?
8        A.   Prior to Cardone, I don't -- I really don't
9    recall.
10       Q.   Was it for my client, Capsugel?
11       A.   Probably, yeah.
12       Q.   Do you believe you performed any services
13   between the end of your engagement with Cardone and
14   Capsugel?
15       A.   No.  I was out almost a year.  A year, yeah.
16       Q.   Did you receive any income during those
17   periods of time that you weren't providing services as a
18   contractor?
19       A.   No.  No.
20       Q.   No?
21           MR. CLARK:  You want to kind of let him
22   finish the question before answering just so the court
23   reporter can get everything down.
24       Q.   (By Mr. Parker) :  Did you apply for
25   unemployment benefits between the time period when your

---

Page 13

1    engagement with Capsugel ended and your engagement with
2    Cardone Industries began?
3        A.   No.
4        Q.   CPM Consulting is an L.L.C. of which you are
5    the sole member, correct?
6        A.   Yes.
7            (Exhibit No. 1 marked.)
8        Q.   (By Mr. Parker) :  I'm handing you what I've
9    marked as Exhibit 1, sir.  Exhibit 1 reflects that CPM
10   Consulting, L.L.C., is a Florida Limited Liability
11   Company, correct?
12       A.   Yes.
13       Q.   And the document reflects that you filed these
14   Articles of Incorporation with the Florida Secretary of
15   State on November 14th, 2006, correct?
16       A.   Yes.
17       Q.   And then the second page of the document
18   reflects correctly that you are the managing member or
19   manager of the entity, correct?
20       A.   Yes.
21       Q.   Is CPM currently still a Florida Limited
22   Liability Company?
23       A.   Yes.
24       Q.   You've never organized it under the laws in
25   the State of Texas, correct?

---

4  (Pages 10 to 13)

**MARTINO RIVAPLATA**                                    **5/14/2019**

Page 14

1    A.  No.
2    Q.  Now, you at some point changed the name of CPM
3  Consulting, correct?
4    A.  I did, yes.
5         (Exhibit No. 2 marked.)
6    Q.  (By Mr. Parker):  The document I'm handing to
7  you is Exhibit 2.  This is paperwork that you filed with
8  the Florida Secretary of State regarding the name
9  change, correct?
10   A.  Yes.
11   Q.  And this paperwork on each page has a file
12 stamp which shows that the papers were filed with the
13 Florida Secretary of State on July 29 of 2016, correct?
14   A.  Yeah.
15   Q.  Is that yes?
16   A.  Yes.
17   Q.  And it looks like the new name for CPM
18 Consulting, L.L.C., is EPM Consulting, L.L.C., correct?
19   A.  Yes.
20   Q.  Is that the current name of your entity?
21   A.  Yes.
22   Q.  Is EPM Consulting the name of the entity
23 through which you now perform services as a contractor?
24   A.  Yes.
25   Q.  What was the reason why, after ten years, in

Page 15

1  2016 you changed your entity's name from CPM Consulting
2  to EPM Consulting?
3    A.  It was just to reflect better the type of
4  software I implement.  The first is for corporate
5  performance managment.  The second one is for enterprise
6  performance management, and there's a difference
7  technically about the software, how you install and
8  implement it.  So CPM is different than EPM, so since I
9  started doing more HANA on top of BPC, it just made
10 sense for me that my company reflect clearly what I do
11 which is EPM.  That's the only reason.
12   Q.  This last document, Exhibit 2, is signed and
13 dated by you on January 26th, 2016, correct?
14   A.  Yes.  Yes.
15   Q.  And have you made any subsequent changes to
16 the name of your entity?
17   A.  No.  Stay EPM.  No.
18   Q.  What is Maggie Property Developers, L.L.C.?
19   A.  It's my mom's company.  She's trying to get
20 into real estate, buying and sell homes, and, you know,
21 like she's trying to do remodeling stuff.
22   Q.  Approximately how old is your mom?
23   A.  My mom's 80 years old.
24   Q.  Is her name Margarita?
25   A.  Yeah.

Page 16

1         (Exhibit No. 3 marked.)
2    Q.  (By Mr. Parker):  Exhibit 3 is a copy of the
3  Articles of Organization for Maggie Property Developers
4  that was filed on August 8th of 2017 with the Florida
5  Secretary of State, correct?
6    A.  Yeah.
7    Q.  And this document on the second page reflects
8  that you and your mother, Margarita, are the persons
9  authorized to manage the entity, correct?
10   A.  Yes.
11   Q.  And the address listed there for both you and
12 your mother is the address that you said that your
13 mother lives at and that you reside at too, correct?
14   A.  Yes.
15   Q.  I guess that's a typo.  It should say Dallas,
16 Texas, rather than Dallas, Florida, correct?
17   A.  It's a typo.
18   Q.  Have you received any income personally from
19 Maggie Property Developers?
20   A.  No.
21   Q.  Is that a no?
22   A.  No -- yeah, no.
23   Q.  Do you know if your mother has received any
24 income from that entity?
25   A.  No.

Page 17

1    Q.  You don't know or she hasn't?
2    A.  No, she hasn't.  Zero.
3    Q.  In 2017 you performed services for
4  approximately three months for Capsugel in New Jersey,
5  correct?
6    A.  Yes.
7    Q.  Did you say yes?
8    A.  Yeah, it was supposed to be six months plus,
9  but it was only two months and-a-half or three.
10   Q.  And during the time period when you performed
11 services for Capsugel, you performed them on site for
12 Morristown, New Jersey, right?
13   A.  Yes.
14   Q.  And throughout the time period that you
15 performed services for Capsugel in Morristown, New
16 Jersey, you were supervised by Muralidhar Nuggehalli,
17 correct?
18   A.  Yes.
19   Q.  Were you supervised by anyone else while you
20 performed services for Capsugel?
21   A.  No.  It was the mainly only one him.
22   Q.  How did you come to enter an arrangement the
23 document that I'll mark as Exhibit 4, which is a
24 subcontractor services agreement between Robert Half
25 Technology and your entity, CPM Consulting?

**ELITE DEPOSITION TECHNOLOGIES**                **214-698-5199**

**APP. 011**

Page 18

1            (Exhibit No. 4 marked.)
2       A.  Your question is how?
3       Q.  Yeah.
4       A.  Okay.  During that time, you know, I was
5   looking for new projects, and I entertained several
6   projects at that time.  It was three or four projects or
7   five maybe, and in those pool of five projects, this
8   company came to talk to me with Barry Cormier, and he
9   explained to me the details of the project.  Technically
10  I really liked the definition of the project, especially
11  because they were using HANA and BPC.  The other
12  projects were only using BPC.  The last of the
13  projects -- all my entertaining projects were six months
14  plus.  There was one that was one year right off the
15  bat.  So they was all like six months plus, one year.
16          So this guy Barry Cormier called me on
17  the phone, explained me the specifications of the
18  project, and I sent him my resume to him.  And that was
19  very quickly, this guy quickly set up an interview with
20  this gentleman Nuggehalli the next day, and that's when
21  I came about to see about this project just, you know,
22  recruiters call me every day, send me e-mails every day.
23  That's how he reached to me.  He knows my name, knows --
24  okay.  I've been doing this for 20 years.  I guess he
25  knows me already.  I'm in his database.

Page 19

1       Q.  In your answer you said this company.  I just
2   want to confirm you were referring to Robert Half?
3       A.  He and Barry Cormier called me about this
4   project.
5       Q.  So I want to make sure I understand.  Are you
6   saying that Robert Half reached out to you about working
7   for CPM or you sent him your resume initially?
8       A.  He called me.
9       Q.  Okay.  And the gentleman who you're saying
10  called you from Robert Half, his name is Barry Cormier,
11  C-O-R-M-I-E-R?
12      A.  Yes.
13      Q.  And he worked for Robert Half Technology,
14  correct?
15      A.  Yes.
16      Q.  So the sequence here is Mr. Cormier called you
17  out of the blue, correct?
18      A.  Like everybody else.  Everybody call me out of
19  the blue, yeah.
20      Q.  Right.  In response to him calling you, you
21  sent him your resume, correct?
22      A.  He sent me an e-mail and said attach me your
23  resume to my e-mail, and then I will get back to you.
24      Q.  And then after you sent him your resume, the
25  following day you had an interview with who would become

Page 20

1   your supervisor at Capsugel, Nuggehalli?
2       A.  Yes.  This is probably just about a day.  I
3   don't recall the timing after my call, but it was very
4   quickly like within one day or two I was on the
5   interview, which is kind of cool for me.
6       Q.  And the interview was done over the phone?
7       A.  The interview was done over the phone.
8       Q.  Did you ever travel to Capsugel's location in
9   Morristown prior to you being engaged --
10      A.  No.
11      Q.  -- to provide services?
12      A.  No.
13      Q.  When Mr. Cormier reached out to you, you said
14  he provided you with a project definition, correct?
15      A.  Yes, he gave me -- typically the recruiters
16  don't have specific details.  They usually give you
17  360-degrees ballpark picture of the project, yeah.
18      Q.  And during that call how did he define the
19  project to you?
20      A.  Mr. Cormier?
21      Q.  Yes.
22      A.  He said to me that there was a merger between
23  two big firms and companies, and they need people, and
24  your resume looks great.  They need help.  And he told
25  me the names of the companies.  He said this company,

Page 21

1   Lonza and Capsugel, they're merging, and they need
2   people, and your resume is great.  You do HANA and on
3   top of HANA you do BPC, and I think you're going to be
4   great.
5           In an e-mail I sent him my resume, and
6   then seems like he obviously send my resume to
7   Capsugel -- I'm assuming that -- and that's why he said
8   to me they want an interview with you.
9       Q.  Okay.  Now, you've referenced HANA and BPC a
10  couple times.  Can you, in your most simplest terms,
11  explain to someone like me, who doesn't work in this
12  industry, what HANA means and BPC means?
13      A.  Yeah.  HANA is the database.  It's like Oracle
14  or Simple Serve.  HANA is just the database as the
15  repository of raw datas, as the repository of all your
16  transactions.  Like when you bill your services for
17  professional services, that bill you bill to your client
18  goes to that database; expenses, legal fees, et cetera,
19  whatever.  That goes to HANA database.  That's HANA.
20          BPC is a front-end tool on top of HANA,
21  but what it does is aggregates all that raw data,
22  aggregates them up and putting them into another
23  database type queue which is going to aggregate that raw
24  data that's in HANA that is very easy to understand and
25  analyze by high level officers like CFO, CEO, financial

**MARTINO RIVAPLATA**                                        **5/14/2019**

Page 22

1   analysts. And what they do with that cue from HANA,
2   BPC, what BPC does is it provides planning applications,
3   consolidation applications and reporting applications.
4   That's the difference. One is the front-end. One is
5   the back-end. HANA is the back-end, and BPC is the
6   front-end.
7        Q. Is HANA a brand?
8        A. Yes. It's SAP HANA.
9        Q. So is HANA a product put out by SAP?
10       A. Yes.
11       Q. But BPC is not a product?
12       A. It's a product too, another product by SAP.
13  There are two products. SAP BPC is one product; SAP HANA
14  is another product. So two completely different
15  products that there's a lot of skills that, you know,
16  people hired only for HANA, only for BPC.
17       Q. And you were able to have the skills for both?
18       A. Both, yes.
19       Q. Now, did Lonza or Capsugel that were going to
20  be merging together, do you know if they already used
21  those two products?
22       A. Yes.
23       Q. Did both use them or only one?
24       A. Both.
25       Q. So they both had their own separate HANA and

Page 23

1   BPC and were looking to merge?
2        A. That is correct.
3        Q. And that's why you were brought on?
4        A. That is correct.
5        Q. To your knowledge were there any other
6   contractors like you who were brought on to perform the
7   same duties that you were at the same time?
8        A. No.
9        Q. Did you have an office at the Morristown
10  location?
11       A. Yes. Where I went to work, yeah, that's --
12  yes, that's the address that's in there.
13       Q. Right. But did you personally have an office?
14       A. Me? No, no, no, no, no.
15       Q. Were you in a cubicle?
16       A. Oh, a cubicle, yes. Yes. Like this office,
17  but kind of very small like a quarter of this.
18       Q. And if you can remember, who would have been
19  the individuals that you would have interacted with on a
20  day-to-day basis during your time performing services
21  for Capsugel?
22       A. Well, Nuggehalli is one. From there there was
23  another gentleman called Yokesh, and then there was --
24  gosh, there was a lot of people, but they're all from
25  India. Sorry, I don't remember those names. They have

Page 24

1   a lot of long names. Every time they would send me an
2   e-mail, the from e-mail was like 30 people there, you
3   know, that are from India. Indian names. I don't
4   remember all those names. They're all Indian guys.
5        Q. The only person --
6        A. Nuggehalli, Yokesh, and there's two more or
7   three more that I don't recall their names, but they're
8   all -- I would say Prakash maybe or Sumadi (ph). I
9   don't recall very well their other name, but there were
10  other people that I was interacting with.
11       Q. And during the time that you performed
12  services for Capsugel, you worked 40 hours a week,
13  correct?
14       A. Yes.
15       Q. You've seen Exhibit 4 before, haven't you?
16       A. Yes. Yeah. This is the contract that I
17  signed with Barry Cormier. With Robert Half, yeah.
18       Q. Did someone at Robert Half prepare Exhibit 4?
19       A. Yeah, this is Robert Half. This is all Robert
20  Half. I didn't write anything here. This is all Robert
21  Half stuff.
22       Q. Did you make any changes to the document
23  that's marked as Exhibit 4 before it was finalized?
24       A. No.
25       Q. So the document that was signed by you is as

Page 25

1   it was presented to you by Robert Half?
2        A. Yes. This is it.
3        Q. In Exhibit 4 it consists of a subcontractor
4   services agreement between Robert Half and your company,
5   CPM. It also consists of Exhibit A to that
6   subcontractor services agreement which is titled as a
7   work schedule, and then it also consists of Exhibit B to
8   the subcontractor services agreement which is called a
9   personnel agreement, correct?
10       A. Yes.
11       Q. And you personally were not a party to the
12  subcontractor services agreement, correct?
13       A. I am. I am party of this.
14       Q. Where in the subcontractor services agreement
15  that I've marked as Exhibit 4 does it note that you are
16  a party to that contract?
17       A. It's right there, Martino Rivaplata.
18  Personnel name, Martino.
19       Q. If you look at the page before what you're
20  looking at, and you're looking at Exhibit A, the
21  agreement reflects it is signed by two individuals,
22  correct?
23       A. Yes.
24       Q. And it reflects it's signed by you, correct?
25       A. Yeah.

**ELITE DEPOSITION TECHNOLOGIES**                   **214-698-5199**

**APP. 013**

**MARTINO RIVAPLATA**                                      **5/14/2019**

Page 26

1    Q.   And it reflects it is signed by someone named
2  Amy Phetkanya?
3    A.   Yes.
4    Q.   And Ms. Phetkanya, it notes above her
5  signature she was signing on behalf of Robert Half
6  Nevada Staff, Inc., through its division Robert Half
7  Technology, correct?
8    A.   Yeah.
9    Q.   And then above your signature it notes that
10  you were signing on behalf of CPM Consulting, L.L.C.,
11  correct?
12    A.   It says yes, CPM.
13    Q.   Then on the first page of the agreement it
14  says that the agreement is entered into between CPM
15  Consulting, and there's a typo "LCC", and Robert Half
16  Nevada Staff, Inc., through its division Robert Half
17  Technology, correct?
18    A.   Yes.
19    Q.   It doesn't say on the first page of the
20  subcontractor services agreement that you personally are
21  a party to the agreement, does it?
22    A.   Yes.
23    Q.   Where on the first page is your name, sir?
24    A.   No, it doesn't say my name.
25    Q.   Okay.  Now, Exhibit A, the work schedule to

Page 27

1  the subcontractor services agreement reflects again that
2  the work schedule itself is entered into pursuant to the
3  agreement between your company, CPM Consulting, L.L.C.,
4  and Robert Half Nevada Staff, Inc., through its division
5  Robert Half Technology, correct?
6    A.   Yes.
7    Q.   And the work described on the work schedule is
8  SAP HANA data modular, correct?
9    A.   Yes.
10    Q.   And that's the work that you told us that you
11  ultimately did perform along with the BPC work, correct?
12    A.   Yes.
13    Q.   And under this work schedule, you were going
14  to be performing it for Capsugel in Morristown, New
15  Jersey, right?
16    A.   Yes.
17    Q.   And the work schedule reflects that your
18  hourly rate would be $165 an hour, correct?
19    A.   Correct.
20    Q.   And was that indeed the rate at which you
21  performed services under this contract for Capsugel?
22    A.   Yes.  Yes.
23    Q.   Did that rate change at anytime when you
24  performed services under the contract for Capsugel?
25    A.   No.

Page 28

1    Q.   The document notes that your expected start
2  date was April 3 of 2017, correct?
3    A.   Yes.
4    Q.   As best as you can recall, was April 3, 2017,
5  the date on which you actually started to perform
6  services for Capsugel?
7    A.   I started that day.
8    Q.   Do you remember what day of the week that was?
9    A.   Monday.  Had to be Monday.
10    Q.   And the document notes that the expected
11  project length was six months, and then there's a plus
12  sign, correct?
13    A.   Yes.
14    Q.   And it notes that your project manager would
15  be the gentleman who we've referred to earlier,
16  Muralidhar Nuggehalli, correct?
17    A.   Yes.
18    Q.   And then it has a contact person for someone
19  at Robert Half Technology, correct?
20    A.   Yes.
21    Q.   And then it says travel arrangements, other
22  expenses subject to client approval, and then says not
23  applicable, correct?
24    A.   Yes.
25    Q.   And this Exhibit A, just like the

Page 29

1  subcontractor servicers agreement that we looked at is
2  signed by yourself, correct?
3    A.   Yes.
4    Q.   And you were signing here on behalf of a
5  subcontractor which was your company, CPM Consulting,
6  L.L.C., correct?
7    A.   Yes.
8    Q.   And then it's also signed by Amy Phetkanya who
9  was signing on behalf of Robert Half Nevada Staff, Inc.,
10  through its division Robert Half Technology, correct?
11    A.   Yes.  Yes.
12    Q.   And then finally, sir, Exhibit B to the
13  subcontractor services agreement that I've marked to
14  your deposition as Exhibit 4 is an agreement between you
15  personally and Robert Half Nevada Staff, Inc., through
16  its division Robert Half Technology, correct?
17    A.   Yes.
18    Q.   And you signed that document in your
19  individual capacity.  It's not dated, but on the last
20  page, correct?
21    A.   What page is that?  Eleven?
22    Q.   Yes, sir.
23    A.   Yes, that's my signature.  Yes.
24    Q.   And then it looks like again Amy Phetkanya
25  signed on behalf of Robert Half Nevada Staff, Inc.,

**ELITE DEPOSITION TECHNOLOGIES**          **214-698-5199**
**APP. 014**

**MARTINO RIVAPLATA**                                        **5/14/2019**

Page 30

1   through its division Robert Half Technology, right?
2       A.  Yeah.  Yes.
3       Q.  And this document, sir, on page two, and it's
4   page two of the subcontractor services agreement, in
5   paragraph 3B.
6       A.  B, okay.
7       Q.  3B notes that the agreement or the work
8   schedule could be terminated at any time by Robert Half
9   Technology with or without cause for no reason or for
10  any reason, correct?
11      A.  Yes, that's what it says.
12      Q.  Is it your testimony that in your initial
13  conversations with Barry Cormier from Robert Half
14  Technology that he told you that the Capsugel project
15  was anticipated to last six months or more?
16      A.  Six months plus in IT jargon is easily a year.
17  It's like six months -- it's only because that's the way
18  it is.  Six months plus can be a year easily.  Eight,
19  eleven, it's always six months plus.  That's why they
20  put the plus there.
21      Q.  And that's what Mr. Cormier told you?
22      A.  Yeah.
23      Q.  Did you speak with anyone else personally from
24  Robert Half Technology before you entered into the
25  subcontractor services agreement?

Page 31

1       A.  No.
2       Q.  Was Barry Cormier the only person from Robert
3   Half who you spoke -- strike that.
4           Did you ever speak to Mr. Cormier during
5   the time you started providing services for Capsugel?
6       A.  Like when I was already working there?
7       Q.  Yes.
8       A.  Yes.
9       Q.  Did you speak with anyone else from Robert
10  Half once you started performing services for Capsugel?
11      A.  I only recall talking with Barry Cormier.
12      Q.  At Robert Half?
13      A.  At Robert Half, yeah.
14      Q.  Prior to performing services through Robert
15  Half for Capsugel, had you ever previously provided
16  services for this client through Robert Half?
17      A.  No.  First time.
18      Q.  The subcontractor exhibits, and it's A and B
19  in Exhibit 4, we can agree they reflect they were
20  entered into April 3 of 2017?
21      A.  Yeah.  Yes.
22      Q.  You said earlier that's when you started
23  working as a contractor for Capsugel?
24      A.  Yes.
25      Q.  With that date in mind, when, as best you can

Page 32

1   recall, do you think that Mr. Cormier first reached out
2   to you and told you about this opportunity at Capsugel?
3       A.  Well, the best I recall, because this -- this
4   project came through very quickly, fairly quickly.  I
5   would say two weeks tops.  Two weeks.  We only talked
6   for maybe -- yeah, one week, maybe two weeks, ten days.
7   Yeah, it was very quickly.
8       Q.  So you confirmed earlier after speaking with
9   Mr. Cormier and sending him your resume, you then
10  ultimately interviewed with who would be your
11  supervisor, Nuggehalli, correct?
12      A.  Yes.
13      Q.  And you said you talked to him over the phone,
14  correct?
15      A.  Yes.
16      Q.  Was anyone else, to your knowledge,
17  participating in that interview?
18      A.  I don't -- I don't recall.  I only -- he said
19  he was expecting some other to be in the call, but I
20  didn't hear any other voices, so I'm assuming it was him
21  only.  But it may be other people in the call, yeah.  I
22  don't recall exactly, but I only -- because I only speak
23  him a long time.  Almost an hour technical interview.
24      Q.  Do you recall if Mr. Cormier from Robert Half
25  participated in that call?

Page 33

1       A.  He might have been, yes.  He might be.  He
2   didn't speak though, but, you know, you never know
3   because this stuff, you can do three-way calls and don't
4   say nothing.  Yeah, I think he was aware, yeah.
5       Q.  But no one told you he was on the phone?
6       A.  No.  No.  I don't recall.  Nuggehalli said
7   there's going to be somebody else on the call, and we
8   just start talking and then we just dropped that.
9       Q.  You said you talked a little over an hour?
10      A.  Close to an hour.  Not over an hour.  Close to
11  an hour.
12      Q.  What do you remember, sitting here today over
13  two years ago, what do you remember about that call?
14      A.  Well, what I recall perfectly was that they
15  were in a hurry to add another consultant because they
16  had this merger with Lonza.  He had tons of work.  I
17  remember he said tons of work, and I like when people
18  say tons of work.  I remember that clearly.
19          He said you have a wonderful resume.  You
20  have exactly what we need now.  You have HANA, BPC and
21  it's hard to get that guy that has both skills, so I
22  said yeah.  And we talk about the HANA project in
23  detail.  Specifically he told me about current
24  conversion which I know very well.  He asked if I knew
25  how to implement a currency conversion.  I said yes, and

**ELITE DEPOSITION TECHNOLOGIES**                      **214-698-5199**

**MARTINO RIVAPLATA**                                      5/14/2019

Page 34

1    I went there and did a currency conversion.
2         Another thing you represent BPC. We have
3    a big consolidation, a big planning application that we
4    want you to take a look at it and try to make it faster.
5    We have an issue with consolidations and I want you to
6    check it out because we cannot figure it out, and that's
7    why we talk long because we talk about two projects in
8    one; BPC issues they have and HANA implementation they
9    have. So that's why it took almost like an hour to
10   talk.
11        What else? Oh, he ask me that if I have
12   another engagement, and I told him to be honest, yes, I
13   do. He said it's probably going to be six months plus,
14   close to a year. Don't worry. A lot of work. We'll
15   sign six months plus, but you know how that works.
16   You're going to be extended, extended, and that makes
17   sense because they always extend you. You know, you
18   start with six months plus project, and you end up
19   working three years. So that's what I recall the most.
20        What else? Try to remember. He told me
21   about -- yeah, no, that's pretty much it. We talk a lot
22   of technical stuff between BPC and HANA and the lands
23   and a lot of work, we don't have time, blah, blah, blah.
24   He just wanted somebody immediately. That what he said,
25   immediately. He asked me can you start right away. I

Page 35

1    said yes, and I started immediately. That's about the
2    bulk of the talk.
3         The length, they -- the specification of
4    detail, and he was very detailed talking about the
5    consolidation portion and BPC portion. That's what we
6    talk about the length, magnitude and amount of work. He
7    said tons of work. That's it. Those three areas.
8         Q. Did you tell Muralidhar during this
9    conversation that you were local and living in New York
10   at the time?
11        A. No.
12        Q. So if he says you said that, your testimony is
13   he's not being truthful?
14        A. I state -- no, I said I -- no, I don't recall.
15   Like, no. No.
16        Q. Have you ever lived in New York?
17        A. I did.
18        Q. When's the last time you lived in New York?
19        A. Well, it was probably 2015, '16. I live for
20   like five years on and off. One time for two years, and
21   one time three years. So in total five years.
22        Q. Just so the record is clear, your testimony
23   today is you did not tell Muralidhar during this
24   interview that you were living in New York?
25        A. No. No living in New York. No.

Page 36

1         Q. Did you tell him you lived in Texas at the
2    time?
3         A. Yes, I told him that I was having the phone
4    call from my mom's house in Dallas.
5         Q. Were you working for anyone else at the time
6    that you had this interview?
7         A. No.
8         Q. Do you recall when you had last worked prior
9    to this interview?
10        A. No, I don't recall. That was definitely
11   not -- I don't recall. I did work though, but I
12   don't -- oh, yeah, yes, yes, Houston, Texas. I worked
13   for a company called West Link. That was my prior,
14   prior, prior to Capsugel. I was in Houston for another
15   merger, by the way. There was another merger between
16   two chemical companies, Westlake and Atlanta, Georgia
17   Pacific Company, Axiall is the company name that was a
18   merger between Axiall and Westlake, and they hired me to
19   do the merger -- to do the merger of the two systems so
20   similar to Capsugel. That's probably why Capsugel hired
21   me because they saw this guy had a merger and we're
22   going to merge. I don't know. That's probably why
23   they're going to hire me because I've done merger
24   systems integration.
25        Q. What's your date of birth?

Page 37

1         A. January '6, '63.
2         Q. 1963?
3         A. Yes.
4         Q. Where were you born?
5         A. I was born in Peru. Then I came here a long
6    time ago.
7         Q. When did you move to the United States?
8         A. '70s, '80s, I was young.
9         Q. And have you been here since then?
10        A. Yes, I went to school here. I went to SMU
11   here in Dallas.
12        Q. Is your mom from Peru?
13        A. Yes.
14        Q. When did you go to SMU?
15        A. I went to SMU in this 1991/1992 through 1996.
16   Four years.
17        Q. Did you obtain a degree?
18        A. Yes, Bachelor of Science accounting finance,
19   double major and minor in finance.
20        Q. Have you obtained any Master's degrees?
21        A. I have the equivalent of Master's degrees for
22   SAP, certified professional, in SAP, BPC and certified
23   professional in SAP HANA, so they say it's equivalent to
24   a Master's.
25        Q. Who did you get the equivalency of a Master's

**ELITE DEPOSITION TECHNOLOGIES**                    **214-698-5199**

**MARTINO RIVAPLATA**                                         **5/14/2019**

Page 38

```
 1   degree from?
 2       A.  SAP.
 3       Q.  Where did you train with SAP?
 4       A.  In their own facilities.  SAP has training
 5   facilities in Dallas, in Philadelphia, and I went to the
 6   training for both for SAP HANA and SAP BPC and got
 7   certified professional with them.
 8       Q.  Where did you go to high school?
 9       A.  I went to Saint Thomas.
10       Q.  Is that in Texas?
11       A.  Yeah.
12       Q.  Is that in Dallas?
13       A.  Dallas, yeah.  Saint Thomas, they have
14   actually the school -- there's a school in Lima, Peru.
15       Q.  Named Saint Thomas?
16       A.  Yeah.
17       Q.  But you went to the one in Texas?
18       A.  Yes.
19       Q.  When did you graduate high school?
20       A.  Seventy something; '79, '76.
21       Q.  1979 or '76?
22       A.  '79 I think, yeah.
23       Q.  Now, you testified earlier that it's common
24   for IT contracts, when noting the length of a project,
25   to have a number of months or a number of years and then
```

Page 39

```
 1   for there to be a plus sign, correct?
 2       A.  It is very typical, very normal standard in
 3   IT.
 4       Q.  Have you ever had, other than this engagement
 5   with Capsugel, a project that ended in a time that was
 6   shorter than what was articulated to you as the expected
 7   project length?
 8       A.  Never.
 9       Q.  This was the first time?
10       A.  First time in my life.
11       Q.  Have you ever had a contract where there was a
12   plus sign next to the expected duration that did not
13   last longer than what the actual duration was and didn't
14   go into additional months or additional years?
15       A.  No.  They always been to additional months.
16       Q.  What's the expected duration on your current
17   project you're working on?
18       A.  This one is eight month plus, which is
19   definitely another year probably.
20       Q.  And the contract before in New York, what was
21   the duration there?
22       A.  Six months plus.
23       Q.  And the contract before with Cardone?
24       A.  Same thing.
25       Q.  Six months plus?
```

Page 40

```
 1       A.  Yeah.
 2       Q.  Now, do you know, as you sit here today,
 3   whether the subcontractor services agreement that I've
 4   marked as Exhibit 4 was ever provided to anyone at
 5   Capsugel?
 6       A.  Yes, I think so, yeah.  Everybody knew that I
 7   was going to be there for six months plus, yes.
 8       Q.  I'm not asking you to speculate or to guess.
 9       A.  Okay.
10       Q.  Can you testify with certainty that the
11   subcontractor services agreement between CPM and Robert
12   Half was provided to someone at Capsugel?
13       A.  I think, yes, to Nuggehalli.
14       Q.  Did you personally, on behalf of CPM, ever
15   provide a copy of the subcontractor services agreement
16   between your company and Robert Half to anyone at
17   Capsugel?
18       A.  Me personally, no.
19       Q.  And no one else on behalf of CPM would have
20   done that either, right?
21       A.  No.  I'm the only one.  No.
22       Q.  So if Capsugel did get a copy of the
23   subcontractor services agreement between Robert Half and
24   CPM, it would have received it from someone at Robert
25   Half, correct?
```

Page 41

```
 1       A.  Yes.
 2       Q.  And then with respect to the Exhibit A to the
 3   subcontractor services agreement, did you personally
 4   ever provide a copy of Exhibit A, the work schedule, to
 5   anyone at Capsugel?
 6       A.  Me personally, no.
 7       Q.  And so no one on behalf of CPM Consulting
 8   would have provided that to Capsugel, correct?
 9       A.  Not that I recall, no.
10       Q.  And do you know for certain whether anyone
11   from Robert Half Technology provided the Exhibit A work
12   schedule to anyone at Capsugel?
13       A.  Yes.
14       Q.  And what's the basis for you testifying with
15   certainty that that Exhibit A was provided to Capsugel?
16       A.  Because Barry Cormier told me before, during
17   and right before -- after that they knew that my work
18   with the Capsugel was going to be six months plus, and
19   he was actually very surprised when this thing ended in
20   two months and-a-half.  So he actually was very
21   surprised, very apologetic and, frankly, I don't know.
22   He was scared on the phone.  He didn't know what was
23   going on.  He called me on the phone, explained to me,
24   Martino, I don't know what happened.  They know six
25   months plus.
```

11  (Pages 38 to 41)

**ELITE DEPOSITION TECHNOLOGIES**                  **214-698-5199**

**MARTINO RIVAPLATA**                                                    **5/14/2019**

Page 42

1      Barry Cormier called me during the
2  timeframe I worked every week to check how I was doing.
3  So I was doing great because he received good feedback
4  from the controller, Lynn Horowitz, from Michael Mars,
5  which is the financial planning analyst manager.  So
6  Barry Cormier was very happy to begin the first few
7  weeks I remember.
8      Q.  So the comments from Barry Cormier are what
9  lead you to believe Exhibit A --
10     A.  Yes.
11     Q.  -- to subcontractor services agreement was
12  provided to Capsugel?
13     A.  Absolutely, yes.
14     Q.  Did you personally, on behalf of your company
15  CPM Consulting, provide Exhibit B to the subcontractor
16  services agreement, which is a personnel agreement, to
17  anyone at Capsugel?
18     A.  Me personally, no.
19     Q.  So if Capsugel got this document, it's your
20  testimony they would have got it from someone at Robert
21  Half?
22     A.  Yes.
23     Q.  And you believe that probably would have been
24  from Barry Cormier?
25     A.  Definitely through Barry Cormier, but Barry

Page 43

1  Cormier, as you know, has other people that work with
2  him like secretaries and -- and other people.  So Barry
3  Cormier or other people that works in Barry Cormier that
4  was handling my contract with Capsugel, yes.
5          (Exhibit No. 5 marked.)
6      Q.  (By Mr. Parker)  I'm handing you Exhibit 5,
7  which I will represent to you is a copy of the statement
8  of work between Capsugel and Robert Half International,
9  Inc.  Have you seen that document before, sir?
10     A.  No.  It's not my signature here.
11     Q.  No, I know.  I'm just asking you have you ever
12  seen it before?
13     A.  No.
14     Q.  This document at the top notes that it is a
15  statement of work entered into as of March 26th of 2017
16  between Capsugel and Robert Half International, Inc.,
17  through its division Robert Half Technology and the
18  Creative Group, correct?
19     A.  That's what it says, yes.
20     Q.  And this document notes that you were going to
21  be assigned to provide services to Capsugel, correct?
22     A.  That's what it says, but I never -- this looks
23  totally strange to me.  I've never seen this document.
24     Q.  That's fine.  I'm not asking you if you've
25  seen it.

Page 44

1      A.  Okay.
2      Q.  That's what it says though?
3      A.  That's what it says.
4      Q.  It notes that the expected duration of the
5  assignment was three months, correct?  Correct?
6      A.  Yes, that's what it says, three months.
7      Q.  It notes in paragraph four that either party
8  may terminate the statement of work at any time upon ten
9  days prior written notice to the other party, correct?
10     A.  That's what it says.
11     Q.  And the document at the bottom is signed by
12  representatives of Capsugel and Robert Half
13  International, Inc.?
14     A.  That's what it looks like, yes.
15     Q.  And the individual who signed the document on
16  behalf of Robert Half International, Inc., is Amy
17  Phetkanya?
18     A.  Yes.
19     Q.  And that's the same representative from Robert
20  Half International who signed the agreement with you and
21  your company, CPM, correct?
22     A.  That's what it says.
23     Q.  And it looks like both representatives from
24  Capsugel and Robert Half signed this document on
25  April 3, 2017, correct?

Page 45

1      A.  Yes.
2      Q.  And April 3, 2017 is the same date that you
3  and your company, CPM Consulting, entered into
4  agreements with Robert Half that are marked as
5  Deposition Exhibit 4, correct?
6      A.  4/3 is the date I started working.
7      Q.  And it's the date that your contracts with
8  Robert Half were signed, correct?
9      A.  I'm not sure.  Yeah, it is.  April 3rd, yes,
10  start date.
11     Q.  Well, each one of those agreements notes that
12  they're entered into as of April 3, 2017, don't they?
13     A.  Yes.
14     Q.  But it's your testimony no one ever showed you
15  the statement of work between Robert Half and Capsugel
16  prior to today?
17     A.  This paper?
18     Q.  Correct.
19     A.  Exhibit 5, I have never seen this.  You are
20  showing me this for the very first time.
21     Q.  Okay.
22          (Exhibit No. 6 marked.)
23     Q.  (By Mr. Parker)  Did you ever interact with
24  a gentleman named Danny DuPont when you performed
25  services for Capsugel?

                                          12  (Pages 42 to 45)

**MARTINO RIVAPLATA**                                          **5/14/2019**

Page 46

1      A.  Danny DuPont, that's the guy who received me
2  the very first day, April the 3rd.  I didn't know who he
3  was.  He didn't introduce himself.  He said okay, you
4  got to throw yourself in this office.  That was very
5  harsh though.  I never been treated like that.  He just
6  said throw your bag in this office and he left.  That
7  was Danny DuPont.
8      Q.  Did you interact with him after that?
9      A.  No, just that first day kind of hard awakening
10  there.  It's got a, you know, yeah.
11      Q.  All right.  I've handed you --
12      A.  First day.
13      Q.   -- Deposition Exhibit 6.
14      A.  Yeah.
15      Q.  And this appears to be kind of an instant
16  message chain between Danny DuPont and your supervisor,
17  Muralidhar Nuggehalli?
18      A.  Yeah.
19      Q.  And if you look about 3-quarters down the
20  page, Mr. Nuggehalli sends a message at 9:37 a.m. in
21  which he notes here that he's talked with you and he
22  notes here "based in NYC."  Do you see that, sir?
23      A.  Based in NYC.  Yeah, I don't know because I
24  used to live in NYC, but not based that I live there.
25      Q.  Do you see that?

Page 47

1      A.  Yeah, it says there, but I did not really
2  explain that to him that way.
3      Q.  I'm just confirming it's your testimony that
4  you did not tell him you were based in NYC?
5      A.  No.  I said I used to live in NYC.  I didn't
6  say I was based and live there.  I have friends there,
7  but not based, no.
8      Q.  You didn't say you were living there at the
9  time?
10      A.  No.
11      Q.  And then on the next page at the top
12  continuing over from the first page it looks like
13  Muralidhar says you're available now and that you are
14  local, and Mr. DuPont says "like local," and Muralidhar
15  says "from NYC."  Do you see that there, sir?
16      A.  Yes.
17      Q.  But you didn't tell him you were from NYC?
18      A.  No.  Probably he told me mistakenly.  I said I
19  used to live NYC before, but I didn't, no.
20      Q.  Now, during the time that you performed
21  services for Capsugel, you were paid by Robert Half,
22  correct?
23      A.  Yes.
24      Q.  And you were paid by Robert Half to CPM's bank
25  account, correct?

Page 48

1      A.  Yeah, I think so.  I recall that, yeah.
2          (Exhibit No. 7 marked.)
3      Q.  (By Mr. Parker)  Exhibit 7 is a statement
4  from Frost Bank of CPM's bank account, correct?
5      A.  Yes.
6      Q.  And it reflects that it is issued, at the top,
7  as of April 28th, 2017, correct?
8      A.  Yes.  Yes.  Robert Half.
9      Q.  That would have been the first month you
10  performed services for Capsugel, correct?
11      A.  Yes.
12      Q.  At the top under deposits and credits, there
13  are three payments made to CPM Consulting by Robert
14  Half, correct?
15      A.  Yes.
16      Q.  And all three payments are in the amount of
17  $6600, correct?
18      A.  Yes.
19      Q.  Looks like from this document and other
20  documents that you were paid by Robert Half on a weekly
21  basis.  Do you remember that?
22      A.  Yes.
23      Q.  And I'll represent that the payments that I've
24  seen, they're all in the same amount; $6,600?
25      A.  Yeah.

Page 49

1      Q.  By my math that's just your hourly rate times
2  40?
3      A.  Yes.
4      Q.  Is that consistent with your recollection too?
5      A.  That is correct.
6      Q.  You weren't paid directly, at any point during
7  your engagement, by Capsugel, correct?
8      A.  No.  They billed Capsugel.  No -- I mean, they
9  billed Capsugel, and then they got that and how that
10  works.
11      Q.  So all the funds that were paid to you for
12  your work came from Robert Half, correct?
13      A.  From Robert Half because that's who contract
14  me.  Robert Half, yes.
15      Q.  Pursuant to your contract with Robert Half,
16  were you eligible to receive any employee benefits as
17  providing services as a contractor?
18      A.  No.
19      Q.  And you didn't receive any benefits at all
20  from Capsugel for providing benefits as a contractor,
21  right?
22      A.  No.
23      Q.  Do you receive benefits from the current
24  company you're providing services to?
25      A.  No benefits, no, no.

                                    13  (Pages 46 to 49)

**MARTINO RIVAPLATA**                                       **5/14/2019**

Page 50

```
 1       Q.  Do you ever receive benefits when you provide
 2   services as a contractor?
 3       A.  No.
 4       Q.  You just get your hourly rate?
 5       A.  That's the end of it.
 6       Q.  Your engagement with Capsugel we established
 7   started on April 3 of 2017, correct?
 8       A.  Yes.
 9       Q.  And it ended on June 30th of 2017, correct?
10       A.  Yes.
11           (Exhibit No. 8 marked.)
12       Q.  (By Mr. Parker)  Take a minute to read
13   Exhibit 8.  My only question to you at this time is have
14   you seen this document before?
15       A.  No, never seen this.  And I don't know who
16   this guy Jarell Chavers is.  I never talked to that
17   Jarell Chavers.
18       Q.  Is this the first time you've seen Exhibit 8?
19       A.  Yeah, this is the first time I've ever seen
20   this e-mail.  I'm not copied on this e-mail, so why
21   would I ever know this?  My name is nowhere near here.
22   I know nothing about this e-mail.  No.
23       Q.  Exhibit 8 appears to be an e-mail chain
24   between your supervisor at Capsugel, Muralidhar
25   Nuggehalli, and a gentleman named Jarell Chavers who is
```

Page 51

```
 1   a national account executive for Robert Half Technology,
 2   correct?
 3       A.  I don't know really who Jarell Chavers is.
 4       Q.  That's what the document shows who he is --
 5       A.  Oh, well, okay, that's what it is.  Yep.  Yep.
 6       Q.  And is it your testimony that you've never
 7   personally interacted with Jarell Chavers?
 8       A.  I really don't recall the name.  I recall only
 9   talking with Barry Cormier.
10       Q.  You see at the top on the first page of
11   Exhibit 8 Mr. Chavers is reaching out to Muralidhar and
12   he says, "I wanted to touch base with you regarding
13   Martino.  I hope everything is continuing to go well
14   with him so far.  At this point, he is set to end his
15   contract with you on June 30th.  Do you think he will
16   end up getting extended out past June 30th?  If so, how
17   long of extension are you thinking?  If you think 6/30
18   is a good date to end Martino's services, let me know
19   and I will update our system."
20           Did I read that correctly?
21       A.  Yeah.
22       Q.  And it's your testimony you didn't have any
23   discussions with Mr. Chavers about you providing
24   services to Capsugel ending as of June 30th?
25       A.  The only person that I recall that I speak is
```

Page 52

```
 1   Barry Cormier.  I did not talk to -- I don't recall
 2   talking with this guy.  No, don't recall that.
 3       Q.  You can put that aside.
 4           (Exhibit No. 9 marked.)
 5       Q.  (By Mr. Parker)  I'm handing you an e-mail
 6   chain between those same two gentlemen, Muralidhar
 7   Nuggehalli and Jarell Chavers from Robert Half, that
 8   I've marked as Exhibit 9.  Please take a look at that
 9   document, sir.
10       A.  Yeah.  Okay.
11       Q.  Again, this reflects that it's an e-mail chain
12   between Muralidhar Nuggehalli and Jarell Chavers from
13   Robert Half, correct?
14       A.  Yes, that's what it says, yeah.
15       Q.  In the initial message in this chain
16   Mr. Chavers sends an e-mail to Muralidhar in which he
17   notes that, "Martino is looking to confirm if he will be
18   extended past this month or not regarding his work
19   there," correct?
20       A.  I don't know why he put that.  I never talked
21   to him.
22       Q.  But what I read was correct, right?
23       A.  What we're reciting here, yes, Martino is
24   looking to confirm.  I never talked to Jarell, so I
25   don't know how he's saying I'm looking to confirm.
```

Page 53

```
 1       Q.  Do you recall speaking to anyone at Robert
 2   Half around the time of this e-mail, which was
 3   June 14th, 2017, about whether you would be extended
 4   past that month?
 5       A.  I don't recall talking with anybody.  I only
 6   talked to Barry Cormier that my contract was going to be
 7   six months plus and mostly extended for a year.
 8       Q.  It's your testimony you didn't talk to anyone
 9   at Robert Half around June 14th, 2017, for the purpose
10   for trying to determine if your assignment was going to
11   be extended or not past that month?
12       A.  I only recall talking to Barry Cormier.
13       Q.  And not about if your contract would be
14   extended past June?
15       A.  No.  I only talked to Barry Cormier about my
16   contract being six months plus.  That's it.
17       Q.  And then you see in response to the e-mail
18   from Mr. Chavers, Mr. Muralidhar tells Mr. Chavers that,
19   "As discussed earlier, all the integration work is now
20   coming to a close and a lot of the work pending is being
21   assigned to business and Lona IT teams," correct?
22       A.  Lonza.
23       Q.  You think he omitted a Z there in Lona?
24       A.  That's the company that merged with Capsugel.
25   Capsugel merged with that company Lonza.
```

14  (Pages 50 to 53)

**ELITE DEPOSITION TECHNOLOGIES**                **214-698-5199**

**APP. 020**

Page 54

1    Q.  So how did you learn that your services were
2  no longer going to be needed by Capsugel?
3    A.  They just knocked the door, came to sit down
4  there and said you're fired.
5    Q.  Who is they?
6    A.  Nuggehalli, Muralidhar and DuPont.  They just
7  came, opened the door, sit down, say Martino, you know
8  what, turn in your badge after a week back.  That's it.
9    Q.  The two gentlemen who you've identified were
10  your supervise- --
11    A.  Yeah, Nuggehalli and DuPont.
12    Q.  Danny DuPont?
13    A.  They come here, sit down and say Martino,
14  thank you very much, you have two weeks, bye.  That's
15  the end of it.  No explanation.  No nothing.  That's it.
16    Q.  This was a five or ten-second meeting?
17    A.  One minute.  Less than ten seconds.  Fifteen
18  seconds.  Twenty seconds at the most.
19    Q.  And they told you you had two weeks?
20    A.  Yeah.
21    Q.  Well --
22    A.  Well, yeah, hold on.  No, not even say two
23  weeks because that was discussed after they left.
24  Nuggehalli came back and said you can stay two weeks.
25  They just tell me to go.  Period.

Page 55

1    Q.  And your last day ended up being June 30th,
2  right?
3    A.  Yes.
4    Q.  So they came to you on or about June 15th or
5  16th?
6    A.  Yes.  Yes.
7    Q.  Did you tell them, Muralidhar and Danny
8  DuPont, that you were surprised because you thought you
9  were going to be there at least six months and probably
10  longer?
11    A.  Yes.
12    Q.  You told that to them?
13    A.  Yes.
14    Q.  Do you recall to which one of those gentlemen
15  you specifically said that?
16    A.  Both of them.  I mean, they knew it all along
17  I was going to be six months plus.  It was a shock.
18  They just said sorry, blah, blah, blah, and they left.
19  Fifteen, twenty second deal.  That's it.
20    Q.  After they told you that your services were no
21  longer going to be needed, did you reach out to anyone
22  at Robert Half?
23    A.  Of course.
24    Q.  Who did you contact?
25    A.  Barry Cormier.

Page 56

1    Q.  Did you contact him by phone?
2    A.  Yes.
3    Q.  And what do you remember discussing with him
4  in that conversation?
5    A.  He was shocked too.  I don't know what's going
6  on.  He was like Martino, I don't know what's going on.
7  These people are so bad.  I don't know.  I've been
8  talking to them, blah, blah, blah.  Your contract six
9  months plus.  I have no idea.  I'm sorry.  He was very
10  apologetic, and, you know, I just was shocked too.
11    Q.  Did you have any follow-up conversations with
12  him?
13    A.  With Barry?
14    Q.  Yeah.
15    A.  That was just the call that I recall right
16  now.  I called him after the ten-second meeting with
17  him.  I immediately called him after they left my
18  office, and Barry couldn't believe it.  He was more
19  shocked than me because he's making money too, right, so
20  he's no longer going to make any money because I'm out
21  of here.  He was actually very mad because he's a sales
22  recruiter.  He's a sales guy.  He was pissed.  I
23  remember.
24    Q.  Did you have any follow-up conversations with
25  him?

Page 57

1    A.  With Barry Cormier?
2    Q.  Yeah.
3    A.  I didn't call him, but he called me back
4  trying to say he can hook me up with other projects
5  because he knew that I rented an apartment, he knew that
6  I drove my car from Dallas to Morristown and I found --
7  I rented an apartment, you know, because this is six
8  month plus.  So I rented an apartment for one year.  It
9  makes sense.  We're on a six month plus project, which
10  is in my mind a year easily because from Nuggehalli, he
11  said that to me.  So I went in.
12    Normally, like IT is not -- I'm not a
13  novice here.  I'm not new.  I've been doing this 20
14  years.  In the IT world everybody knows the terms.
15  Everybody down to the secretary.  Everybody knows
16  everybody here.  It's not like I didn't know this.  This
17  is crap, okay.  Everyone knows this is six months plus.
18  So I moved there, and I explained everything to Barry
19  Cormier.  He was very mad with this company Capsugel,
20  and I followed up and he said Martino, I want to try to
21  find you another project because he was mad too.  So
22  anyway, I never called him.
23    Q.  He didn't call you back with any other
24  projects?
25    A.  He would call me back, but I didn't -- I was

MARTINO RIVAPLATA                                        5/14/2019

Page 58

1    too shocked.  I didn't want to talk to him anymore
2    because I was mad because here I am in New Jersey with a
3    six month project and I have a lease that I have to pay,
4    and they just throw me like a dog, like garbage.  You
5    know, I wouldn't want to do business with Barry Cormier
6    ever in my life.  Even Capsugel, man.  I've been doing
7    this 20 years, and it's the first time they treat me
8    like a piece of crap.  I'm sorry my language, but that's
9    the truth.
10        Q.   Did Barry Cormier ever e-mail you any
11   potential opportunities?
12        A.   No, I never talk to him.
13        Q.   But he did try to contact you about other
14   opportunities?
15        A.   He tried to call me on the phone.  He tried to
16   make it up, all this crap that this happened to me.
17        Q.   And then you wouldn't call him back?
18        A.   I -- no, well, I think I did.  I think I left
19   a voicemail, but he wasn't there, and we never reach out
20   again.
21        Q.   Is there a reason you didn't sue Robert Half
22   and only sued Capsugel?
23        A.   I don't -- I don't know that answer.  I don't
24   recall -- what is the question?  Sorry.
25        Q.   Is there a reason that you didn't file your

Page 59

1    lawsuit against Robert Half as opposed to Capsugel?
2        A.   I don't know.  I don't know the -- I don't
3    know.
4        Q.   Did you think about suing Robert Half?
5        A.   No.  Well, you know, I was not only mad with
6    Robert Half; I was mad with Capsugel because
7    everybody -- you have to understand I'm not a kid around
8    the block here.  I've been doing this for 20 years.
9    When you go into a contract, the recruiter and the
10   person know the terms.  I don't enter the contract if I
11   don't know that.  Barry Cormier knows, Capsugel knows.
12   The guys at Capsugel, they're -- this is an IT Indian
13   shop.  They know what they do, okay.  They thought was
14   Indian.  I'm not Indian.  You know, to treat me like a
15   dog, I'm sorry, but this is just ridiculous.  I've never
16   been in this situation in my life.  It's bad.  I'm not
17   mad with Robert Half.  I'm mad with Capsugel.
18   Everything.  Everything.  It's a nightmare.
19        Q.   But your contract was with Robert Half, wasn't
20   it?
21        A.   Robert Half and Capsugel.  I mean, I worked
22   through Robert Half.  Robert Half is just a passthrough
23   thing.  I work for Capsugel.
24        Q.   But you don't have any contracts to which
25   you're a party with Capsugel, do you?

Page 60

1        A.   But they are aware of my contract with Robert
2    Half that is six months plus, and the fact that they
3    actually recommend me to rent an apartment in
4    Morristown for a year, that means they knew that my
5    contract was for six months plus.  Why would they ever
6    recommend me Martino, look for an apartment --
7        Q.   You're not answering my question.
8        A.   What is the question?
9        Q.   My question is you've never had any direct
10   contracts with Capsugel, correct?
11        A.   Me personally, no, but through Robert Half,
12   yes.
13        Q.   Well, hold on here.  Let's break this down.
14   You personally, Martino Rivaplata, have never had any
15   direct contracts with Capsugel, correct?
16        A.   Not direct, no.
17        Q.   And your company, CPM or EPM, has never had
18   any direct contracts with Capsugel, correct?
19        A.   Directly, no.  Indirectly, yes.
20        Q.   And you've never been employed by Capsugel,
21   correct, directly?
22        A.   Not directly, but indirectly, yes.
23        Q.   Well, you indirectly performed services for
24   them, but you were never employed by them, correct?
25        A.   I was working for them indirectly through

Page 61

1    Robert Half because I work with Capsugel employees.  I
2    produce product for Capsugel.
3        Q.   Who told you to get an apartment in New Jersey
4    for a year?
5        A.   This guy, gosh, trying to recall his name.
6    There's a lot of this -- I'm sorry, but I've never
7    worked in a company that has so much people from India.
8    I'm sorry.  Yokesh.  Yokesh or Prakash, but I'm pretty
9    sure Prakash must have told me that the one that --
10   three Indian guys told me that because they live around
11   there.  That was Prakash, Santikomar (ph), but Yokesh
12   was the one who gave me the details.  Like he gave me --
13   you need to go to an area in Morristown called Off The
14   Green Morristown.  He said that to me in details.  It's
15   in the Speedwell Avenue I remember.  Just go straight,
16   Speedwell Avenue, and you're going to hit Hanover
17   Street, make a right and there's a nice apartment.  Go
18   get you one.
19        Q.   He told you the complex that you should live
20   at?
21        A.   Yokesh.
22        Q.   You're saying he told you the apartment center
23   you should live?
24        A.   This is called Off The Green area between
25   Speedwell Avenue and Hanover Street because he said that

16  (Pages 58 to 61)

**MARTINO RIVAPLATA**                                    **5/14/2019**

Page 62

1    he used to live there and something that his friends --
2    I don't recall exactly.  Either he lived there or his
3    friends live there, but he told me it's a very nice
4    apartment complex, and you can get a one-year lease
5    there, and I did.
6          Q.  You don't know Yokesh's last name?
7          A.  Something-kumar.  Shivakumar or Sivakumar.
8    It's a long last name.  Something Kumar.  Yokesh
9    Sivakumar.  He told me very good detail, and that was
10   very nice because I didn't know too well the area so he
11   can focus my search in apartments.  And I did actually
12   rent an apartment there.
13         Q.  It's your testimony he told you to get a year
14   lease?
15         A.  No, he said that they only lease one year so
16   you can get easily a one-year lease there.
17         Q.  Did anybody tell you to get a one-year lease
18   from Capsugel?
19         A.  Prakash.
20         Q.  Prakash told you?
21         A.  Prakash too.
22         Q.  Do you remember his last name?
23         A.  No.
24         Q.  Did anyone else from Capsugel tell you to get
25   a one-year lease?

Page 63

1          A.  Hold on.  Michael Mars also probably told me.
2    Michael recommend me something like that, but he told me
3    another area where I think was around his area, but that
4    was too far from me.  I typically, when I go to projects
5    outside Texas, I typically try to rent apartments that
6    are close to the office.  So Michael Mars' apartment he
7    recommended me, it was too far so I decided that Yokesh
8    was the best solution that recommend me Off The Green
9    because.  It was pretty cool because it was very close
10   to the office, Capsugel office.  My drive time was not
11   even like ten minutes, which is great, yeah.
12         Q.  So just so I understand it, Yokesh, whose name
13   you're not certain of --
14         A.  Sivakumar.
15         Q.  He's the individual who told you which complex
16   to rent at?
17         A.  Yes.
18         Q.  And he told you that that complex would do a
19   one-year lease, correct?
20         A.  They would rent me a year, yes.
21         Q.  And it's your testimony a gentleman named
22   Prakash told you that you needed to get a one-year
23   lease, correct?
24         A.  He's the one that -- he was actually -- he's
25   the one who was working this revenue pricing volume

Page 64

1    project that he wanted to bring me in because there was
2    a lot of work in this company, so this guy was worried
3    about his prize value project.  So he said Martino, I
4    want you for this project.  So everybody knew Martino is
5    going to be here while so help him out getting an
6    apartment for a year.  So Prakash told me you need to --
7          Q.  I need yes or no answers.
8          A.  Yes.  Yes.
9          Q.  I'm going to ask you again.  Did Prakash --
10         A.  Yes.
11         Q.  Hold on.  You don't know my question.  Did
12   Prakash tell you that you needed to get a lease for one
13   year?
14         A.  Exactly like that, no.
15         Q.  Okay.  Did anyone from Capsugel tell you that
16   your lease for your apartment needed to at least be one
17   year in duration?
18         A.  Yes.
19         Q.  Okay.  Who?
20         A.  Yokesh.
21         Q.  So Yokesh not only told you where he thought
22   you should live and that that apartment complex would do
23   one-year leases, but it's your testimony that you needed
24   to get at least a one-year lease?
25         A.  Yes.

Page 65

1          Q.  Is he the only person from Capsugel that told
2    you that?
3          A.  Prakash too.  Prakash.
4          Q.  I thought --
5          A.  I said yes to that one too.  It's the same.
6    I'm trying to recall as much detail as possible, but the
7    same question is yes for both, both Yokesh and Prakash.
8          Q.  Let me make sure the record is clear.
9          A.  All right.
10         Q.  You're saying that Yokesh told you which
11   apartment complex he thought you should live at,
12   correct?
13         A.  Yes.
14         Q.  He told you that apartment complex would do
15   leases at least one year in duration, correct?
16         A.  Yes.
17         Q.  He also told you that you needed to get a
18   lease of at least one year duration, correct?
19         A.  Yes, because he knew that --
20         Q.  Just yes or no.
21         A.  Yes.
22         Q.  And it's your testimony that Prakash at
23   Capsugel also told you that you needed to get a lease --
24         A.  Yes.
25         Q.  -- that was at least one year duration?

**ELITE DEPOSITION TECHNOLOGIES**                **214-698-5199**
                                                          **APP. 023**

**MARTINO RIVAPLATA**                                     **5/14/2019**

Page 66

1    A.  Yes, sir.
2    Q.  Did anyone else from Capsugel --
3    A.  No.
4    Q.  Hold on.  Did anyone else from Capsugel tell
5  you your lease needed to be at least one year in
6  duration?
7    A.  No.
8    Q.  What did you do after your engagement with
9  Capsugel ended on June 30th of 2017?
10    A.  What did I do?  Well, the first thing I did is
11  tried to see how I'm going to resolve the lease issue on
12  the apartment.  I know I had to pay a penalty, and I
13  went to the office, and, yeah, that there was a penalty
14  I had to pay.  I don't recall how much I paid, but they
15  asked me to pay something to break the lease.  That was
16  the first thing I did.
17         Second thing I did I was trying to look
18  for new projects.  And the third thing I did was to find
19  a truck to put my stuff and ship it back to Dallas.  I
20  ship all my stuff from the apartment.  I ship my car
21  because I didn't want to drive back.  So I ship my car
22  with a shipment company, you know, my stuff with one
23  truck and my car with another truck, so it was just
24  typical moving out.
25    Q.  As best you can recall, approximately when did

Page 67

1  you move back to Dallas from New Jersey?
2    A.  Probably that month, in that July month.
3    Q.  In July?
4    A.  (Nods head.)
5    Q.  Okay.
6         (Exhibit No. 10 marked.)
7    Q.  (By Mr. Parker):  Exhibit 10 is a document
8  that your counsel produced to me in this case.  Have you
9  seen this document before?
10    A.  I don't recall.  Maybe.  Yes.  Sure.
11    Q.  Did you prepare this document?
12    A.  Yes, I think so.  Oh, my gosh.  What is this?
13  Can you explain to me what is this?
14    Q.  I got it from your lawyer.
15    A.  Well, yes, if it came from me, yes, I did.
16    Q.  Well, the document reflects here, at least to
17  me, I'll ask you to confirm, that you have gone through
18  for the remaining what you believed would be three
19  months at least of your providing services to Capsugel
20  and have itemized out how much you thought you would
21  have earned during that time period; is that correct?
22    A.  Yes, ma'am.
23    Q.  And it looks like in doing that, you did it
24  for the months of July, August and September, and you
25  assumed that for each of the workdays during those three

Page 68

1  months you would have worked eight hours, correct?
2    A.  Yes.
3    Q.  And you would have been paid at your hourly
4  rate of $165, correct?
5    A.  Yes.
6    Q.  And you estimate that the total lost wages for
7  those three months of July through September of 2017 is
8  $84,480, correct?
9    A.  That is for three months only, but it doesn't
10  consider the plus.
11    Q.  Right, but that's for the --
12    A.  Three months.
13    Q.  Three months, right?
14    A.  Yes.
15    Q.  Did you have to work holidays when you were at
16  Capsugel?
17    A.  Holidays?  Well, can I expand on that question
18  or you just want yes or no?
19    Q.  Just yes or no.
20    A.  Yes, but he didn't pay me.
21    Q.  Is that why you wrote zero for July 4th,
22  2017 --
23    A.  Yeah, I worked eight hours, but they didn't
24  pay me because they don't believe in 4th of July there.
25    Q.  You didn't work then because your contract

Page 69

1  ended June 30th?
2    A.  Yeah, Memorial Day weekend.  Yeah, I didn't
3  work then, correct.  Memorial Day I did work, but I
4  didn't get paid.
5    Q.  Who did you submit your time records to when
6  you provided services to Capsugel?
7    A.  When I provide my time, I enter -- there's a
8  website that is for -- Robert Half has a website where
9  you go in and enter your project name and log in to the
10  website, and the website has all the months there for
11  the project, and that's obviously my six months plus
12  that I needed to log in my time.  That's how I enter my
13  hours.
14    Q.  It's a Robert Half website?
15    A.  It's a Robert Half website.
16    Q.  It's not a Capsugel website?
17    A.  Not Capsugel website.  It's Robert Half.
18    Q.  You weren't responsible, during the time you
19  provided services to Capsugel, to report your time to
20  anyone at Capsugel?
21    A.  Yes.
22    Q.  Who did you report your time to?
23    A.  Muralidhar Nuggehalli.
24    Q.  How would you provide your time to him at
25  Capsugel?

18  (Pages 66 to 69)

**MARTINO RIVAPLATA**                                          **5/14/2019**

Page 70

1    A.  They have another website too.
2    Q.  So you would --
3    A.  Enter twice.
4    Q.  Go to both a Robert Half and Capsugel website
5    and put your time?
6    A.  That's correct.
7    Q.  Did you generally put down eight hours each
8    day that you worked?
9    A.  Yes.
10        (Exhibit No. 11 marked.)
11    Q.  (By Mr. Parker) :  I'll hand you what I've
12    marked as Exhibit 11.  I'll represent to you this is
13    another document I received from your counsel in this
14    case.  This is specifically your and your company's
15    answers to Capsugel's interrogatories which are written
16    questions that we ask you to answer under oath.
17    A.  Yeah.
18    Q.  Focus your attention first of all, please,
19    sir, on page two to your answers to interrogatories on
20    number one where I asked about the damages that you were
21    seeking in this lawsuit.  Do you see that, sir?
22    A.  Number one answer?
23    Q.  Yes.
24    A.  Yes, I do.
25    Q.  Do you see that answer is in response to my

Page 71

1    question about the damages you were seeking in this
2    case?
3    A.  Yes.
4    Q.  You note in your answer you're seeking the
5    remaining three months, and that's what we just looked
6    at on the Exhibit 10?
7    A.  Yeah.
8    Q.  As well as an additional six months because
9    you believe the plus sign after the six months in your
10    agreement with Robert Half meant that the contract would
11    have been at least a year?
12    A.  Yeah.
13    Q.  And it notes you're seeking attorney's fees,
14    and as of the date these responses were prepared, they
15    were roughly $19,000.  Do you see that, sir?
16    A.  Yes.
17    Q.  Are you paying your lawyer in this case by the
18    hour?
19    A.  Yes.
20    Q.  And then it notes that you are also seeking
21    damages for a penalty for breaking your lease.  Do you
22    see that?
23    A.  Yes.
24    Q.  Is it correct in order to get out of your
25    lease you say was a year in duration, you had to pay the

Page 72

1    company approximately $1,700?
2    A.  Yes.  That's my rent.  Yes, that's right.
3    Yes.
4    Q.  If you'll look at interrogatory number two, it
5    reflects that you were out of work at the top of page
6    three from July 30th, 2017, to July 1, 2018, correct?
7    A.  Yes, that is correct.
8    Q.  Based on your earlier testimony, I just want
9    to know if that is actually accurate based on the dates
10    that you gave for when you performed services for
11    Cardone Industries?
12    A.  Yeah, that's correct.
13    Q.  Because earlier your testimony was that you
14    performed services for Cardone beginning in February or
15    March 2018, and you said you provided them through July
16    or August of 2018.  I just want to make sure I
17    understand when you worked for them.
18    A.  I said I don't recall the exact date.  I can
19    go back and check my contract, but this is about right
20    starting in July.  Yeah, I didn't work in January,
21    February.  I'm sorry.  I didn't recall very well.  No.
22    Q.  So now I need to reconfirm my timeline then,
23    if you will.
24    A.  Yeah.
25    Q.  So it's your testimony that you stopped

Page 73

1    performing services for Capsugel June 30th, 2017,
2    correct?
3    A.  Yes.
4    Q.  Then it's your testimony that you didn't
5    provide services for anyone --
6    A.  No.
7    Q.  -- until July 1, 2018?
8    A.  Yeah, this is the Philadelphia project, yes.
9    I didn't work for almost a year, probably close to a
10    year or a year, yes.  I did not work a year completely,
11    yeah.
12    Q.  You didn't work as a contractor or employee?
13    A.  No, I didn't work at all.  I tried to find
14    project and couldn't find.  I compete with a hundred
15    million people from India, so it's hard for me to find a
16    project.
17    Q.  So this document reflects that you started
18    performing services for Cardone July 1, 2018, and it
19    says through the present.  And the present date these
20    interrogatories were served was November 18th of 2018.
21        So, with that understanding, what is your
22    best recollection now today as to when you stopped
23    performing services for Cardone?
24    A.  July, August, September, October, probably
25    November.  November of 2018, yes.  July -- yeah, July

19  (Pages 70 to 73)

**MARTINO RIVAPLATA**                                              **5/14/2019**

Page 74

```
 1   because I was there -- I was living there in
 2   Philadelphia.  So July, August, September, October,
 3   November.  Yeah, November.  November/December, something
 4   like that.
 5        Q.  And so with that understanding then when do
 6   you now believe you provided services for Corning?
 7   Because you testified --
 8        A.  It was overlap.  Remember I said it was
 9   overlap.  I was working two projects at the same time.
10   Corning probably started August/September timeframe.
11        Q.  That went from August or September of 2018 to
12   April of 2019?
13        A.  Yes.
14        Q.  And you're sticking with that you started with
15   Newmont in May of --
16        A.  Yes, that is correct.  I'm sorry.  I didn't
17   recall exactly but this is correct.  July all the way to
18   November/December, and I overlapped Corning with
19   August 19th.  So I was running two projects at the same
20   time for a month or two, yeah.
21        Q.  If you'll look, sir, at your answer to
22   interrogatory number 12, which is on page nine, I ask
23   there --
24        A.  Page nine, yeah.
25        Q.  -- for you to identify every person who you or
```

Page 75

```
 1   any of your representatives have contacted, interviewed
 2   or for whom you have obtained written or oral regarding
 3   the case, including current or former employees of
 4   Capsugel, and the answer is Barry Cormier, correct?
 5        A.  Barry Cormier, yeah, is the one that I spoke
 6   with Capsugel, yes.
 7        Q.  Have you spoken with him since you filed this
 8   lawsuit?
 9        A.  No.
10        Q.  Have you spoken with anybody from Robert Half
11   since you filed this lawsuit?
12        A.  No.
13        Q.  Have you spoken with anyone from Capsugel
14   since you filed this lawsuit?
15        A.  No.
16        Q.  Have you spoken with anyone from Capsugel
17   since you stopped working there June 30th, 2017?
18        A.  No.  Spoke, no.
19        Q.  Have you e-mailed with anyone from there since
20   then?
21        A.  I ask Michael Mars for a work reference to be
22   placed in my resume, and he send it to me.  I work with
23   him a lot, and he say Martino, no problem, put my name,
24   put Michael Mars as a work reference on my resume.  That
25   was the only time, just for work references.
```

Page 76

```
 1        Q.  And then finally at the top of page ten of
 2   your interrogatory answers I asked describe the
 3   relationship between CPM and yourself, and the answer is
 4   that you are the sole member of CPM.  That's correct,
 5   right?
 6        A.  Yeah.
 7            MR. PARKER:  Want to take a break for
 8   about five minutes?
 9            (Recess taken.)
10            (Exhibit No. 12 marked.)
11        Q.  (By Mr. Parker)  I'm handing you,
12   Mr. Rivaplata, a document I've marked as Exhibit 12
13   which is your and CPM Consulting's second amended
14   complaint in this lawsuit.  Okay?
15        A.  Yeah.
16        Q.  If you would please turn to the second page.
17        A.  Yeah.
18        Q.  Paragraph six notes that you are a United
19   States citizen; is that correct?
20        A.  Yes.
21        Q.  When did you become a United States citizen?
22        A.  I really don't recall, but it was a long time
23   ago.  More than 30 years.  Thirty, 40 years ago.  I'm
24   sorry I did not know exactly.
25        Q.  And the next sentence notes that CPM is a
```

Page 77

```
 1   Texas-based L.L.C., but I think we confirmed earlier
 2   it's actually a Florida-based L.L.C., correct?
 3        A.  Yes.
 4        Q.  And then you confirmed earlier that you are
 5   the owner and sole owner of CPM, correct?
 6        A.  Yes.
 7        Q.  Looking at paragraph eight, sir, did you ever
 8   tell your supervisor, Muralidhar Nuggehalli, that you
 9   were going to rent an apartment in New Jersey to perform
10   contractual work for Capsugel?
11        A.  Yes, when I was there at the site, yes.  Yes,
12   I did.
13        Q.  Did you tell him that you had rented an
14   apartment?
15        A.  Yes.
16        Q.  And what's the basis for your belief that he,
17   being Muralidhar, was aware of the terms of your
18   agreement with Robert Half?
19        A.  Oh, many, many beliefs.  The first one is that
20   he assigned me to a project, a BPC project that was
21   pretty much outside the area that he hired me for
22   because in the interview process he talked to me more
23   about the HANA portion of the project, but then he told
24   me, Martino, there's some project I want you to work
25   with Lynn Horowitz, which is the controller, which is
```

**ELITE DEPOSITION TECHNOLOGIES**                    **214-698-5199**

**APP. 026**

**MARTINO RIVAPLATA**                                         **5/14/2019**

Page 78

1　the BPC project which I did.  Then he talked to me about
2　Prakash has another small project, the price revenue
3　project and then the HANA project.  So he talked to me
4　about so many things.  And also the fact that they were
5　in the middle of the merger, and there was a lot of
6　reporting that needed to be done.  So for me that's
7　good.  That's a lot of work there.
8　　Q.  I don't think you answered my question.  My
9　question is what's the basis for your belief that
10　Muralidhar was aware of the terms of your and CPM's
11　agreements with Robert Half?
12　　A.  Oh, because he told me on the phone in the
13　interview process.  He told me your project's going to
14　be six months plus, easily a year.  He said that to me
15　on the phone in the first interview.
16　　Q.  But you don't know for certain whether he
17　actually got a copy of your subcontractor agreement with
18　Robert Half, correct?
19　　A.  Can you repeat the question?
20　　Q.  You don't know for certain that Muralidhar
21　received a copy of CPM's subcontractor services
22　agreement with Robert Half, correct?
23　　A.  No, I don't.
24　　Q.  And you don't know for certain that anybody
25　from Robert Half received a copy of your subcontract

Page 79

1　services agreement with Robert Half, correct?
2　　A.  I know for sure that Robert Half handed my
3　six-month long contract to them, to everybody in
4　Capsugel, to Nuggehalli and DuPont.  That I'm sure.
5　　Q.  Your testimony today is you know for certainty
6　that someone from Robert Half provided a copy of your
7　subcontractor services agreement to individuals at
8　Capsugel?
9　　A.  Yes.
10　　Q.  And the basis for that belief is what?
11　　A.  Cormier phone call -- Cormier told me that on
12　the phone.
13　　Q.  So, for the record, Cormier from Robert Half
14　told you --
15　　A.  Yes.
16　　Q.  -- that he provided the subcontractor services
17　agreement that you and your company entered into with
18　Robert Half to representatives from Capsugel?
19　　A.  Yes.
20　　Q.  Okay.  Now, you say in paragraph nine that you
21　believe Nuggehalli is an Indian national.  Is that your
22　belief?
23　　A.  It is.  He is an Indian national, yes.
24　　Q.  And to your knowledge was he an employee or
25　contractor of Capsugel?

Page 80

1　　A.  The best I recall he's a contractor, an H-1B
2　visa.
3　　Q.  What's the basis of your belief that he's a
4　contractor?
5　　A.  Because he told me.  He told me that
6　specifically because one day we were chatting just like
7　a normal chat on the halls, and we're talking about like
8　he used to be a contractor as well.  That's what he told
9　me that he was a contractor there.
10　　Q.  But did he tell you at the time he was a
11　contractor or employee?
12　　A.  Contractor.
13　　Q.  And it's your testimony that he told you he
14　was on a H-1B visa?
15　　A.  Yes.
16　　Q.  Did anyone else from Capsugel tell you they
17　were on an H-1B visa?
18　　A.  They all are.
19　　Q.  That's not my question.  Did anyone else from
20　Capsugel tell you that?
21　　A.  Yes.
22　　Q.  Who?
23　　A.  Yokesh, Prakash, and -- oh my goodness.
24　There's some difficult names, See-bomb (ph) something.
25　There's two or three more guys that told me that.

Page 81

1　　Q.  So it's your testimony that approximately four
2　to five --
3　　A.  Yes.
4　　Q.  -- from Capsugel --
5　　A.  Yes.
6　　Q.  Hold on.
7　　A.  Oh, sorry.
8　　Q.  Let me ask my question --
9　　A.  Yeah.
10　　Q.  -- before you talk.  It's your testimony that
11　four or five people from Capsugel told you that they
12　were on H-1B visas?
13　　A.  Yeah, four sounds about right.
14　　Q.  And do you know if any of those individuals
15　were actually employed directly by Capsugel?
16　　A.  They were not employed directly by Capsugel,
17　no.
18　　Q.  So the individuals who you believe who
19　allegedly told you they were on H-1B visas were all like
20　you, contractors, correct?
21　　A.  Yes.
22　　Q.  In paragraph 11 you state that you were
23　instructed to transition your duties to three
24　individuals from India, correct?
25　　A.  Yes.  Yes.

**ELITE DEPOSITION TECHNOLOGIES**                **214-698-5199**
**APP. 027**

MARTINO RIVAPLATA                                        5/14/2019

Page 82

1     Q.   Who gave you that instruction?
2     A.   Nuggehalli.
3     Q.   Was that in the meeting that he told you that
4  your services were no longer going to be needed or was
5  it a subsequent meeting?
6     A.   No, that was before.
7     Q.   It was before what?
8     A.   Before he told me to go.
9     Q.   So before you learned that --
10    A.   Terminated.
11    Q.   -- that your services weren't going to be
12 needed, he had already told you to transition the duties
13 to three other individuals?
14    A.   Yes.
15    Q.   Did you ask him at that time why he was asking
16 you to do that if you thought you were going to still be
17 working there for nine more months?
18    A.   No.
19    Q.   And are the individuals listed in the last
20 sentence of paragraph 11 the three individuals he told
21 you to transition your duties to?
22    A.   Those three there?
23    Q.   Yes.
24    A.   Yes, they are.  Those are the guys that were
25 in the meeting, yes.

Page 83

1     Q.   And do you know if any of those three
2  individuals are actually directly employed by Capsugel?
3     A.   No.
4     Q.   It's your belief they're all contractors?
5     A.   Yes.
6     Q.   And are any of those three individuals folks
7  who told you that they were on an H-1B visa?
8     A.   Yokesh is one of them.  The other two are no,
9  those are -- they bid this -- no, I don't know.
10    Q.   It's your belief that those three individuals
11 are all from India?
12    A.   Yes, sir.
13    Q.   Did any of those three tell you they're from
14 India?
15    A.   Yes.
16    Q.   They all did?
17    A.   Yes.
18    Q.   And you're alleging in this lawsuit that you
19 personally were discriminated against by Capsugel,
20 correct?
21    A.   Yes.
22    Q.   And what's the basis for your belief that you
23 were discriminated against?
24    A.   Well, there are many areas where I felt that I
25 was discriminated against.  The very first day, what

Page 84

1  this gentleman named DuPont -- he's not American either.
2  He's not from India.  He's from France.  I don't know
3  where he's from.  So he threw me in this office.  I
4  don't think that's proper.  I'm the first day for God's
5  sake.  I drove all the way from Dallas to work for you
6  and you treat me like I'm garbage or something.  It was
7  a hard awakening for me.  But anyway, that's one.
8             Second, as I was working, I was
9  participating in meetings like I'm meeting like in this
10 conference room like this.  I was the only American in
11 all India nationals here.  So we were talking about the
12 project, the HANA project and the BPC project.  It was
13 going well, blah, blah, blah.  We finish working that
14 project, and they turn around and look at me and say
15 Martino, you can leave because you don't belong here
16 anymore because Indian meeting.  I said okay.  All I did
17 was stand up and walk out.  They did that to me twice.
18 They said to me like this:  Martino, you can leave, this
19 is all Indians.  You don't belong at this meeting.  You
20 can go.  This is an all-Indian meeting.  You can go.  He
21 mentioned Indians.  I just left.  They did that to me
22 twice.
23            And then the other thing is that I
24 noticed there's 95 percent of Indian nationals working
25 in that company and all contractors.  Americans probably

Page 85

1  me and 10 more, so it's 95 percent.  That pretty much
2  told me, in my mind, and I felt discrimination
3  completely.  And other instances -- those were the major
4  instances.  They said go because I don't belong there.
5  The parking lot it seemed like it was all Indian.  I was
6  the only American there.  This guy DuPont -- and the
7  fact that I saw information from my lawyer spreadsheet
8  where I saw that it's 95 percent Indian nationals and
9  it's only 5 percent Americans there including me.
10            So all those things, little details made
11 me to believe I was discriminated.  That's why they
12 fired me that day like it's nothing.  They opened the
13 door, five seconds and I was gone.  And they did not
14 treat this to treat Indians, so obviously they don't
15 like my nationality.  I had to conclude that.  That's
16 it.  Those are the instances.
17    Q.   So you think you were discriminated against
18 for your nationality --
19    A.   Yes.
20    Q.   Hold on.  For the rest of the day let me ask
21 my questions.
22            You think you were discriminated against
23 because of your nationality because Danny DuPont in 2017
24 just put you in an office and didn't really warmly greet
25 you, correct?

ELITE DEPOSITION TECHNOLOGIES                        214-698-5199

**MARTINO RIVAPLATA**                                                    **5/14/2019**

Page 86

1    A.  I think so, yes.
2    Q.  You also think you were treated differently
3  because at least on two occasions you were in meetings
4  with your colleagues and they told you that you could go
5  ahead and leave because this was an all-Indian meeting?
6    A.  That's correct.
7    Q.  And your testimony is you were specifically
8  told you did not belong in the meeting because you were
9  not Indian or you just didn't need to be in the meeting
10  any longer?  What's your testimony on that?
11    A.  What they said is you do not need to be here
12  because this is an all-Indian meeting.  You don't belong
13  here.
14    Q.  Who is the "they" that made that comment to
15  you?
16    A.  You know, there was a lot of Indian nationals
17  in that meeting, and it probably was one of the guys
18  that worked in the infrastructure or some kind of the
19  IT.  He used to be in charge of the ICT.  It was a
20  group, they handle -- they have an offshore company
21  called HCL that worked for Capsugel.  One of those guys
22  said it.
23    Q.  So can you identify today by name one of the
24  individuals who told you you don't belong in this
25  meeting, this is an all Indian meeting?

Page 87

1    A.  I didn't know him by name, but I know he works
2  for HCL in the infrastructure department.  But at that
3  meeting Nuggehalli was present.  Yokesh was present.
4    Q.  Were any other comments made to you that you
5  believe were discriminatory during the time that you
6  provided services at Capsugel?
7    A.  Those two were the most discriminatory to me.
8    Q.  But I'm asking you were there any other ones?
9    A.  No, not that I recall.  I mean, I'm sorry.
10  Not that I recall.
11    Q.  That's fine.  Did anybody at Capsugel ever say
12  anything to you that you believed was negative, rude or
13  offensive about the fact that you are from Peru?
14    A.  I don't recall that.
15    Q.  Did anybody at Capsugel say anything rude or
16  negative to you or something that you found offensive
17  because of the fact that you are a United States
18  citizen?
19    A.  Yes.
20    Q.  What?
21    A.  The two incidents that they told me to leave
22  because I don't belong here because I'm American and
23  they're Indians.
24    Q.  Anything else?
25    A.  I don't recall.  Those are the most shocking

Page 88

1  ones, but I might recall later.  I don't recall it right
2  now.
3    Q.  Who do you believe made the decision at
4  Capsugel to end your assignment there?
5    A.  Can you repeat that?
6    Q.  Sure.  Who do you believe at Capsugel made the
7  decision to end your assignment?
8    A.  To end, ah.  I think -- and I telling you this
9  from experience.  I'm a veteran on this 20 years, and I
10  think that decision was made by the Indian people, those
11  Indians that I named over there; Yokesh and Muralidhar,
12  and, yeah.
13    Q.  So it's your belief that contractors engaged
14  by Capsugel made the decision for Capsugel to end your
15  assignment?
16    A.  Yes.
17    Q.  You and your company CPM also allege in this
18  lawsuit that Capsugel interfered with your contract with
19  Robert Half, correct?
20    A.  Yes.
21    Q.  And is it your contention in this case that
22  Capsugel interfered with that contract by terminating
23  your assignment after you had worked there for just
24  three months?
25    A.  Yes.

Page 89

1    Q.  Is there anything else that you are claiming
2  in this lawsuit that Capsugel did to tortiously
3  interfere with your contract with Robert Half?
4    A.  No.  Those two things.  No.
5    Q.  Just that one thing, right?
6    A.  Yeah, interference, tortious interference.
7    Q.  Which, for the record, was just simply
8  Capsugel ending your assignment after three months,
9  correct?
10    A.  Yes.
11    Q.  (By Mr. Parker):  All right.  I don't have
12  any further questions.  Thank you for your time, sir.
13  Pass the witness.
14      MR. CLARK:  We'll reserve our questions.
15      MR. PARKER:  All right.  Thank you, sir.
16  (End of proceedings, 12:14 p.m.)
17      * * * * *
18
19
20
21
22
23
24
25

                                23  (Pages 86 to 89)

MARTINO RIVAPLATA                                    5/14/2019

Page 90

1                    CHANGES AND SIGNATURE

2    WITNESS NAME:  MARTINO RIVAPLATA

3    DATE OF DEPOSITION:  TUESDAY, MAY 14, 2019

4    PAGE/LINE      CHANGE                    REASON

5    7/13    there's a lot of work there            Misspoken

6    17/21   Yes, I was also supervised by Lynn Horowitz   Recalled Afterwards

7    36/13   Westlake                               Misspoken

8    38/18   No, I went to Saint Thomas in Lima     Correction

9    40/13   Yes, to Nugehalli and Danny Dupont     Correction

10   62/15   Yes, he said                           Correction

11   66/7    No, only Yokesh and Prakash            Correcion

12   67/22   Yes, Sir                               Correction

13   78/23   I know for sure he received a copy of CPM's   Corrrection
             subcontractor services with Robert Half

14   84/16   because It's an only-Indian meeting    Correction

15   87/10   I recall another instance when Yokesh    Recalled Afterwards
             expressed bad about Michael Mars,
16           saying that he was just a very private white kid

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24        I, MARTINO RIVAPLATA, have read the foregoing

25   deposition and hereby affix my signature that same is

ELITE DEPOSITION TECHNOLOGIES              214-698-5199

APP. 030

MARTINO RIVAPLATA                                          5/14/2019

                                                              Page 91

1    true and correct, except as noted above.

2

3

                          _Los Nos Rivaplata_
4                         MARTINO RIVAPLATA

5    STATE OF  Colorado        )

6    COUNTY OF  Arapahoe       )

7

8        Before me  John Hershey        on this day

9    personally appeared MARTINO RIVAPLATA, known to me or

10   proved to me under oath or through  Texas ID card

11   (description of identity card or other document) to be

12   the person whose name is subscribed to the foregoing

13   instrument and acknowledged to me that they executed the

14   same for the purposes and consideration therein

15   expressed.

16       Given under my hand and seal of office this the

17   29th day of  June          , 2019 .

18

19
                                         _[signature]_
                                    _____
20   ┌─────────────────────────┐     NOTARY PUBLIC IN AND FOR
     │   JOHN HERSHEY          │
     │   NOTARY PUBLIC         │     THE STATE OF  Colorado
     │   STATE OF COLORADO     │
     │   NOTARY ID # 20154035365│
     │ MY COMMISSION EXPIRES SEPTEMBER 08, 2019 │
     └─────────────────────────┘
21                                   COMMISSION EXPIRES: 09/08/2019

22

23

24

25

                                                         APP. 031

**MARTINO RIVAPLATA**                                          **5/14/2019**

---

Page 90

```
 1            CHANGES AND SIGNATURE
 2   WITNESS NAME:  MARTINO RIVAPLATA
 3   DATE OF DEPOSITION:  TUESDAY, MAY 14, 2019
 4   PAGE/LINE   CHANGE          REASON
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24       I, MARTINO RIVAPLATA, have read the foregoing
25   deposition and hereby affix my signature that same is
```

Page 91

```
 1   true and correct, except as noted above.
 2
 3
 4            _____
                 MARTINO RIVAPLATA
 5   STATE OF _____)
 6   COUNTY OF _____)
 7
 8       Before me _____ on this day
 9   personally appeared MARTINO RIVAPLATA, known to me or
10   proved to me under oath or through _____
11   (description of identity card or other document) to be
12   the person whose name is subscribed to the foregoing
13   instrument and acknowledged to me that they executed the
14   same for the purposes and consideration therein
15   expressed.
16       Given under my hand and seal of office this the
17   _____ day of _____, 20_____.
18
19
20            _____
                 NOTARY PUBLIC IN AND FOR
             THE STATE OF _____
21           COMMISSION EXPIRES: _____
22
23
24
25
```

Page 92

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 2                    DALLAS DIVISION
 3
 4
 5   CPM CONSULTING, LLC and      )
     MARTINO RIVAPLATA,           )
 6                                )
              Plaintiffs,     )
 7                                )
     VS.                  ) CIVIL ACTION NO.
 8                        ) 3:17-cv-03059-S
                          )
 9   CAPSUGEL US, LLC,        )
                             )
10                           )
              Defendant.    )
11
12
13       REPORTER'S CERTIFICATE TO THE
            ORAL DEPOSITION OF
             MARTINO RIVAPLATA
14         TUESDAY, MAY 14, 2019
15
16       I, Terri Etekochay, Certified Shorthand
17   Reporter in/for the State of Texas, hereby certify:
18       That the witness, MARTINO RIVAPLATA, duly
19   sworn and that the transcript of the deposition is a
20   true record of the testimony given by the witness;
21       That the deposition transcript was duly
22   submitted on ____ May 31, 2019 ___ to the witness via
23   his counsel, for examination, signature, and return
24   by __ July 5, 2019 __ (30 days per Federal
25   Rules of Civil Procedure);
```

Page 93

```
 1       That pursuant to information given to the
 2   deposition officer at the time said testimony was
 3   taken, the following includes all parties of record
 4   and the amount of time used by each party at the time
 5   of the deposition:
 6   APPEARING FOR THE PLAINTIFF(S):
     TIME: 00:00
 7
 8   STEVEN CLARK
     Texas State Bar No. 04294800
 9   Clark Firm PLLC
     5445 La Sierra Drive, Suite 415
10   Dallas, Texas 75231
     Telephone: (214) 890-4066
11
12   APPEARING FOR THE DEFENDANT(S):
     TIME: 1:48
13
14   TALLEY PARKER
     Texas State Bar No. 24065872
15   Jackson Lewis P.C.
     500 North Akard
     Suite 2500
16   Dallas, Texas 75201
     Telephone: (214) 520-2400
17
18       I further certify that I am neither counsel
19   for, related to, nor employed by any of the parties
20   in the action in which this proceeding was taken,
21   and further that I am not financially or otherwise
22   interested in the outcome of this action.
23       Further certification requirements pursuant to
24   Rule 203 of the Texas Code of Civil Procedure will
25   be complied with after they have occurred.
```

24  (Pages 90 to 93)

**APP. 032**

**MARTINO RIVAPLATA**                                              **5/14/2019**

Page 94

```
1          Certified to by me on this the 25th day of
2     May, 2019.
3
4                    T.Etekochay
                     ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                     TERRI ETEKOCHAY, CSR, RPR
5                    Texas CSR No. 8283, 1/31/21
                     Elite Deposition Technologies
6                    Firm Registration No. 10110
                     400 N. St. Paul Street
7                    Suite 1340
                     Dallas, Texas 75201
8                    214.698.5199
                     Www.EliteDeps.com
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**ELITE DEPOSITION TECHNOLOGIES**                    **214-698-5199**

# EXHIBIT B

***** CONFIDENTIAL *****

CONFIDENTIAL

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

- - - - - - - - - - - - - - - - -x
CPM CONSULTING, LLC and
MARTINO RIVAPLATA,
                    Plaintiffs,

                                CIVIL ACTION NO.
            v.                  3:17-cv-03059-S

 CAPSUGEL US, LLC,


                    Defendant.

 - - - - - - - - - - - - - - - -x

                            200 Headquarters Plaza
                            East Tower, 7th Floor
                            Morristown, New Jersey

                            Thursday, 6/13/2019
                            10 a.m.


    CONFIDENTIAL VIDEOTAPED DEPOSITION of

MURALIDHAR N. NUGGEHALLI, a nonparty in the

above-entitled action, held at the above time and

place, taken before Viola S. Zborowski, a Shorthand

Reporter and Notary Public of the State of New

Jersey, pursuant to the Federal Rules of Civil

Procedure, Notice and stipulations between Counsel.


            *     *     *

Exhibit
**D**

***** CONFIDENTIAL *****

## Page 2

APPEARANCES:
CLARK FIRM PLLC
  BY: STEVEN E. CLARK, ESQ.
  5445 La Sierra Drive
  Suite 415
  Dallas, Texas 75331
  Phone: 214-890-4066
  Fax: 214-890-4013
  E-mail: Sclark@dfwlaborlaw.com
  Attorneys for Plaintiff,
  CPM Consulting, LLC and Martino Rivaplata

JACKSON LEWIS, P.C.
  BY: MELANIE UREMOVICH, ESQ.
  500 North Akard
  Suite 2500
  Dallas, Texas 75201
  Phone: 214-520-2400
  Fax: 214-520-2008
  E-mail: melanie.uremovich@jacksonlewis.com
  Attorneys for Defendant

ALSO PRESENT:

  Joshua Grossman, Videographer


          * * *

## Page 3

INDEX
EXAMINATIONS                                  PAGE
BY MR. CLARK:                                    6
        E X H I B I T S
NO.       DESCRIPTION                         PAGE
P-1   Plaintiff's First Amended Notice of        5
      Oral Deposition
P-2   Document entitled, "Professional           5
      Profile," Bates stamped Capsugel
      000397 through 000403
P-3   Spreadsheet                               26
P-4   E-mail dated 3/29/2017, Bates stamped     39
      Capsugel 000001 through 000002
P-5   E-mail dated 3/30/17, Capsugel 000006     47
      to 000009
P-6   Document entitled, "Statement of Work     48
      for Robert Half Technology & The
      Creative Group," Bates stamped
      Capsugel 000039 through 000042
P-7   Memo dated 3/30/17, Bates stamped CPM     51
      0072 through 76
P-8   Document entitled, "Robert Half           53
      Technology Subcontractor Services
      Agreement," Bates stamped Capsugel
      000900 through 911
P-9   Document entitled, "Inbox -               57
      MARTINO.RIVALTA@CAPSUGEL.COM -
      Outlook," Bates stamped CPM -237
P-10  Document entitled, "Screenshots of a      60
      portion of Capsugel 001028 - Part 1 of
      2"
P-11  Document entitled, "Screenshots of a      63
      Portion of Capsugel 001030 - Part 1 of
      4"
P-12  Memo dated 6/7/2017, Bates stamped        66
      Capsugel 000015 through 17
P-13  Memo dated 6/15/17, Bates stamped         67
      Capsugel 000034 through 35
P-14  Document entitled, "Screenshots of a      70
      Portion of Capsugel 001031 - Part 1 of
      2"

## Page 4

        E X H I B I T S
NO.       DESCRIPTION                         PAGE
P-15  Confidential Document Bates stamped      74
      CPM 0305 through 0307
P-16  Document entitled, "Overview Actions,"   79
      Bates stamped Capsugel 000072 through
      74
P-17  Invoice No. 0045060, Bates stamped       83
      Capsugel 000726 through 000782
P-18  Invoice from Robert Half, Bates          84
      stamped Capsugel 000724 through 725
P-19  Memo dated 7/27/17, Bates stamped        88
      Capsugel 000031 through 033
P-20  Memo dated 10/6/17, Bates stamped        89
      Capsugel 000036 through 038
P-21  Document entitled, "Screenshots of a     92
      Portion of Capsugel 000852"
P-22  Plaintiff's Second Amended Complaint     93
P-23  Document entitled, "Title 8 - Aliens     97
      and Nationality, Page 362"
P-24  Document entitled, "Justice News"       100
P-25  Defendant's Objections and Answers to   100
      Plaintiffs' First Set of
      Interrogatories
P-26  Defendant's Supplemental Objections     102
      and Responses to Plaintiff's First
      Requests for Production of Documents

## Page 5

          (Exhibit P-1, Plaintiff's First Amended
Notice of Oral Deposition was received and marked for
identification.)
          (Exhibit P-2, Document entitled,
"Professional Profile," Bates stamped Capsugel 000397
through 000403 was received and marked for
identification.)
          THE VIDEOGRAPHER:  My name is Joshua
Grossman, certified legal video specialist in
association with the court reporter Viola Zborowski.
I'm the videographer.  I'm recording the deposition
of Muralidhar Nuggehalli, being taken at 220
Headquarters Plaza, Morristown, New Jersey, at the
time of 9:56 a.m. in the matter of CPM Consulting,
LLC, versus Capsugel U.S.
          Will counsel please identify themselves
for the record beginning with plaintiff's counsel.
          MR. CLARK:  Yes, Steven Clark,
Plaintiff's counsel.
          MS. UREMOVICH:  And Melanie Uremovich,
counsel for defense.
          THE VIDEOGRAPHER:  Will the court
reporter please identify herself and swear in the
witness.

APP. 035

***** CONFIDENTIAL *****

Page 6

1   MURALIDHAR N. NUGGEHALLI, doing business at Lonza,
2   412 Mt. Kemble Avenue, Morristown, New Jersey, 07940,
3   having first been duly sworn by the Notary Public,
4   was examined and testified as follows:
5       EXAMINATION BY MR. CLARK:
6       Q.   Would you state your full name for the
7   record, please?
8       A.   I'm local to New Jersey.
9       Q.   No, no, your full name for the record.
10      A.   Muralidhar Nuggehalli.
11      Q.   All right.  And you -- you reside here
12  in New Jersey; is that correct?
13      A.   Yes.
14      Q.   And my name is Steve Clark.  I'm the
15  plaintiff's counsel in the case.  I'm going to be
16  taking your deposition here today.  I'd like to reach
17  an agreement with you -- with you at the beginning
18  and that is if I put any questions to you that you
19  don't understand or are confusing, will you let me
20  know and I'll try to repeat or rephrase the question?
21      A.   Yes.
22      Q.   And for the court reporter's purpose it
23  will be helpful, sometimes I talk a little slower,
24  let me finish the question before you start the
25  answer, even though you know the answer may be kind

Page 7

1   of obvious to you.
2       A.   Yes.
3       Q.   All right.  If you need to take a break
4   at any time let me know.  All right?
5       A.   Yes.
6       MS. UREMOVICH:  Steve, can we put on the
7   record we'll be doing this pursuant to the rules?
8       (A discussion is held off the record.)
9       MS. UREMOVICH:  Back on the record.  I
10  would like also like the witness to have an
11  opportunity to read and sign the deposition, please.
12      MR. CLARK:  Yeah, we'll take -- we'll be
13  taking the deposition pursuant to the Federal Rules.
14      MS. UREMOVICH:  Agreed.
15      MR. CLARK:  And it's being taken by
16  notice.
17      Q.   And Plaintiff's Exhibit 1 is a copy of
18  the deposition notice for your deposition here today.
19  Do you see that?
20      A.   Yes.
21      Q.   All right.  Can you tell me what you did
22  to prepare for your deposition?  And again I'm not
23  asking about conversations with counsel, but
24  otherwise, what did you do to prepare?
25      A.   We just had a preliminary discussion

Page 8

1   with all the exhibits that was -- that was shared
2   with us from the plaintiff, and we went through that
3   and those were some of the things that we went
4   through.
5       Q.   Okay.  So did you read Mr. Rivaplata's
6   deposition transcript?
7       A.   Yes, I did, um-hum.
8       Q.   Did you review any other documents?
9       A.   The contract that was shared with CPM
10  and -- and -- and Martino Rivaplata.
11      Q.   Now, just so we can be clear, is that
12  the Robert Half contract with CPM?
13      A.   With CPM, yes.
14      Q.   Okay.  And then Capsugel actually had a
15  statement of work with Robert Half as well?
16      A.   That's correct.
17      Q.   Okay.  Besides the depo transcript and
18  the contract with CPM, were there any other documents
19  that you looked at?
20      A.   All the documents we already shared with
21  our counsel here.  All the items related to Martino's
22  e-mails and all the documents -- e-mail documents
23  that when he was working for us.
24      Q.   One of the things I was going to ask you
25  about, is did you during -- you were Mr. Rivaplata's

Page 9

1   supervisor; correct?
2       A.   That's correct.
3       Q.   And did you, throughout the time he was
4   employed by Capsugel at the Morristown facility, did
5   you maintain any kind of a file on him?
6       A.   No, there was no file for official
7   recordkeeping.  The only time -- the only
8   recordkeeping was done by Robert Half which was their
9   timekeeping system.
10      Q.   Okay.  So if you had team meetings or
11  one-on-one meetings with Mr. Rivaplata regarding his
12  duties, did you ever make any notes or any electronic
13  memorandums in a laptop or phone device?
14      A.   Most of the meetings were related to
15  deliverables, so we did not make any official minutes
16  of meetings, but if there was any change to our work
17  packages, we would send out an e-mail, yes.
18      Q.   Okay.  Let me show you what I've marked
19  as Plaintiff's Exhibit 2, and ask you if you can
20  identify that.
21      A.   This looks like -- like my resume.  Yes,
22  it looks like my resume.
23      Q.   And can you put a time frame on -- on
24  the resume that we've marked as Plaintiff's Exhibit
25  2, is that current through today or was that

***** CONFIDENTIAL *****

Page 10

1  submitted --
2      A.    This looks like this was before I got
3  hired into Capsugel because there is no reference of
4  Capsugel experience here.
5      Q.    So when would you have started with
6  Capsugel?
7      A.    2013, February, probably the 18th.  18
8  February 2013.
9            THE VIDEOGRAPHER:  Excuse me, counsel.
10  We need to go off the record for a technical issue.
11  10:03 a.m. off the record.
12            (Discussion held off the record.)
13            THE VIDEOGRAPHER:  10:06, back on the
14  record.
15            MR. CLARK:  Ready to proceed?  All
16  right.
17      Q.    After a brief break, I believe the last
18  question related to your resume, and just to
19  summarize, Plaintiff's Exhibit 2 would be the resume
20  you would have submitted in conjunction with your
21  employment at Capsugel; is that correct?
22      A.    Yes.
23      Q.    And what is your current position with
24  Capsugel?
25      A.    It is now Lonza.  We have been acquired

Page 11

1  by Lonza.  And I'm the head of North America finance
2  and reporting applications.
3      Q.    Okay.  Did -- and who do you report to?
4      A.    My boss is Pirmin Amherd.
5      Q.    Pirmin?
6      A.    P-I-R-M-I-N, A-M-H-E-R-D.  A-M-H-E-R-D
7  is the last name, is the name, Amherd.
8      Q.    And what is his title?
9      A.    What's -- can you repeat that question?
10      Q.    What is his title?
11      A.    His title is head of global
12  applications.
13      Q.    When you started at Capsugel, what --
14  what was your position?
15      A.    I was head of finance and reporting
16  applications.
17      Q.    And did you have a different boss at
18  that time?
19      A.    Yes, it was Mr. Danny DuPont.
20      Q.    And he would have been your boss at the
21  time Mr. Rivaplata was retained?
22      A.    Yes.
23      Q.    Okay.  Let me ask, have you ever had
24  your deposition taken before?
25      A.    No.

Page 12

1      Q.    First time?
2      A.    First time.
3      Q.    Okay.  And are you a U.S. citizen?
4      A.    I am currently a U.S. citizen.
5      Q.    All right.  And where are you from
6  originally?
7      A.    Originally from India.
8      Q.    Okay.  And when you came -- when did you
9  come to the U.S.?
10      A.    Sometime in 2004, May 2004.  I don't
11  know the exact dates.
12      Q.    When -- when you came in May, was it on
13  a work visa?
14      A.    Yes, it was a H1 visa that I was -- came
15  to the United States.
16      Q.    And who was that -- who issued that
17  visa -- or strike that.  Let me rephrase.  What
18  company sponsored that visa?
19      A.    There was a company called Caritor, it
20  is now NTT Data through acquisitions, and
21  subsequently it was Capgemini U.S., LLC.
22      Q.    And when you started work at Capsugel,
23  were you still on the work visa?
24      A.    No, I was a green card holder at that
25  time.

Page 13

1      Q.    Okay.  And just for the court's benefit,
2  what is a green card holder?
3      A.    A permanent resident.
4      Q.    Okay.  So that would be the next step --
5  step up from the work visa; correct?
6      A.    Yes.
7      Q.    The way the work visa works, is a
8  company sponsors that visa for you to come to the
9  United States and work; is that correct?
10      A.    That's correct.
11      Q.    And then you can obtain the green card,
12  and then that allows you to work for anyone in the
13  U.S., correct?
14      A.    That's correct.
15      Q.    Is that the primary difference --
16      A.    That's correct.
17      Q.    -- to your understanding?
18      A.    That's correct.
19      Q.    Then you can apply for citizenship?
20      A.    Yes.
21      Q.    Which you did.  Okay.  And I believe you
22  said that the company is now owned by Lonza; is that
23  correct?
24      A.    Yes, we are now one, Lonza.
25      Q.    Okay.  So is there a Capsugel anymore or

***** CONFIDENTIAL *****

Page 14

1   is it Lonza?
2        A.    Capsugel as a legal entity still exists,
3   but as a corporate overall entity it doesn't exist.
4   It is now a part of the Lonza umbrella.
5        Q.    Okay.  Now, we're here today in
6   Morristown, New Jersey, and is that where the
7   facility is located that you worked out of?
8        A.    Yes, our headquarters is still in
9   Morristown.  It's 412 Mount Kemble Avenue.
10       Q.    Okay.  And how many departments are
11  housed in Morristown?
12       A.    I don't know the exact answer to it, but
13  all the corporate functions, including global IT,
14  global finance, global hedge fund, global legal, all
15  the C-level execs -- global HR, legal, finance,
16  compliance.  Those are some of the departments that I
17  know of.  And all the CEOs, CFOs CMOs, all the
18  C-level executives.
19       Q.    And has that been pretty consistent from
20  the time you began working at Capsugel?
21       A.    Yes.
22       Q.    So when you first began working at
23  Capsugel, can you kind of describe what your duties
24  and responsibilities were?
25       A.    I was hired to come into Capsugel to

Page 15

1   build up the overall SAP finance applications and
2   reporting applications.  Capsugel in itself was
3   divestments from Pfizer, so we had to let go of all
4   of the Pfizer systems and build up our own systems.
5   And that's what my main responsibility was to bring
6   up all these new systems.
7        Q.    Okay.  And then as far -- in the
8   department that you were head -- you were a part of
9   at that time was what again?  I'm sorry.
10       A.    Global IT.
11       Q.    Global IT.
12       A.    IT stands for information technology.
13       Q.    Right, got you.  So how big a department
14  at the time you began working there was global IT?
15       A.    Globally we had 33 people, and
16  Morristown I can't really -- I don't know the exact
17  answer to it.
18       Q.    Okay.  Of the 33, how many of those were
19  actual employees?
20       A.    All of them.
21       Q.    Okay.  When you say 33, then we're
22  talking about --
23       A.    I'm -- I'm referring to just global
24  employees only when I gave you --
25       Q.    Right.

Page 16

1        A.    -- that number.
2        Q.    Right.
3        A.    It does not include any of our vendors,
4   contractors.
5        Q.    Okay.  What I kind of want to get a
6   handle on is when you first began working at
7   Capsugel, did the company utilize both employees and
8   contractors?
9        A.    That's a normal practice, yes.
10       Q.    Yeah.  And do you have any idea what
11  percentage of the workforce represented contractors
12  as opposed to employees?
13       A.    I don't have the exact number with me,
14  no.
15       Q.    The best approximation?
16       A.    If I were to -- I -- I don't know the
17  answer to it, because if you go by revenue or you go
18  by personnel, it changes, the ratio changes.  I don't
19  know the answer to it.
20       Q.    Okay.  What if we just asked the
21  question in terms of personnel?
22       A.    Personnel?  I would say, about -- we had
23  about at any given point in time -- it also depends
24  on the new CapEx projects that we have, about 20.
25       Q.    And did those contractors come from, you

Page 17

1   know, various staffing companies?
2        A.    We had two main vendors, Headseal
3   (phonetic) and PwC, who are preferred vendors and
4   most of the contractors came through them.
5        Q.    Give me the names again.
6        A.    PWC, PricewaterhouseCoopers.
7        Q.    Okay.
8        A.    Headseal for our network and
9   infrastructure, and then if capacity exceeded that or
10  if we didn't get any extra skill set, then we would
11  go to other vendors.
12       Q.    And you said there were two main
13  vendors.  So kind of just take me through the process
14  of how contractors would be brought on board.
15       A.    So there are two main pieces when we
16  engage our contractors.  One is for any new projects
17  that we bring on.  For example, it could be a new
18  project because of a merger or it could be a new
19  piece of work package because of merger and things
20  like that or it could be onboarding a new site to a
21  new system, so that's when we onboard contractors.
22  And for our existing maintenance and support, we keep
23  the lights on, for example, if I get a daily ticket
24  or a question from an end user, we have contractors
25  to support that as well.

***** CONFIDENTIAL *****

Page 18

1  Q.   And as far as bringing -- bringing the
2  contractors on for one of these functions through
3  these two main vendors, can you walk me through the
4  process?
5  A.   Typically, there's a -- a master
6  services agreement because they are our main vendors.
7  So we have to source all of our contractors from
8  there.  But then sometimes when we have to engage
9  some specific skill sets that they don't have or they
10 don't have at the right time, they come provided to
11 us at the right time, then we look at other vendors.
12 But onboarding the vendor is as -- once we have the
13 MSA, we have the SOW for the specific piece of work
14 and once the SOW is signed, the purchase order is
15 issued.  And then we give access to our consultants,
16 to our systems.  That's typically the onboarding
17 process.
18 Q.   So the MSA is the master service
19 agreement?
20 A.   Master service agreement.
21 Q.   And then the state -- SOW or statement
22 of work would be for the particular --
23 A.   Project.
24 Q.   -- project itself?  And then there would
25 be a PO issued?

Page 19

1  A.   PO for specific work packages.
2  Q.   Okay.  Now if you had to go outside of
3  the two primary vendors, was there a different
4  process or was it basically the same?
5  A.   We still had a vendor approved list
6  which is maintained by our procurement group.  And we
7  have to pick from those preferred vendors, and those
8  vendors can source their candidates from anywhere.
9  Typically that's how it works.  And that's -- we
10 chose Robert Half in this case for Martino's
11 engagement.
12 Q.   Okay.  And had you worked with Robert
13 Half before?
14 A.   A lot of other functions had, but this
15 was my first experience with Robert Half.
16 Q.   And just for the record, Robert Half was
17 a staffing company?
18 A.   It is a staffing company that provides
19 staffing for all functions, information technology,
20 HR, accounting.
21 Q.   I'm trying to ask the question broadly
22 and then if we need to kind of narrow it down, we can
23 focus on that.  But when outside contractors were
24 brought in, was there a typical period of time that
25 they were engaged, their services were engaged for?

Page 20

1  A.   There's no fixed timeline.  SOWs are
2  very time specific.  They talk about duration.
3  That's pretty much in the SOW that we have.
4  Q.   Are you familiar with the term
5  six-months plus?
6  A.   I have just seen that on the Robert Half
7  contract, but on the Capsugel side we don't use any
8  plus.  It's very clear in terms of months.
9  Q.   Excuse me?
10 A.   It's very clear in terms of months when
11 we write our SOWs.
12 Q.   Okay.  Going back to the question, I --
13 though, are you familiar with that term?
14 A.   No.
15 Q.   Is that an industry term?
16 A.   I'm not.
17 Q.   And was there -- were there specific
18 durations of time -- or strike that.
19      Were there -- were there standard
20 durations of time that were utilized in the SOW or
21 did they vary?
22 A.   They vary based on SOW and exact work
23 that is defined for that specific item.
24 Q.   Okay.  So can you kind of give me an
25 example?  We know the SOW in this particular case, I

Page 21

1  think, was three months --
2  A.   Three months, yes.
3  Q.   -- as it related to the SOW between --
4  A.   Capsugel.
5  Q.   -- Robert Half and Capsugel --
6      MS. UREMOVICH:  Let him ask you the
7  question first.
8  Q.   Would -- were they done in increments of
9  three months or could they be as long as a year, for
10 example?
11 A.   The SOWs define the timeline.
12 Q.   Right.
13 A.   If the scope of the work grows, then we
14 add addendums to increase it if required.
15 Q.   Okay.  So that's -- that's kind of what
16 I'm trying to get at is, was there a standard initial
17 period that was utilized and -- and then additions
18 depending on whether the work justified it or not?
19 A.   I don't know if there is a standard, but
20 it's defined on the work packages which is more
21 project specific.
22 Q.   Okay.  Could -- could the SOW be as much
23 as six months?
24 A.   If the project requires six months, yes,
25 it can be.

***** CONFIDENTIAL *****

Page 22

1    Q.   Okay.  Now, let's talk about Martino,
2 specifically.  What was the need that required his
3 services at the time?
4    A.   So during 2017, June, we were
5 going -- we were -- had to go through a merger, so
6 we had to prep for that June time, June/July time
7 frame.  So we had to consolidate a few reporting
8 aspects and also we had to report to the new
9 corporate identity.  So we needed extra IT help at
10 that time to make all this happen before June and
11 July go live.
12    Q.   And how many persons were engaged to
13 perform those services?
14    A.   For just this project, we had leveraged
15 an excellent consultant, that's Martino in this case,
16 but we also leveraged some of our internal support
17 that we already had as well.
18    Q.   Okay.  So Martino would have been the
19 only external consultant?
20    A.   External, yes.
21    Q.   And was the main reason he was chosen is
22 that he could work on more than one aspect of the
23 consolidation and merger?
24    A.   We had at -- our job description asked
25 for two -- two systems that we wanted help with, SAP

Page 23

1 HANA, H-A-N-A, and SAP BPC, these are our systems
2 which we use for accounting and reporting.  And we
3 found a skill set that -- that could do both and
4 that's why Rob -- Martino was engaged on this
5 contract.
6    Q.   Okay.  Because he had the skill set to
7 do both?
8    A.   Correct.
9    Q.   The HANA and the BPC?
10    A.   That's correct.
11    Q.   And just again for the benefit of those
12 not familiar, these are accounting systems; is that
13 correct?
14    A.   SAP BPC is an accounting system.  SAP
15 HANA is more a reporting system.
16    Q.   Okay.  And the challenge was trying to
17 integrate Capsugel with Lonza for the merger; is that
18 correct?
19    A.   We were getting ready for the merger, so
20 we had to build more reports.  We had to consolidate
21 our financials, that's why we brought on extra help.
22    Q.   Now, you said in addition to external,
23 you also utilized internal as well; is that correct?
24    A.   Yes.  When I say internal, our preferred
25 vendors were already working with us, which is the

Page 24

1 PwC offshore team.
2    Q.   Okay.  And so were -- were there
3 specific individuals from that PWC offshore team that
4 were involved in this project --
5    A.   Yes.
6    Q.   -- that would have been working
7 alongside Martino?
8    A.   So we had Venugopal, V-E-N-U-G-O-P-A-L,
9 and Karunankar Muppaneni, K-A-R-U-N-A-N-K-A-R.
10    Q.   K-A-R --
11    A.   -- U-N-A-N-K-A-R, Karunankar.  So those
12 two individuals were helping us with the project on
13 the HANA site.  Make sure I did that right, please.
14    Q.   They were HANA?
15    A.   Yeah.
16    Q.   Is it Hannah or HANA?
17    A.   It's the same, H-A-N-A.  I can't
18 pronounce it.
19    Q.   And then --
20    A.   We had Yokesh was working on our BPC
21 system already.  He was helping with the BPC.
22    Q.   Okay.  All these -- these were -- how
23 many of these three were actual employees?
24    A.   None of them.
25    Q.   So they were all contractors?

Page 25

1    A.   Yes.
2    Q.   Were they all Indian contractors?
3    A.   Different Indians.
4    Q.   Different regions, but -- but were they
5 from India?
6    A.   So Karunankar and Venugopal are from our
7 PwC Bengal office in India, and Yokesh Sivakumar,
8 Yokesh is working in our Morristown office.
9    Q.   Okay.
10        MS. UREMOVICH:  This may be on the
11 record, but the deposition is going to be
12 confidential.
13        MR. CLARK:  Yes.  So for purposes of the
14 record, some of the documents that Capsugel has
15 produced in this case have been designated as
16 confidential.  So counsel has agreed that for
17 purposes of the deposition, we're designating the
18 entire deposition as confidential.
19        MS. UREMOVICH:  Correct.
20        MR. CLARK:  So we don't have to go
21 through and segment each and every bit of testimony
22 relating to discussion of confidential documents.
23 The documents itself that are confidential are so
24 designated.  And is it agreeable -- do we need to
25 identify it at the time they're offered that they've

**APP. 040**

***** CONFIDENTIAL *****

Page 26

1  been designated or can we rely on the fact that
2  they're shown to be confidential?
3          MS. UREMOVICH:  Let's just designate
4  that -- that -- that as you offer the exhibit it is
5  confidential but the entire -- but we have agreed
6  that the entire deposition is marked confidential.
7          MR. CLARK:  Okay.
8          MS. UREMOVICH:  Thank you.
9          MR. CLARK:  Let's mark this as
10  Plaintiff's Exhibit 3.
11          (Exhibit P-3, Spreadsheet was received
12  and marked for identification.)
13          MS. UREMOVICH:  Thank you.
14      Q.    I'm going to show you what has now been
15  marked as Plaintiff's Exhibit 3, and this is a --
16  been designated as a confidential document produced
17  by Capsugel in this case to the plaintiffs.  Can you
18  identify the document?
19      A.    Yes.
20      Q.    Just generally.
21      A.    This seems to be our HR record.
22      Q.    Okay.  And my understanding is, and just
23  for your benefit, the original document was produced
24  in a smaller format, but being old and unable to read
25  the small print we had it blown up a little larger

Page 27

1  for ease of reference.  But my understanding is that
2  this was a list of the personnel at the Morristown
3  facility that were working in the global IT
4  department where Martino Rivaplata and others were --
5  were stationed?
6      A.    Yes.
7      Q.    Is that correct?
8      A.    So there is a mixture of offshore, which
9  means they're not physically on site.
10      Q.    Okay.
11      A.    And there's a -- physically people on
12  site, Morristown, it says MT employee, that's what
13  Morristown employee means.
14      Q.    Okay.  So just so I understand, if --
15  and we're looking in the last column on the right --
16      A.    Uh-hum.
17      Q.    -- where it says MT/offshore.  So if the
18  designation is offshore, they are actually not
19  physically at Morristown?
20      A.    Correct.
21      Q.    But if they're listed as MT then they
22  are there?
23      A.    Yes, Morristown, physically in
24  Morristown.
25      Q.    Sorry.  As far as MT, this seems to be a

Page 28

1  little bit -- strike that.
2          There's an MT employee and just MT.  Do
3  you see that?
4      A.    Yes.
5      Q.    What would be the difference in the
6  designation?
7      A.    So based on what I can see, for example,
8  Matthew and Martino, MT means they are physically in
9  Morristown but they're not employees but external
10  contractors.
11      Q.    Okay.  And if we look at the agency
12  column, that would identify the vendor that that
13  particular contractor came from; is that correct?
14      A.    Yes, that looks like the vendor.
15      Q.    So can you -- looking down the list, the
16  primary one is PWC which would all be offshore;
17  correct?
18      A.    That's correct.
19      Q.    And then there is CSC, what is that?
20      A.    Computer science corporation.
21      Q.    And those are also offshore?
22      A.    I don't directly deal with that.  That
23  is another application called sales force which I am
24  not an expert in.
25      Q.    Okay.  There's also HTC global services?

Page 29

1      A.    Yes.  So that's -- that's our -- that is
2  the area that on -- that supported me so that's the
3  vendor.
4      Q.    Okay.  And that would be an on-site --
5      A.    Correct.
6      Q.    -- person?
7      A.    That's on site.
8      Q.    And then if we look at the second column
9  to the right of the person's name, that's employee
10  type, so there would be -- the designations would
11  either be contingent or regular; is that correct?
12      A.    That's correct.
13      Q.    The regular would be actual employees?
14      A.    That's correct.
15      Q.    And the contingent would be contractors?
16      A.    That's correct.
17      Q.    And then on the -- kind of the middle of
18  the page, the column org unit name, do you see that?
19      A.    Yes.
20      Q.    So there are different listings, most of
21  those are Capsugel contingent workforce, Morristown.
22  But there, for example, if we look at you, you're
23  listed as SAP Center of Excellence.  What is that?
24      A.    This is more an HR sub organization.  I
25  am not very familiar with this hierarchy.

APP. 041

***** CONFIDENTIAL *****

Page 30

1    Q.    Okay.
2    A.    But in HR they have another level of
3  hierarchy which I am not privy to.  They've divided
4  us there.
5    Q.    So -- and then your boss Danny DuPont is
6  listed as IT applications.
7    A.    Um-hum.
8    Q.    So SAP Center of Excellence would report
9  to IT application; is that correct?
10   A.    That's correct.
11   Q.    And then there is -- above Danny there
12  is a Clifford Nickelson that is shown as being global
13  IT infrastructure.
14   A.    Um-hum.
15   Q.    How does that relate?
16   A.    So they relate to everything related to
17  Microsoft Office tools, e-mails, office, Word, Excel,
18  networks, that is Wi-Fi, LAN, VAN.
19   Q.    Okay.
20   A.    Those kinds of things fall into
21  infrastructure.
22   Q.    And then there is one other category I
23  was going to ask you about.  It's Borming Chiang and
24  for --
25   A.    Project management.

Page 31

1    Q.    It says IT project management.  So how
2  does that differ?
3    A.    So we have a group of -- a project
4  management office.  So they are responsible for
5  running projects as project managers, whether it's
6  giving status to the CEO or CFO on all of the
7  portfolios of projects running in the company.
8    Q.    Okay.
9    A.    And one correct thing, that I'm not
10  going by org unit name.  I know what they do, so I'm
11  going by that definition.
12   Q.    Okay.  That's fine.  So at least
13  according -- and just -- just for the record, PX-3 is
14  an HR created document?
15   A.    Correct.
16   Q.    Let me ask about one other director,
17  Tariq Jamal, it says HT strategy and PMO.  What is
18  that?
19   A.    Strategy is what is your next five-year
20  plan.  Strategy is all about making your next five
21  years plan.  And PMO is basically heading the Borming
22  -- he's Borming Chiang's boss.  So he overlooks the
23  overall project of the company.
24   Q.    Okay.
25   A.    PMO stands for project management

Page 32

1  office.
2    Q.    Okay.  Thank you.  Now, so the -- going
3  back, the three internal team members that were
4  working with Martino were -- that are shown on this
5  document were Yokesh, Venugopal Nair, and Karunankar
6  Muppaneni?
7    A.    Yes.
8    Q.    Okay.  And all them would be under your
9  sup -- your direct supervision?
10   A.    That's correct.
11   Q.    And then Danny DuPont would have -- he
12  would be the overall responsible person?
13   A.    That's correct.
14   Q.    And did he report to someone as well?
15   A.    Yes, our CIO.
16   Q.    Okay.
17   A.    And his name is Ian Robertson.
18   Q.    Ian?
19   A.    Robertson.
20   Q.    Okay.
21   A.    He's on this list as well.  Ian
22  Robertson.  He's -- he was the global CIO.
23   Q.    All right.  Before -- before we leave
24  Plaintiff's Exhibit 3, do you know whether Yokesh was
25  on a green card or H-1B?

Page 33

1    MS. UREMOVICH:  Objection.  It calls for
2  speculation.  You can answer if you can.
3    A.    We hired them from our vendors like
4  Robert Half.  We typically don't ask for statuses as
5  long as they can render the service for us.
6    Q.    All right.  Well, for example, I mean
7  he's -- Yokesh is still employed so you would have
8  had contact with him from 2017 when Martino worked
9  there through the present time; correct?
10   A.    Yes.
11   Q.    So from working with him, do -- do you,
12  yourself, have any knowledge whether he is working
13  on --
14   A.    I'm not absolutely sure, but I think
15  he's on H1.
16   Q.    Okay.  And what about Venugopal Nair?
17   A.    He's not on site.  So he probably
18  doesn't need an H1.
19   Q.    Okay.  Because he's based in India?
20   A.    India.
21   Q.    Okay.  And what about Karunankar?
22   A.    Same as Venugopal.
23   Q.    Now, let's turn to Martino specifically.
24  I think we talked about generally he was brought in
25  because there were two functions, both the SAP HANA

***** CONFIDENTIAL *****

Page 34

1   and the BPC, that you needed external contractor
2   assistance to work with the existing internal team;
3   correct?
4       A.   He was a perfect fit -- fit for our job
5   description that we advertised with Robert Half.
6       Q.   Okay.  So were there -- was Robert Half
7   utilized because the other principal vendors did not
8   have candidates or --
9       A.   They did offer candidates.  Either they
10  were not available to us at the time that we were
11  looking for.
12      Q.   Okay.
13      A.   And either they were not qualified
14  for -- they didn't go through the full interview
15  process with us and qualify completely.
16      Q.   Okay.  So in terms of getting that
17  candidate, just kind of walk me -- how would you kind
18  of get the word out that you had a need for that
19  particular candidate?
20      A.   So when we evaluate, when we go to these
21  integration meetings, we find out that we have to
22  deliver something, and based on that we create small
23  work packages, and then we write out a job
24  description on what we need based on the needs that
25  we have, and we evaluate that with our preferred

Page 35

1   vendors to see if they can meet the needs.  If they
2   cannot meet the needs on time, then we go to our
3   second list of preferred vendors, in this case Robert
4   Half, and we give them the job description and they
5   give us the candidates to interview for and so we can
6   pick from them.
7       Q.   And do -- do you recall -- well, there
8   was more than one candidate that was interviewed for
9   this particular position that ultimately Martino was
10  chosen for; correct?
11      A.   Yes.
12      Q.   So -- and who -- who comprised the
13  interview team?
14      A.   Myself and Danny DuPont.
15      Q.   And were the interviews conducted by
16  phone?
17      A.   Yes.
18      Q.   -- or Skype or --
19      A.   Phone.
20      Q.   Okay.  And with Robert Half, they were a
21  secondary approved vendor, so who was the principal
22  contact that you worked with?
23      A.   Jarell Chavers was my main contact for
24  this engagement.
25      Q.   Jarell Chavers?

Page 36

1       A.   Um-hum.
2       Q.   Okay.
3       A.   Yes.
4       Q.   Do you know who Barry Cormier is?
5       A.   I don't know who that is.
6       Q.   And so with Half, would there have been
7   an e-mail sent out, or would there have been a phone
8   conversation with Jarell that -- to say that, hey, we
9   have this need?
10      A.   The requirements are always through
11  e-mail, but we also have telephonic discussions
12  because they engage with us to understand really what
13  they need, and those additional details that are
14  missing in the job description.  They reach out to us
15  if there are any doubts on that.
16      Q.   Okay.  And so what did you say to Jarell
17  as it related to trying to find the candidate for the
18  position initially?  I'm talking about the initial
19  discussions, before a candidate was actually
20  identified.
21      A.   So we'd give them the job description.
22      Q.   Okay.
23      A.   And we typically give them the
24  engagement time frames, and we ask for when we need
25  to onboard them.  So those are some of the typical

Page 37

1   information shared.
2       Q.   Onboard would be --
3       A.   When the project can start.
4       Q.   Start the project?
5       A.   Um-hum.
6       Q.   And do you recall what the time frame
7   was that was discussed with Jarrell?
8       A.   Three months.
9       Q.   Okay.  And then what is the next step
10  that Jarrell identified Martino?
11      A.   They -- I don't remember how many
12  candidates they supplied but we did interview a few.
13      Q.   Okay.
14      A.   And Martino was selected based out of
15  them.
16      Q.   All right.  Now, as far as Martino is
17  concerned, how many interviews were there?
18      A.   Just one.
19      Q.   One?  Phone interview?
20      A.   Phone interview.
21      Q.   And would it have been both you and
22  Danny?
23      A.   Danny would have sat in sometimes for
24  some periods.
25      Q.   Okay.  Was the -- how long was the

***** CONFIDENTIAL *****

## Page 38

1  actual interview, do you recall?
2       A.   I don't recall exact time frame, but
3  typically 30 minutes to 45 minutes.
4       Q.   Okay.  And just to be clear, you would
5  have had his resume at the time of the interview;
6  right?
7       A.   Yes.
8       Q.   Okay.  Anything else you would have had
9  about him?
10      A.   Mostly resume.
11      Q.   Would you have had rates or anything
12 yet?
13      A.   No.
14      Q.   Okay.  Would any -- anyone -- or strike
15 that.  Did anyone from Robert Half also participate
16 in the interview process?
17      A.   Not that I recall.
18      Q.   So it just would have been you,
19 yourself, Danny, and Martino?
20      A.   The candidate.
21      Q.   Okay.  Any notes made of the interview
22 that you're aware of?
23      A.   Umm, I don't recall making any notes on
24 an electronic format.  I scribbled it on the paper,
25 shared it with my boss through chat, I believe.

## Page 39

1       MR. CLARK:  Mark this as Plaintiff's 4.
2       (Exhibit P-4, E-mail dated 3/29/2017,
3  Bates stamped Capsugel 000001 through 000002 was
4  received and marked for identification.)
5       Q.   Let me hand you what's been marked as
6  Plaintiff's Exhibit 4.  And would this be -- well,
7  let me ask, what is Plaintiff's Exhibit 4?
8       A.   It looks like a chat between me and my
9  boss, Mr. Danny DuPont, on finalization of a
10 candidate.
11      Q.   So how would the -- what format would
12 the chat be done through?
13      A.   We use Skype.
14      Q.   Skype?  Okay.  Now, would this -- let me
15 just put this in context.  Would this have been
16 created post interview?  Or is this kind of --
17      A.   This is post interview.
18      Q.   Okay.  It wouldn't have been created
19 coextensive with the interview itself; is that right?
20      A.   It -- it looks like it's post interview.
21      Q.   All right.  Did -- do you know whether
22 there was any kind of a chat done that actually was
23 part of the interview itself?
24      A.   Can you rephrase that question?  Chat
25 with who?

## Page 40

1       Q.   Danny, between you and Danny, would
2  there have been a chat?
3       A.   There could have been.
4       Q.   Okay.  Do you recall seeing one?
5       A.   No.
6       Q.   In -- in looking through the chat, it --
7  it appears to me, I don't want to put words in your
8  mouth, but it appears to me that you were tasked with
9  the principal decision to -- which candidate to
10 chose?
11      A.   That is correct.  Because I was
12 responsible for the end deliverable.
13      Q.   All right.  Okay.  So that's a fair
14 characterization.
15           There's a reference here sort of towards
16 the bottom where Danny says prefer him over PwC, and
17 then you say he can serve both needs.  That's --
18 that's referencing Martino; correct?
19      A.   That's correct.
20      Q.   And let me -- if you move -- let's see.
21 About five up there's a reference to based in New
22 York City, NYC?
23      A.   Yes.
24      Q.   And how -- how did you or when you noted
25 that, how did -- what -- what information did you

## Page 41

1  have?
2       A.   Can you rephrase that question?
3       Q.   Yeah, it wasn't a very good question.
4           There's a reference to Martino from
5  Robert Half and then it says based in NYC.
6       A.   Um-hum.
7       Q.   So your understanding was that he was
8  based in New York City?
9       A.   Yes.
10      Q.   And how did you come to that
11 understanding?
12      A.   I -- I don't know the exact source.  It
13 could be the -- the Robert Half or the Martino's
14 feedback to me.
15      Q.   But it couldn't have come from Jarrell,
16 is that what you're saying?
17      A.   Jarell who?
18      Q.   Chavers.
19      A.   Okay.
20      Q.   Your understanding -- your understanding
21 it could have been from Jarell as opposed to Martino?
22      A.   It's been a long time.  I don't know the
23 actual source, but it could have been either/or.
24      Q.   Okay.  On page 2 of Plaintiff's 4
25 there's a reference to -- I think you ask kind of in

***** CONFIDENTIAL *****

Page 42

1 the middle of the page, should I interview all of the
2 Savantis guys. And then Danny responds, you only
3 interview who you want. And then let me try to get
4 rate on RHT, that's Robert Half; right?
5     A.   Half.
6     Q.   And then you say, CenturyLink guy is not
7 on my preferred list. Is that one of the other
8 candidates?
9     A.   Yes. So we went to all our secondary
10 vendors. Those are some of them.
11     Q.   Okay. And then moving a little further
12 down, your -- you had prepared a -- a reply that you
13 ran by Danny; is that what it was? Where you say,
14 I'm still in the process of interviewing people?
15     A.   This must have been one of the
16 CenturyLink feedback, giving feedback on their
17 candidates.
18     Q.   Okay. So let me just ask it this way.
19 Was a decision made based on this chat with Danny to
20 go ahead and move forward with Martino or was that
21 still subject to getting the rate information?
22     A.   At this point from a skill level, the
23 decision was made that Martino was the strong
24 candidate, but that there's a commerce decision that
25 needs to be handled by Danny, because it's his budget

Page 43

1 so he had to make the final call as well.
2     Q.   Okay. Were there -- were there any
3 other candidates still in the running, so to speak,
4 besides Martino?
5     A.   They were top two. I don't remember the
6 second person's name off the top of my head right
7 now.
8     Q.   Okay. But ultimately Martino was
9 chosen?
10     A.   Correct.
11     Q.   In the interview with Martino, was it
12 -- was the length of the project specifically
13 discussed with him?
14     A.   No. Typically it's technical interviews
15 that we have that is more on the skill base of
16 what -- what the work is going to be and what we need
17 to do, and the work package itself, what is expected
18 of output.
19     Q.   Was there a point at -- at which the
20 length of the project was ever discussed directly
21 with Martino?
22     A.   Typically the candidates ask what the
23 duration is. We say we don't have that information
24 or it's generally not discussed at that time.
25     Q.   Okay.

Page 44

1     A.   And it's -- there's no clarity.
2     Q.   I want to kind of just move forward for
3 the purposes of my question. The decision was made
4 to bring Martino on board, and he was onboarded, and
5 then he began working with the internal team that
6 we've already identified, and then -- so he came on
7 board in April of 2017?
8     A.   Yes.
9     Q.   And he worked throughout April, May, and
10 then he worked into June?
11     A.   June.
12     Q.   And sometime in June, I believe in
13 mid-June he was told the project is going to be
14 ending?
15     A.   Um-hum.
16     Q.   Correct?
17     A.   Yes.
18     Q.   Now, having kind of given that overview,
19 up to the point where he was told the project was
20 ending, was there any -- do you recall having any
21 specific discussions with him that the project was
22 only going to be three months?
23     A.   I don't remember, recollect discussing
24 duration during the project.
25     Q.   Okay. Were you aware that he had rented

Page 45

1 an apartment after the decision was made to bring him
2 on --
3     A.   No, I was not aware of that.
4     Q.   Okay. How much contact did you have
5 with Martino during the time he worked for Capsugel?
6     A.   So we used to have regular daily
7 meetings to look at where our deliverables are in
8 terms of overall project. I was running at something
9 like five or six projects at that time so I have to
10 keep in touch.
11     Q.   You were busy.
12     A.   Yeah. I had -- I head team leads for
13 every stream and they would give me the status of
14 those projects.
15     Q.   Who would have been the team lead
16 for --
17     A.   In this case Martino would have been the
18 deliverable, responsible for that delivery packet.
19 So he would have been the team lead for that stream.
20     Q.   Okay. And how were these team meetings
21 held? Were they in person? Or were they Skype or
22 some combination?
23     A.   A combination. So mostly conference
24 rooms we used, but if people were late or they had to
25 do multitasking when they were on the call and do

***** CONFIDENTIAL *****

Page 46

1    something else, they could do it on Skype as well.
2         Q.    Okay.  And what was your overall
3    assessment of his performance while he worked for
4    Capsugel?
5         A.    He delivered our packages on time.  So
6    there was no performance-related issues, if that's
7    what you're relating to.
8         Q.    So would it be fair to say that you felt
9    like he performed to your expectations?
10        A.    Yes.
11        Q.    Would it be fair to say that he
12   confirmed your decision that he was the right guy to
13   hire --
14        A.    Yes.
15        Q.    -- for the project?
16        A.    For the project.
17        Q.    Okay.  Now, in addition to your daily
18   meetings, would there be other types of meetings that
19   Martino would be involved in with the internal team?
20        A.    Yes.  So we used to have back-to-back
21   meetings, so there is a possibility they could have
22   overlapped.
23        Q.    Okay.  And how would those -- well,
24   strike that.
25             And, again, those would have to be done

Page 47

1    in part through Skype, because at least two team --
2         A.    That's correct.
3         Q.    -- two of the three team members were
4    offshore?
5         A.    That's right.  That's why I said
6    combination.
7         Q.    Okay.
8         A.    If you're in an office, you turn up into
9    a conference room.  Otherwise it would be through
10   Skype.
11        Q.    All right.  Over the time that he worked
12   under your supervision, were there any discussions
13   with him about working on additional assignments?
14        A.    Not that I recall.  But I -- we used to
15   have daily discussion on the deliverables that was at
16   hand.  There was nothing out of scope at that point
17   that I recall.
18        Q.    Okay.  Were you aware that -- he did
19   work on other matters besides the HANA and BPC?
20        A.    I was not aware of that.
21        Q.    Okay.
22             MR. CLARK:  Let's mark this.
23             (Exhibit P-5, E-mail dated 3/30/17,
24   Capsugel 000006 to 000009 was received and marked for
25   identification.)

Page 48

1             (Exhibit P-6, Document entitled,
2    "Statement of Work for Robert Half Technology & The
3    Creative Group," Bates stamped Capsugel 000039
4    through 000042 was received and marked for
5    identification.)
6         Q.    I'm going to hand you two exhibits,
7    because I think they relate to each other, hopefully,
8    that I've marked as Plaintiff's Exhibits 5 and 6.  If
9    you could look at those and identify them, please.
10   What's Plaintiff's Exhibit 5?
11        A.    This seems to be the finalization of the
12   commercial contract or the SOW, so the finalization
13   of the rate and the finalization of the SOW and its
14   language.
15        Q.    And most of that is -- again I'm talking
16   about the document in general, most of that is
17   between Jarrell and Danny?
18        A.    Danny and Brett.  She's the procurement
19   executive.
20        Q.    Okay.  And then if we look at the last
21   page, it's -- there's a reference to sending out the
22   SOW; correct?
23        A.    Right.
24        Q.    And what I've marked as Plaintiff's
25   Exhibit 6 would have been the SOW?

Page 49

1         A.    Yes.
2         Q.    This is my copy.  Unfortunately is not a
3    particularly good one.  But it -- it appears that it
4    was signed by Brett on behalf of Capsugel?
5         A.    Yes.  She's -- she's the authorized
6    person to sign off on the SOW from a procurement
7    perspective.
8         Q.    Okay.  And then signed by Amy -- I'm
9    going to butcher it -- Amy Phetkanya on behalf of
10   Robert Half?
11        A.    I see that, yes.
12        Q.    Okay.  Did you have any dealings with
13   her?
14        A.    Amy, no.
15        Q.    Okay.  So she just would have been
16   Brett's counterpart at Half as best you know?
17             MS. UREMOVICH:  Objection.  Calls for
18   speculation.  You can answer if you can.
19        A.    It looks like it.
20        Q.    All right.  Let me reask it.  She's the
21   listed signatory on behalf of Robert Half; correct?
22        A.    I can't answer to it without knowing
23   what their role was, but she signed, so she looks
24   like she is responsible for.
25        Q.    All right.  Her title is regional VP?

***** CONFIDENTIAL *****

Page 50

1    A.    Vice president.
2    Q.    Okay.  And in this particular statement
3 of work it says -- it's Martino and the rate is $223
4 an hour, and the -- the estimated assignment duration
5 is three months; is that correct?
6    A.    Yes.
7    Q.    And then Exhibit A would just be the
8 conditions of the engagement; is that right?
9    A.    Correct.
10   Q.    Now, this -- the SOW isn't typically
11 shared with a candidate; is that -- is that a correct
12 statement?
13   A.    Yes.
14   Q.    And to your knowledge, it was not
15 provided to Martino, was it?
16   A.    I don't think so.
17   Q.    Okay.
18   A.    At least Capsugel did not provide that
19 to him.
20   Q.    Right.  It wouldn't be part of the
21 standard protocol --
22   A.    That's correct.
23   Q.    -- it would be provided to the staffing
24 agency which in this case was Robert Half; is that
25 right?

Page 51

1    A.    That's right.
2        (Exhibit P-7, Memo dated 3/30/17, Bates
3 stamped CPM 0072 through 76 was received and marked
4 for identification.)
5    Q.    I'm handing you what I've marked as
6 Plaintiff's Exhibit 7.  Have you seen this document
7 before?
8    A.    No, I have not.
9    Q.    Okay.  We talked generally about
10 onboarding.  So part of the onboarding process would
11 be the agency would provide the information to the
12 candidate about where to report and who his
13 supervisor is; is that correct?
14   A.    That's correct.
15   Q.    And does Plaintiff's 7 reference that
16 you are the principal contact person?  I think that's
17 on page 2.
18   A.    That's correct.
19   Q.    And you'll -- you'll see that
20 Plaintiff's Exhibit 7 is a communication from Barry
21 Cormier at Robert Half to Martino.  Do you see that?
22   A.    Um-hum, yes.
23   Q.    But you -- and he's listed as senior
24 recruiter for Enterprise Technical Services, do you
25 see that?

Page 52

1    A.    Yes.
2    Q.    But you didn't have any direct dealings
3 with Barry; is that correct?
4    A.    I don't recall working with Barry.  It
5 was only Jarrell who was our interface with Martino.
6    Q.    Okay.  If you would go to what's -- it's
7 shown as three -- three of five.
8    A.    I'm on it.
9    Q.    Okay.  There's reference here from
10 Martino about how to report his hours.  Do you see
11 that?
12   A.    Yes.
13   Q.    So I want to digress for a second here.
14 He would have been required to submit his time to
15 Robert Half so they could invoice Capsugel; correct?
16   A.    That's correct.
17   Q.    And -- and that would be kind of the
18 standard protocol if an outside vendor is used?
19   A.    Every vendor has something different,
20 but time cards are one of the prerequisites.
21   Q.    Okay.  And then -- now with -- with
22 regard to the actual contractor that is brought in,
23 is this also a time system that the contractor is
24 required to enter his time for Capsugel?
25   A.    Not in Capsugel.  It will be in their

Page 53

1 vendor system.
2    Q.    Okay.  So only the vendor system, there
3 wouldn't be a --
4    A.    Capsugel time recording, no.
5    Q.    Okay.
6    A.    However, we approve on their system, the
7 vendor system their time.
8    Q.    Okay.  So you have access to the vendor
9 system?
10   A.    Yes.  So there is a workflow triggered
11 and that triggers a link to me to approve the time
12 that comes from the vendor.
13   Q.    Does that reflect a project length on it
14 or do you know?
15   A.    I have not paid any attention to it.  I
16 just use it to approve the lead time.
17   Q.    Okay.
18        (Exhibit P-8, Document entitled, "Robert
19 Half Technology Subcontractor Services Agreement,"
20 Bates stamped Capsugel 000900 through 911 was
21 received and marked for identification.)
22   Q.    Let me hand you what I believe has been
23 marked Plaintiff's Exhibit 8 and ask you if you have
24 seen that document before?
25   A.    I have not seen this document.

***** CONFIDENTIAL *****

Page 54

1    Q.    Okay.  Was this a document, though, that
2 you did review in preparation for the deposition?
3    A.    Yes, this is the one that was shared for
4 me for the review yesterday, yes.
5    Q.    Okay.  But you didn't -- just so the
6 record is clear, this was not a document provided to
7 you by Robert Half as part of the normal process when
8 Martino Rivaplata was engaged; is that correct?
9    A.    That's correct.  I have not seen this
10 during engagement.
11    Q.    Okay.  And for the record, Plaintiff's
12 Exhibit 8 is identified as the Robert Half
13 subcontractor services agreement with various
14 attachments; correct?
15    A.    It does say that, yes.
16    Q.    And if we look at the Exhibit A, work
17 schedule, which I think is Bates numbered Capsugel
18 907, do you have that?
19    A.    Yes.
20    Q.    This shows the work schedule for Mr.
21 Rivaplata; is that correct?
22    A.    Yes.
23    Q.    And the description of the work would be
24 SAP HANA data modular; is that -- do you see that?
25    A.    I'm looking for it.

Page 55

1    Q.    Description of work.
2    A.    Yes.
3    Q.    Okay.  And moving down, expected start
4 date was April 3rd, and then expected project length
5 it was six months plus, do you see that?
6    A.    Yes.
7    Q.    And then you're listed as the client
8 project manager and your contact phone number is
9 given?
10    A.    That's correct.
11    Q.    Is that correct?
12    A.    Yes.
13    Q.    And then there's listed the Robert Half
14 contact is a person by the name of Rus Neidhardt, do
15 you see that?
16    A.    Yes.
17    Q.    Did you have any dealings with that
18 person?
19    A.    I don't remember working with Rus.
20    Q.    Okay.  Is -- is he someone that you
21 worked with on other --
22    A.    I didn't -- don't recall.  Jarrell was
23 our face for our contact.
24    Q.    Okay.  I think going back to the initial
25 pages, subcontractor services agreement was between

Page 56

1 Robert Half and CPM Consulting; correct?
2    A.    You're on page 1?
3    Q.    Yes.
4    A.    You are on page 900, Capsugel 900?
5    Q.    Yes.  Is that correct?
6    A.    Yes.
7    Q.    And then if we look at page 910, it's
8 been -- the agreement has been signed by both Amy
9 Phetkanya, regional manager, and then Martino; is
10 that correct?
11    A.    Yes.  I see that.
12    Q.    And during the time that Martino worked
13 for Capsugel, is it fair to say that this was not a
14 document that you were -- that you were personally
15 aware of?
16    A.    No, this was shared with me a couple of
17 days back for this preparation.
18    Q.    All right.  Do you want to take a break?
19    A.    Sure.
20         MS. UREMOVICH:  I think now is a good
21 time.  Off the record.
22         THE VIDEOGRAPHER:  11:17 a.m. going off
23 the record.
24         (Discussion held off the record.)
25         THE VIDEOGRAPHER:  This begins DVD

Page 57

1 number two.  Time is 11:31 a.m.  Back on the record.
2         MR. CLARK:  Let's mark this as
3 Plaintiff's Exhibit 9.
4         (Exhibit P-9, Document entitled, "Inbox
5 - MARTINO.RIVALTA@CAPSUGEL.COM - Outlook," Bates
6 stamped CPM -237 was received and marked for
7 identification.)
8    Q.    Let me hand you what I've now marked as
9 Plaintiff's Exhibit 9.  This is actually a CPM
10 document.  But the main -- well, let me ask you this,
11 can you identify Plaintiff's Exhibit No. 9 from
12 looking at it?
13    A.    Yes.
14    Q.    What is it?
15    A.    It looks like a meeting invite to do a
16 knowledge transfer to our existing support team.
17    Q.    Okay.  So this would have been after the
18 --
19    A.    After all the deliverables were done and
20 the contract was done.
21    Q.    Okay.  So I kind of went out of
22 sequence.  I tend to work chron -- chronologically,
23 but this would be an example of an invite for a
24 meeting that would be partially Skype, I guess?
25    A.    That's correct.

***** CONFIDENTIAL *****

Page 58

1    Q.    Okay.  And you would have been one of
2  the people invited -- actually, all the -- all the
3  persons are identified at the top; is that correct?
4    A.    Yes.
5    Q.    Okay.  And so this particular meeting
6  invite of June 27, 2017, the purpose of this meeting
7  was to do the knowledge transfer with the end of the
8  project for Martino and the transfer of his work back
9  to the existing internal team; correct?
10   A.    That's correct.
11   Q.    Okay.  And this would have been after
12 Martino would have been advised that the project was
13 ending?
14   A.    That's correct.  The work packages were
15 delivered at that time.
16   Q.    Okay.  And again we're kind of working
17 out of sequence, but who would have been involved
18 in informing Martino that the project was ending,
19 that he was not -- his services were not going to
20 need to be continued?
21   A.    We informed the main vendor, in this
22 case Robert Half.
23   Q.    Okay.
24   A.    We also talked to the consultant, and
25 the main responsibility in this case would be me and

Page 59

1  my boss to communicate the end dates or nearing end
2  dates to the consultant.
3    Q.    Okay.  And can you put a time frame of
4  when -- when Martino was advised?
5    A.    Around June 14th, 15th.
6    Q.    And would that have been in person,
7  Skype or --
8    A.    In person, I think, generally.
9    Q.    So you and Danny?
10   A.    Danny and me.
11   Q.    And then was the internal team --
12   A.    No.
13   Q.    -- part of that?
14   A.    Generally, no.
15   Q.    Okay.  So do you have any recollection
16 how that meeting went?
17   A.    I don't remember completely, but I think
18 he had an office.  I remember we going into his
19 office and Danny saying that our contract has ended,
20 thank you for all the good work.
21   Q.    Okay.
22   A.    And our contract ends probably end of
23 June.
24   Q.    All right.  Did he act surprised?
25   A.    I can't recollect the -- the -- the

Page 60

1  expressions, so I don't know.
2    Q.    Okay.  Was it a pretty short meeting?
3    A.    It was, I would say, but yeah, five,
4  ten -- five minutes max, maybe.
5    Q.    Was it discussed at that meeting that he
6  would be expected to transition the project over to
7  the internal team?
8    A.    No, that was just more the
9  communication.
10   Q.    That it's ending?
11   A.    Yes.
12   Q.    Okay.  All right.  We'll come back, but
13 I want to go -- work back up to that point here with
14 the -- these next exhibits.
15        (Exhibit P-10, Document entitled,
16 "Screenshots of a portion of Capsugel 001028 - Part 1
17 of 2" was received and marked for identification.)
18   Q.    I'm showing you what's been marked as
19 Plaintiff's Exhibit 10, and if you look at the last
20 page, this -- this is a document that Capsugel
21 produced, and by reference these are, at least to my
22 understanding, documents that were provided to
23 Capsugel by Robert Half through a -- a request for
24 discovery.  And as you can tell, very -- very hard to
25 read because of the small print.  So what we did with

Page 61

1  the exhibit, primarily for me, so that I could ask
2  you questions and not squint completely, is I asked
3  my paralegal to blow up part of that, which now is
4  the first couple pages --
5    A.    Okay.
6    Q.    -- of Plaintiff's Exhibit 10.  Do you
7  see that?
8    A.    Yes.
9    Q.    Okay.  So it's really more so that we
10 can have a readable document, at least from my end,
11 to discuss what -- it looks to me, again, this is not
12 a -- for purposes of my questions, this is not a
13 Capsugel document, in the sense that it was generated
14 by Capsugel.  It's a Robert Half document, but it
15 does reference some discussions with you that I
16 wanted to ask about.  So if we look to put it into
17 context, if we look at the bottom, the -- we see the
18 3312017 just referencing that Monday is the start
19 date, which would have been the April 3 date.
20   A.    Sure.
21   Q.    And then if we turn to page 2, there is
22 an entry and again these -- these entries appear to
23 be generated by Jarell Chavers, the jarcha02
24 reference on the left, and then you'll see some --
25 some dates.

***** CONFIDENTIAL *****

Page 62

1        So in April, April 4, it references a
2    conversation that -- apparently between Jarell and
3    you about how things were going with Martino at that
4    time, and it indicates that he's completed the
5    onboarding process, and had his initial meetings
6    to -- referencing the deliverables that he was
7    expected to do; correct?
8        A.   Yes.
9        Q.   Okay.  And that's an entry, similar
10   entry for April 17 as well.  Do you see that?
11       A.   Yes.
12       Q.   And then the -- let's turn to the one
13   that says May 4, 2017, this is referencing a
14   conversation with you, and then there's an indication
15   there, might have additional needs in a few weeks but
16   won't know until after 5/16.  Do you see that?
17       A.   Yes.
18       Q.   Do you know what that is referring to?
19       A.   So this could have been anything that we
20   were working on at that time, any additional new
21   requirements that were being given to us --
22       Q.   Okay.
23       A.   -- but not formalized yet.
24       Q.   All right.  So is that kind of a way of
25   saying there might be additional work that would be

Page 63

1    asked of --
2        A.   Yes.  We're just saying, yeah, be on a
3    standby if there are new things coming.
4        Q.   Okay.  And that's fairly typical, I take
5    it?
6        A.   Yes, because in -- in terms of mergers,
7    the scope of the work is pretty much undefined
8    sometimes.
9        Q.   Okay.  All right.  Let's mark this as
10   Plaintiff's Exhibit 11.
11           (Exhibit P-11, Document entitled,
12   "Screenshots of a Portion of Capsugel 001030 - Part 1
13   of 4" was received and marked for identification.)
14       Q.   I'm handing you Plaintiff's Exhibit 11.
15   And, again, Plaintiff's 11 is the same type of format
16   as Plaintiff's 10.  It's -- the original document in
17   itself is the last page of the exhibit.
18       A.   Okay.
19       Q.   And then there have been screenshots to
20   blow up some of the discussions that are reflected
21   there, which make up the first three pages.  Do you
22   see that?
23       A.   Yes.
24       Q.   So on -- on Plaintiff's 10 we had the
25   maybe additional work reference, I think it was -- on

Page 64

1    May 4th, and so we have a -- similar discussions
2    between you or involving you --
3        A.   Which page are you referring to now?
4        Q.   This would be page 3 of the exhibit.
5        A.   Okay.
6        Q.   If we look at the 5/22/2017 entry, do
7    you see those?
8            MS. UREMOVICH:  Can you clarify which
9    one?
10           MR. CLARK:  Yes, the -- the one that has
11   more text.
12           MS. UREMOVICH:  The fifthth one down?
13       Q.   It says, spoke with you to check in
14   regarding extra work and you said there will be extra
15   work, but it might be more on the perm side with --
16   within finance/accounting.  Do you see that?
17       A.   Yes.
18       Q.   And then it says he is still having
19   conversations surrounding how they will begin
20   sourcing for this resource and should know more next
21   week.  Will follow up at that time.  Do you see that?
22       A.   Yes.
23       Q.   So does that give us a little better
24   insight into where the extra work might be coming
25   from?

Page 65

1        A.   Yes.
2        Q.   Can you explain that then?
3        A.   So we -- during those times we used to
4    attend integration status meetings.
5        Q.   Okay.
6        A.   So I think what came out of that was
7    more and more of actual accounting work, not IT work
8    that came out of those requirements, and that's
9    how -- accounting work, there was more work generated
10   on the accounting side, financial accounting side.
11       Q.   Okay.  So this discussion would have
12   been that there might possibly be more accounting
13   related work for Martino?
14       A.   Not Martino.  Accounting side of the
15   work which is more non-IT type work.
16       Q.   Okay.  Well, so let me ask this, it says
17   it may -- might be more on the perm side within
18   finance/accounting.  What is that referring to?
19       A.   It was probably adding more finance
20   resources, accounting resources.
21       Q.   Okay.  All right.  So this is actually
22   an entry relating to bringing on some additional
23   people?
24       A.   Yes.  That came out of the work.  But I
25   was not responsible for that so this is what we are

***** CONFIDENTIAL *****

Page 66

1  trying to tell them there.
2      Q.   All right.
3           (Exhibit P-12, Memo dated 6/7/2017,
4  Bates stamped Capsugel 000015 through 17 was received
5  and marked for identification.)
6      Q.   Let me hand you what I've marked as
7  Plaintiff's Exhibit 12, and ask you to review that
8  and if you can identify it?
9      A.   Yes.
10     Q.   And what is Plaintiff's 12?
11     A.   This looks like an e-mail between me and
12 Jarell about the final end dates for this particular
13 engagement.
14     Q.   Being Martino?
15     A.   Yes, Martino, yes.
16     Q.   So rather than just read what it says,
17 basically, Jarell was reaching out to you to find out
18 from you whether you thought he would get extended
19 out past June 30, which was the end date under the
20 statement of work; correct?
21     A.   Correct.
22     Q.   And were -- and do you -- do you recall
23 what your response was?
24     A.   I don't recall exact, but I think we
25 said the contract is coming to an end and there's no

Page 67

1  IT related work for Martino at that time, something
2  like that.
3      Q.   Okay.
4           (Exhibit P-13, Memo dated 6/15/17, Bates
5  stamped Capsugel 000034 through 35 was received and
6  marked for identification.)
7      Q.   I'm going to hand you what I've marked
8  as Plaintiff's Exhibit 13 and ask you if you can
9  identify that?
10     A.   Yes, this -- this is an e-mail exchange
11 between me and Jarell about the closure and he is
12 checking on me whether I had any other extension.
13     Q.   Okay.  And basically the end result is
14 that you had -- you indicated to Jarell that the
15 integration work was coming to a close and the
16 pending work was going to be assigned to business and
17 Lonza IT teams?
18     A.   I meant Lonza which was our acquisition
19 company.
20     Q.   Okay.  So when -- when it says business
21 and Lonza IT teams, are you referring to the internal
22 group or are we talking about something else?
23     A.   No, our acquiring IT group, the group
24 that was acquiring.
25     Q.   Okay.  So was that decision a part of

Page 68

1  discussions that you had had with Danny or was this
2  your -- kind of your decision or --
3      A.   I was in charge of my stream in the
4  integration, so it was one of the decisions but it
5  rolls up under our CIO at that time also, so...
6      Q.   Okay.  I wanted to ask about Jarrell's
7  e-mail to you.  We talked about kind of the end
8  result which you're -- you're responding to that, but
9  at the bottom of -- of the first page he states, I
10 know the BPC work is winding down, however, from what
11 I hear there's a lot of work on the HANA side that
12 still needs to be completed.  At -- was that a
13 correct statement?
14     A.   Umm, I don't think that would be a
15 correct statement, because the work packages that we
16 had planned between BPC and HANA, they're all closed.
17     Q.   Okay.
18     A.   So Martino delivered about six different
19 views in HANA that was feeding our data into Lonza
20 database and BPC for the consolidation, that was
21 completely done.  So I'm not sure what the HANA side
22 still needs to be completed really means in this
23 e-mail.
24     Q.   Okay.  Were there any phone discussions
25 or was it simply e-mail?

Page 69

1      A.   I think at that time I was traveling.  I
2  don't know if I -- how many times I called Jarell.
3  There must have been a couple of phone calls.
4      Q.   Okay.  And then I wanted to ask you
5  about the last sentence down at the bottom of page 1.
6  It says, in addition it sounds like he's been
7  utilized in other departments based on what able --
8  based on what he is able to bring to the table
9  regarding his skill sets.  Do you see that?
10     A.   Yes.
11     Q.   Do you know what that is referring to?
12     A.   I can only guess.  Martino had to work
13 with two different groups because that was the end
14 results that had to get that verified with the end
15 users.  That's probably what they're referring to
16 when they say multiple departments or other
17 departments.
18     Q.   All right.  Who -- just so we have a
19 document for the record, the two groups would --
20 would have been which?
21     A.   BPC work lead he was working with,
22 Michael Mars and Lynn Horowitz.
23     Q.   Okay.
24     A.   And for HANA he was working with me and
25 other groups which was validating his work output.

***** CONFIDENTIAL *****

Page 70

1    Q.    So in making the decision, you know,
2  that the project was coming to a close and it didn't
3  need to be extended as it related to Martino, were
4  there discussions that you had with -- with Mike --
5  Michael Mars or Lynn Horowitz?
6    A.    They represent the business side which
7  is the accounting side of it.  I'm not responsible
8  for their deliverables, but as long as the system
9  works, according to what they've defined in the
10 integration, IT deliverable was mine to make a
11 decision on.
12   Q.    Okay.  So you made the decision,
13 basically, focused on the IT side?
14   A.    Correct.
15   Q.    And what I'm trying to just understand
16 is, was there any discussion about further utilizing
17 Martino's services on the business or the accounting
18 side?
19   A.    I was not aware of that, and I was not
20 part of that discussion.
21   Q.    Okay.
22        (Exhibit P-14, Document entitled,
23 "Screenshot of a Portion of Capsugel 001031 - Part 1
24 of 2" was received and marked for identification.)
25   Q.    Let me hand you Plaintiff's Exhibit 14,

Page 71

1  and this is another one of those blowup exhibits
2  where the last page is the actual what I call the
3  small print version.
4    A.    Okay.
5    Q.    And the first two pages are screenshots
6  of --
7    A.    Enlarged.
8    Q.    -- portions of that that are part of
9  what I want to discuss with you here today in a
10 little more readable format.
11        Looking at page 1, down at the 6/12
12 entry, that would have been a reference of a
13 discussion with you about his role ending June 30th;
14 is that correct?
15   A.    Who is "miguser" here?
16   Q.    I was going to ask you if you know?
17   A.    I don't know who that is.
18   Q.    You're not aware?
19   A.    I'm not aware of that.
20   Q.    Okay.  If you look at page one and two,
21 can you tell from the context of the entries that --
22 whether miguser would be Jarell Chavers?
23        MS. UREMOVICH:  I'm going to object to
24 the extent that since it doesn't provide the earlier
25 callins that are on page three of this exhibit, you

Page 72

1  have that clarification I believe under the mjpuser
2  and SR name.
3        MR. CLARK:  Okay.  Now, you're really
4  challenging me here to read the fine print.
5    Q.    Can you tell from looking at the last
6  page of the exhibit who miguser was?
7        Let me ask it this way.  Again, look at
8  page 2, top entry, 6/15 and then it's SW spoke with
9  Danny to confirm when Martino will be ending and he
10 said he would speak with his team and get back to me
11 today regarding his end date.  And if we look, oh,
12 kind of mid -- mid -- slightly below mid-page, I
13 think we see that entry, and if we look at the
14 left-hand column, it appears to be Jarell Chavers,
15 doesn't it?
16   A.    Yes, it looks like that.
17   Q.    You see where I'm looking?
18   A.    The last page?
19   Q.    Yes.
20   A.    Um-hum.
21   Q.    Do you see the reference on the kind
22 of to the -- in the left column?
23   A.    Um-hum.
24   Q.    So --
25   A.    Yes.

Page 73

1    Q.    So at least from this page it appears
2  miguser is Jarell Chavers?
3        MS. UREMOVICH:  Objection.  If you look
4  further up, it's a mischaracterization of the
5  evidence.  If you look further up, it looks like
6  Barry Cormier also used that miguser event, created
7  by.
8        MR. CLARK:  Okay.  All right.
9    Q.    Well, for purposes of the -- the entry
10 that we're specifically discussing, it appears that
11 that communication came from Jarell Chavers, doesn't
12 it, to you?
13   A.    I don't know.  I'm not the owner of this
14 content.
15   Q.    Okay.  Well, let's look at the last
16 entry on page 2, and then if you need to look
17 on -- what I'll call the small print version on page
18 three, does -- does the 6/15 entry of Brett appear to
19 reference a discussion between you and Jarell
20 Chavers?
21   A.    From the dates it looks like our
22 conversation, but I don't -- I cannot confirm that
23 this is our exact e-mail.
24   Q.    Well, as I recall, you don't recall
25 having any specific discussions with Barry Cormier

***** CONFIDENTIAL *****

Page 74

1  yourself as it related to Martino; is that right?
2      A.   That's correct.
3      Q.   So just from process of elimination,
4  that -- if there is a conversation referenced about
5  the winding down of the work and --
6      A.   It would be with Jarell then.
7      Q.   -- and farming it out to Lonza's IT
8  team, that would have been between you and Jarell;
9  correct?
10     A.   That's correct.
11          (Exhibit P-15, Confidential Document
12  Bates stamped CPM 0305 through 0307 was received and
13  marked for identification.)
14     Q.   Let me show you what I've marked as
15  Plaintiff's Exhibit 15.  Did you get a chance to look
16  at that?
17     A.   Yes.
18     Q.   And the first page of Plaintiff's 15
19  is -- well, let me reask it this way.  What I really
20  want to have you focus on is the second page, second
21  and third page of the exhibit.  And, again, you're
22  not specifically copied on these e-mails, but we had
23  talked a minute ago about the business side and you
24  identified both Michael Mars and Lynn Horowitz, and
25  these appear to be e-mail communications with them;

Page 75

1  is that correct?
2      A.   Yes.
3      Q.   And, also, with Yokesh Sivakumar?
4      A.   Yes.
5      Q.   Have I said that right --
6      A.   Yes.
7      Q.   -- or close enough?
8      A.   You said that right.
9      Q.   Okay.  Thank you.  These were -- the
10  subject of these communications were on changes with
11  the BPC server reports; right?
12     A.   Yes.
13     Q.   And there's one other person identified
14  here.  I wanted to see if you could tell me who that
15  individual is.  If you look down at the bottom of
16  page 2 there's a cc'd to Karen Polanco?
17     A.   Yes.
18     Q.   Do you know who she is?
19     A.   She was part of Lynn's organization
20  which is from finance.
21     Q.   Okay.  So just to kind of recap,
22  Martino's project would have involved working with
23  your team on the HANA side and then with Michael
24  Mars' group on the BPC side?
25     A.   I would like to rephrase that.  Yes,

Page 76

1  that's correct.  HANA with me, but the end results in
2  this case Michael Mars and Lynn had to sign off on
3  his work product for me to accept that as ITS
4  finished its job.
5      Q.   Okay.  With that qualification, I
6  understand.  They would have to sign on the BPC side
7  for you to approve the --
8      A.   To say that IT side is done.
9      Q.   Okay.  Got you.  All the -- all the work
10  Martino did again was on the Robert Half system that
11  you had access to; right?
12     A.   No.  All the work product that he
13  delivered was done on Capsugel systems.
14     Q.   Okay.
15     A.   The only thing that he used Robert Half
16  system, from engagement was the time system where he
17  reported his time.
18     Q.   All right.  Poor question on my part.
19  You had access to his time system; correct?
20     A.   I wouldn't say access to the time
21  system.  I would just get a workflow that here's the
22  time and when I log in it would take me into their
23  approval system.
24     Q.   All right.  You had access to the system
25  to be able to go in, see the time and then --

Page 77

1      A.   Approve or reject.
2      Q.   -- approve or reject it?
3      A.   Right.
4      Q.   Do you recall any instances where you
5  rejected any of his time?
6      A.   I think there were a couple of times
7  because I think he had overtime on that, and in
8  principle they had to get overtime pre-approved
9  before they put it on time.
10     Q.   Okay.  Were there any instances that you
11  recall where you rejected his time as it related to
12  the quality of his work as opposed to overtime?
13     A.   No.
14     Q.   And then would you, in order to approve
15  his time entries for processing a payment, would you
16  have to consult with Michael Mars or his group on the
17  BPC side?
18          MS. UREMOVICH:  Objection.  Calls for
19  speculation.  You can answer if you can.
20     A.   The time was just more for us to track
21  what he's working on --
22     Q.   Right.
23     A.   -- in terms of duration, but the work
24  products -- the user is being Michael Mars and Lynn
25  had to sign off saying that the work product is

***** CONFIDENTIAL *****

Page 78

1  complete.
2        Q.    Okay.  So let's start over.  So on
3  the -- I want to focus on the BP side -- BPC side.
4        A.    Um-hum.
5        Q.    Either Michael Mars or Lynn Horowitz
6  would have to sign off on -- on Martino's work as it
7  related to that side of the business work that he
8  performed?
9        A.    For the IT deliverable to be complete,
10 yes.
11       Q.    Yeah, okay.  And so how would you know
12 he signed off, was that just kind of marked in the
13 system or --
14       A.    Yes.  So if you see that server, if the
15 report is good, they accept it and that e-mail is
16 taken as an acceptance of their work product
17 acceptance.
18       Q.    Okay.  Did he -- do you recall having
19 any discussions -- I'm just going to call it with
20 anyone on the Mars group about Martino's performance
21 or work product?
22       A.    No.  I don't recall discussing
23 performance with other groups.
24       Q.    Okay.  And -- and the BPC side was
25 integrated under the IT umbrella; is that right?

Page 79

1        A.    So everything is related to business.
2  So there's an IT component and a -- and a business
3  component.  So IT delivers the product, but at the
4  end of the day the ownership is with the business to
5  sign off on the work products we delivered.  It means
6  I accepted this report, it's correct, I can use this.
7        Q.    Okay.  Got you.  That's helpful.  Thank
8  you.
9              (Exhibit P-16, Document entitled,
10 "Overview Actions," Bates stamped Capsugel 000072
11 through 74 was received and marked for
12 identification.)
13       Q.    All right.  Let me hand you what I've
14 marked as Plaintiff's Exhibit 16.  Can you identify
15 that?
16       A.    This looks like our HR system records in
17 our SAP system.
18       Q.    And, specifically, 16 shows the HR
19 records for the -- what we previously identified as
20 the internal team of three?
21       A.    I'm sorry, can you repeat that question?
22       Q.    Yeah.  These -- these are HR records
23 relating to the internal team of three that would
24 have been --
25       A.    The contingent employees.

Page 80

1        Q.    Yeah.  That the work would have been
2  transitioned to; correct?
3        A.    Yes.
4        Q.    Now, on these three individuals they
5  were all -- well, two of the three were offshore and
6  then I believe Yokesh was the one that was at -- at
7  the facility; correct?
8        A.    That's correct.
9        Q.    And have any of them been made
10 employees?
11       A.    No.  Our contracts with our vendors
12 prohibit them from hiring until the termination of
13 their contracts.
14       Q.    Okay.  So the MSA itself has a
15 prohibition concern?
16       A.    Yes.
17       Q.    Some -- some MSAs allows a company to
18 hire when the engagement ends; right?
19       A.    Umm --
20       Q.    Have you ever worked with that scenario
21 or not?
22       A.    I have not.  Not in Capsugel.
23       Q.    Okay.  So if we look at the second page,
24 this is relating to -- I just can't -- Karunankar?
25       A.    Karunankar.

Page 81

1        Q.    Yeah, sorry.  So he actually was
2  separated in July of 2018 and it says end of
3  temporary contract.  Is that --
4        A.    Yes, that's around the time when
5  Karunankar had left our team.
6        Q.    So can you tell from looking at the
7  document itself, whether -- what the original length
8  of his project was?  I mean -- it shows he had a
9  start date of 8/12/2016, so... and then I see a
10 reference to an end date of 3/26/2018.
11             MS. UREMOVICH:  Objection.  That
12 mischaracterizes the evidence.
13       Q.    If -- if you see the last entry, does
14 that reflect a start date of --
15       A.    Karunankar.
16       Q.    -- for him of 8/12/2016?
17       A.    That sounds about right.  That's August
18 when he was --
19       Q.    And then it shows in the next column end
20 date 3/26/2018; is that right?
21       A.    Yes, it says 3/26/2018.
22       Q.    And do you know what the reference to UR
23 means?
24       A.    I don't.
25       Q.    Do you have any knowledge or

***** CONFIDENTIAL *****

Page 82

1  understanding of what the entry above that is
2  referencing?
3       A.   No.  This -- this would be from the HR
4  records.  So I'm not qualified to understand the keys
5  here.
6       Q.   Okay.  From your own knowledge of
7  working with him, do you know what his original
8  project length was?
9       A.   PWC, he comes from PWC, Venugopal and
10  Karunankar are -- represents PwC.  Our original
11  contract with PwC is for five years.  So they can
12  keep them for whenever they want.  It's not our
13  decision to make.
14       Q.   Oh, so it's a five-year agreement?
15       A.   Running agreement, yeah.
16       Q.   So with respect to -- again, I'm sorry,
17  Karunankar, do you know why his -- his agreement
18  ended short of five years?
19       A.   In their world they keep moving to other
20  projects.  It's not that he was terminated or
21  anything.  As far as I know he moved on to another
22  project within PWC.
23       Q.   Okay.  Going back to Plaintiff's 3, if
24  we take out the permanent employees, is it fair to
25  say that most of the persons listed as contractors on

Page 83

1  Plaintiff's Exhibit 3 are PwC offshore workers?
2       A.   Yes.
3       Q.   And would all of those had been from
4  India?
5       A.   Yes.
6       Q.   Okay.
7            (Exhibit P-17, Invoice No. 0045060,
8  Bates stamped Capsugel 000726 through 000782 was
9  received and marked for identification.)
10       Q.   Can you identify Plaintiff's Exhibit 17?
11       A.   Yes.  That's the invoice.  Generally I
12  don't get to see that, but that goes to the
13  accounting department from HTC which represents
14  Yokesh to our -- Capsugel.
15       Q.   Okay.  And the first page is the invoice
16  and then the rest of the exhibit I believe is time
17  records for the --
18       A.   Yes.
19       Q.   -- underlying invoice; is that correct?
20       A.   Yes.
21       Q.   And this -- the unit price is 93.50, is
22  that referring to his rate?
23       A.   Yes.
24       Q.   Okay.  Do you know what the rates were
25  for the PwC workers that are reflected on PX-3?

Page 84

1       A.   No, I don't know on top of my head at
2  this point.
3       Q.   Do -- would it have been in the same
4  range or less?
5       A.   Offshore would be lesser.
6       Q.   Less than 93.50?
7       A.   Yes.
8       Q.   Okay.
9            (Exhibit P-18, Invoice from Robert Half,
10  Bates stamped Capsugel 000724 through 725 was
11  received and marked for identification.)
12       Q.   Let me show you what's been marked as
13  Plaintiff's Exhibit 18.  Can you identify that?
14       A.   This looks like a Robert Half invoice to
15  Capsugel for Martino's services.
16       Q.   Okay.  And that shows his rate of 223 an
17  hour?
18       A.   Yes.
19       Q.   So it would be fair to say that his --
20  his services, Capsugel was paying a much higher rate
21  than either PwC offshore or with respect to Yokesh?
22       A.   Yes.
23       Q.   From HTC; correct?
24       A.   Yes.
25       Q.   So was part of the business decision in

Page 85

1  ending his services related to the cost?
2       A.   No, it was the work package mainly.
3       Q.   Okay.  And when you say mainly the work
4  package, what do you mean?
5       A.   The end of all his deliverables, they --
6  he had delivered what we had asked him to, and that
7  was the end of the work package.
8       Q.   Okay.  But as far as the transition of
9  his work over to the internal team on a going-forward
10  basis, that would be those three individuals all of
11  which would have worked at lower rates than him, than
12  Martino; correct?
13            MS. UREMOVICH:  Objection.  It
14  mischaracterizes the evidence.
15            MR. CLARK:  All right.
16       Q.   Would it be fair to say that when the
17  decision was made that his work was completed, that
18  as far as the transition work over to the internal
19  team, the three individuals we've discussed, that
20  would have been at much lower rates than what the
21  company was paying for Martino's services; correct?
22            MS. UREMOVICH:  Same objection.  You can
23  answer, if you can.
24       A.   The answer is not about transitioning
25  the work, it's about when the promise delivered.

***** CONFIDENTIAL *****

Page 86

1    It's not in the project mode anymore.  It's keep the
2    lights on, which means I -- I don't get the same call
3    to create a new report.  I just have to support it
4    and the report doesn't run.  That's why it goes to
5    the support teams which are much lower priced.
6        Q.   Okay.  And were -- was that a decision
7    made within Capsugel or was that a Lonza decision or
8    a combination?
9        A.   That's a Capsugel -- original Capsugel
10   decision, support and projects are two different
11   categories in IT.
12       Q.   Sorry.  I confused those.
13       A.   That's okay.
14       Q.   So this would be a Capsugel based
15   decision?
16       A.   Decision, yes.
17       Q.   It would not -- was not influenced by
18   the Lonza merger?
19       A.   No.
20       Q.   Okay.  Perfect.  Let me ask it this way,
21   maybe I can save you from a few documents.
22            Once the decision was made that the IT
23   related part of the project had ended and Martino's
24   services were not needed anymore, part of the ending
25   of that process would be returning his badge and

Page 87

1    laptop?
2        A.   Yes, on the last day of the work.
3        Q.   Okay.  And so requests were made to
4    Martino to do that, do you recall?
5        A.   Yes.  I think -- I believe there
6    was -- at the end of the day we -- we asked him to
7    leave behind the laptop and the badge, yes.
8        Q.   Okay.  So there wasn't any issue in
9    terms of finalizing any of that --
10       A.   Can --
11       Q.   -- to your recollection?
12       A.   Can you repeat that question?
13       Q.   You don't recall there being any
14   problems or issues related to him returning --
15       A.   Mart -- in Martino's case, I was not
16   there on his last working day.
17       Q.   Okay.
18       A.   He apparently took the laptop to -- with
19   him, he didn't give it to the help desk or the front
20   office there.  He took it home and then he had to
21   mail it in, the package into us.  That was the
22   exception.
23       Q.   And it was done?
24       A.   Yes.
25       Q.   Okay.  I saved you three exhibits.

Page 88

1            (Exhibit P-19, Memo dated 7/27/17, Bates
2    stamped Capsugel 000031 through 033 was received and
3    marked for identification.)
4        Q.   Can you identify Plaintiff's Exhibit 19?
5            MS. UREMOVICH:  Objection to the extent
6    it calls for speculation.  You can identify it, if
7    you can.
8        A.   This is the e-mail I received from you,
9    Steve, about the pending case that we are talking
10   about.
11       Q.   Okay.  This was a demand letter --
12       A.   Yes.
13       Q.   -- that you received from my office?
14       A.   Yeah, I don't know the exact legal term.
15   Yes, that's what it is.
16       Q.   Okay.  I mean, so -- and for purposes of
17   identification, the actual letter is the second and
18   third page of the exhibit; is that correct?
19       A.   Yes, that's correct.
20       Q.   And the first page at the bottom is the
21   actual e-mail transmittal from me to you; correct?
22       A.   That's correct.
23       Q.   So it's fair to say you did receive it?
24       A.   I did.
25       Q.   And then you generated an e-mail to

Page 89

1    Danny?
2        A.   Yeah, I followed the protocol there.  So
3    I have to report it to my boss, and I think it comes
4    -- and then he does his protocols.
5        Q.   All right.  Now, did you have any
6    discussions with Danny about the demand letter that
7    was not -- not -- not including lawyers?
8        A.   Yes, we did.  When this came, this was
9    forwarded to him and then he had a discussion, then
10   he asked what this is about.  So we just went through
11   this, the details again.
12       Q.   Okay.
13       A.   And then his next steps were he followed
14   the protocol and he took it to our legal department.
15       Q.   Okay.
16            (Exhibit P-20, Memo dated 10/6/17, Bates
17   stamped Capsugel 000036 through 038 was received and
18   marked for identification.)
19       Q.   Let me hand you Plaintiff's Exhibit 20
20   and ask you if you can identify that?
21       A.   Yes.
22       Q.   And what is Plaintiff's 20?
23       A.   This is an e-mail exchange between
24   myself and Jarell about the document that you sent
25   and we were exchanging information on how Robert Half

***** CONFIDENTIAL *****

Page 90

1   was handling that matter as well.
2        Q.   All right.  So to put it -- put this in
3   the proper context, you reached out to Jarell in
4   October of 2017 about whether there were any updates
5   on --
6        A.   Yes.  So one of the things that we did
7   after going into our legal department was --
8            MS. UREMOVICH:  Objection to the extent
9   it calls for privileged information.  Don't disclose
10  anything that you spoke with your legal team about,
11  just answer --
12           MR. CLARK:  No --
13           MS. UREMOVICH:  -- about what, these
14  documents --
15           MR. CLARK:  Right.
16           MS. UREMOVICH:  -- and these e-mails.
17       Q.   But you can testify about actions that
18  you took.  So that's to the extent that includes
19  actions that you took.
20       A.   To reach out to the vendor, yes.
21       Q.   Yes.  So let me ask it this way.  Do you
22  know whether you shared with the vendor a copy of
23  the -- my demand letter which is Plaintiff's 19?
24       A.   I don't recall doing it myself.
25       Q.   Okay.

Page 91

1        A.   But I don't know the -- the subsequent
2   steps that happened.
3        Q.   All right.  Were there any -- besides
4   the e-mail communication that's reflected in PX-20
5   were there any phone conversations between you and
6   Jarell in this time frame about an update on the
7   situation with Martino?
8        A.   Yes.  We did connect a few times, almost
9   the same statement that we talked about, see if there
10  were any updates and what they were doing about it as
11  well.
12       Q.   Okay.  Were there any communications
13  about the difference -- or were -- did you -- strike
14  that.  Start over.
15           In those conversations, did you become
16  aware through Jarell that the signed subcontract
17  agreement with -- between Half and Martino and CPM
18  was for a different project claim than the statement
19  of work?
20       A.   No, not that I recall discussing that.
21       Q.   Did that ever come up in discussions
22  with Jarell?
23       A.   Not until we saw the discovery notes
24  that our contract terms were different.
25       Q.   Okay.

Page 92

1            (Exhibit P-21, Document entitled,
2   "Screenshots of a Portion of Capsugel 000852" was
3   received and marked for identification.)
4        Q.   Let me show you what I've marked as
5   Plaintiff's Exhibit 21.  Have you seen this before?
6        A.   No.
7        Q.   Okay.  Were there -- strike that.  To
8   your knowledge, were there ever any discussions with
9   Robert Half about them not using Martino in the
10  future because he had filed litigation against
11  Capsugel?
12       A.   No, not that I'm aware.
13       Q.   Or what I would call a request of
14  blackballing him?
15       A.   No.
16       Q.   In 21, on -- again, the first page is
17  a -- just a blowup, if you will, from one of the
18  entries on the second page, in the comment section it
19  says:  Do not use for any type of role.  He filed a
20  lawsuit against one of our clients because the client
21  ended his engagement three months early.  Do you see
22  that?
23       A.   Yes.
24       Q.   Do you recall on -- having any
25  conversations with Jarell on that subject?

Page 93

1        A.   No.
2        Q.   Not the blackball issue, but the --
3   client ending his engagement three months early?
4        A.   No.
5            (Exhibit P-22, Plaintiffs' Second
6   Amended Complaint was received and marked for
7   identification.)
8            MS. UREMOVICH:  Thank you.
9        Q.   Let me hand you what I've marked as
10  Plaintiff's Exhibit 22.  Have you seen Plaintiff's
11  Exhibit 22 before?
12       A.   Yes, yesterday we were talking about it.
13       Q.   All right.  And Plaintiff's 22 is the
14  second amended complaint with the, what I'll call the
15  lawsuit against Capsugel.  Now, I'm not asking you
16  whether or not you agree with the contentions, but I
17  just want to ask, do you understand what the
18  contentions are in the lawsuit?
19       A.   Yes.
20       Q.   And the contentions are -- there are two
21  claims.  Is it your understanding there are two
22  claims in the lawsuit, one, discrimination based on
23  the New -- New Jersey law against discrimination or
24  what's referenced as LAD on -- on page three?
25       A.   Yes.

**APP. 057**

***** CONFIDENTIAL *****

Page 94

1    Q.    And then a tortious interference for
2  contract claim which is Count 2 that's referenced on
3  page 5?
4    A.    Yes.
5    Q.    To kind of recap, mid-June is -- we've
6  talked about the meeting with Martino where you and
7  Danny -- short meeting -- told him his services
8  weren't going to be needed; right?
9    A.    Yes.
10    Q.    And then -- then there was a -- at that
11  time was he told his end date would be June 30 or was
12  that a follow-up discussion?
13    A.    I think he was told it was the end of
14  the month, not exactly the date maybe.
15    Q.    Okay.  And in that meeting, was he told
16  that he -- in the remaining two weeks, basically,
17  that he was to transition his work over to the
18  internal team?
19    A.    I think that came subsequently in terms
20  of transition plan.
21    Q.    Okay.  And that's that Skype --
22    A.    Meeting at ITS, yes.
23    Q.    Was on the 27th?
24    A.    I thought it was the 17th.  Yeah, the
25  meeting itself, yes.

Page 95

1    Q.    I think we had the meeting invite.
2    A.    Yes, the 27th.
3    Q.    I think it was the 27th, but you're
4  welcome to look.  We've gone through a lot of paper.
5    MS. UREMOVICH:  Exhibit 9.
6    THE WITNESS:  9?
7    MS. UREMOVICH:  Yeah.
8    THE WITNESS:  Here it is.
9    A.    Yes, the 27th, yes.
10    Q.    The 27th?
11    A.    (Witness nods head.)
12    Q.    And then from what I understand, you
13  weren't there on his last day, you were --
14    A.    I believe I missed his last day.
15    Q.    Okay.  So let me kind of take it
16  up -- but you were involved -- those -- those were
17  part of the three exhibits I didn't mark, but you
18  were involved in follow-up discussions with Martino
19  about returning the badge and the laptop, which
20  would have -- would have been, I can show them to
21  you, would it be --
22    A.    That's correct.
23    Q.    -- in July?
24    A.    Yes.
25    Q.    So what I want to try to ask -- what I

Page 96

1  want to ask you is kind of in this time frame between
2  the initial meeting and your last communications with
3  Martino before you received my demand letter.  Were
4  there ever any discussions that you had with Martino
5  at all about the difference between the statement of
6  work length of three months and his agreement with
7  Robert Half being six months plus?
8    A.    I don't think we discussed that at all.
9  I believe we parted well.  In fact, that -- we were
10  surprised to receive the letter.
11    Q.    Okay.  So your -- you have no
12  recollection of discussing --
13    A.    Contract duration.
14    Q.    -- duration?
15    A.    No.
16    Q.    Okay.  On Plaintiff's 22, if you would
17  look at page four, paragraph 19, you'll see there's a
18  reference in the first sentence of 19 -- again I'm
19  not asking you to agree or disagree, -- there's a
20  reference to the Immigration Reform and Control Act
21  or IRCA, 8 U.S.C., Section 1324b.  Do you see that?
22    A.    Yes.
23    Q.    All right.  Is that a statute that you
24  have any familiarity with?
25    A.    No.

Page 97

1    MR. CLARK:  Let's mark this one as well.
2    (Exhibit P-23, Document entitled, "Title
3  8 - Aliens and Nationality, Page 362," was received
4  and marked for identification.)
5    Q.    Let me hand you what I've now marked as
6  Exhibits 23 and 24.  And let me tell you for
7  identification purposes, 23 is a copy of the 8
8  U.S.C., Section 1324b.
9    And then PX-24 is a copy of a release
10  from the Department of Justice April 3, 2017,
11  cautioning employers seeking H-1B visas not to
12  discriminate against U.S. workers.  Do you see that?
13    A.    Yes.
14    Q.    Now, you're not a lawyer, so I'm not
15  going to hold you to that, but do you -- before this
16  lawsuit began, did you have any familiarity either
17  with 1324b or the Justice Department press release?
18    MS. UREMOVICH:  Objection to the extent
19  that it's been asked and answered.  You can answer if
20  you can.
21    A.    Not -- not the technical details, but,
22  yes, we were aware in general principles of what
23  those meant.
24    Q.    Okay.  So you were generally aware of
25  these -- sorry.  All right.  Back on the record.

***** CONFIDENTIAL *****

Page 98

1 After the -- after the buzzing. Okay. Let's put
2 aside the issues involving Martino which was the
3 litigation that we're in here today. What I'm trying
4 to really ask is, before the issues emerged in the
5 lawsuit that Martino has filed through his company
6 and himself against Capsugel, was -- was there a
7 general awareness related to the prohibitions in
8 1324b and the press release issued by the Justice
9 Department?
10     MS. UREMOVICH: Objection. Calls for
11 speculation. You can answer if you can.
12     Q.   I'm just asking as it relates to you?
13     A.   A general awareness was there, yes.
14     Q.   And what was your general awareness as
15 it relates to the -- to the statute and the Justice
16 Department rules? Again, I'm not holding you to the
17 standard of a lawyer.
18     A.   I think -- yeah, the general rules was
19 not to discriminate, as you said. We don't
20 discriminate whether it's anybody --
21     Q.   All right.
22     A.   -- not just based on work status. But I
23 think the preface was for U.S. citizens and -- versus
24 H-1B employees.
25     Q.   Okay.

Page 99

1     MS. UREMOVICH: Do you want to take a
2 quick break?
3     MR. CLARK: Actually let me ask one
4 follow-up question and then we can take a break and I
5 can look through these and see if there is --
6     MS. UREMOVICH: Anything --
7     MR. CLARK: -- anything I can kind of
8 whittle down. Because I think I'm pretty close.
9     MS. UREMOVICH: Okay, yeah.
10     Q.   Is it fair to say that you do not
11 believe that Capsugel has violated Section 1324b?
12     MS. UREMOVICH: Objection to the extent
13 it calls for a legal conclusion. You can answer, if
14 you can.
15     A.   I personally don't believe we have
16 violated anything. This was a -- a fairly simple
17 case. We finished the work that was allocated to
18 somebody and the work was done and that's pretty much
19 how we saw it.
20     MR. CLARK: Okay. Why don't we take
21 that break.
22     MS. UREMOVICH: Let's take that break.
23 Off the record.
24     THE VIDEOGRAPHER: 12:50 p.m. off the
25 record.

Page 100

1     (Discussion held off the record.)
2     THE VIDEOGRAPHER: Stand by. This
3 begins DVD number three. The time is 12:59 p.m.
4 Back on the record.
5     MR. CLARK: If the reporter will mark
6 the next exhibit here.
7     (Exhibit P-24, Document entitled,
8 "Justice News," was received and marked for
9 identification.)
10     (Exhibit P-25, Defendant's Objections
11 and Answers to Plaintiffs' First Set of
12 Interrogatories was received and marked for
13 identification.)
14     Q.   Let me show you what has been marked as
15 Plaintiff's Exhibit 25. And for identification
16 purposes, this is Capsugel's objections and answers
17 to plaintiff's first set of interrogatories. Do you
18 see that?
19     A.   Yes.
20     Q.   My primary -- let me just ask it -- ask
21 it from this standpoint. Would you have been
22 involved in providing any of the information as far
23 as the answers to interrogatories?
24     A.   Some of the e-mail backups that was
25 related to, yes.

Page 101

1     Q.   Okay. What I wanted to get
2 clarification on -- I think this is correct, but if
3 you'll look at Interrogatory No. 14.
4     A.   Page?
5     MS. UREMOVICH: Can you provide the page
6 number?
7     MR. CLARK: Page 10.
8     MS. UREMOVICH: Thank you.
9     Q.   Interrogatory 14 was asking about during
10 the Martino's interview process, what comments did
11 you or Danny DuPont make in his presence concerning
12 the expected length of time of work at the project.
13 And the answer is during the interview process you
14 and Danny expressed the assignment was expected to
15 last three months as evidenced by the statement of
16 work. That answer really relates to what was
17 discussed with Robert Half; correct?
18     A.   Yes.
19     Q.   That -- based on your earlier testimony,
20 I just wanted to confirm that as it relates to a
21 specific interview that you had with Martino, the
22 length or duration of the contract was not a topic of
23 discussion?
24     A.   That's correct.
25     Q.   Okay.

***** CONFIDENTIAL *****

Page 102

1    (Exhibit P-26, Defendant's Supplemental
2  Objections and Responses to Plaintiff's First
3  Requests for Production of Documents was received and
4  marked for identification.)
5    Q.   Let me hand you what's been marked as
6  Plaintiff's Exhibit 26, and again for identification
7  purposes, this is defendant's supplemental objections
8  and responses to plaintiff's first request for
9  production of documents.  Do you see that?
10   A.   Yes.
11   Q.   And if you would go to page 7.  Request
12 for production number 9.  Please produce your notes
13 from any meetings with Rivaplata and/or Barry Cormier
14 or other Robert Half personnel concerning Rivaplata.
15 The answer is after conducting a diligence search
16 defendant has not located any documents that are
17 responsive to this request.
18    Are -- do you have any electronic or
19 written notes that would be responsive to this
20 request?
21   A.   I think we have probably produced all
22 the e-mails which are considered additional copies of
23 exchange of information.
24   Q.   These are really asking about notes.
25   A.   Minutes of meeting, meeting notes.

Page 103

1    Q.   Meeting notes or meetings (sic) of
2  discussions, whether they were recorded, you know,
3  handwritten or electrically, are there any such notes
4  that you're aware of?
5    A.   No, there is no other physical notes
6  other than the digital that we've already supplied.
7    Q.   Okay.  I just wanted to confirm that for
8  record purposes.  Thank you.
9    All right.  To kind of finish up here I
10 want to go to Plaintiff's 3.  And I'm going to limit
11 my question really to the time frame where you
12 assumed your role, I guess, as business systems
13 analysis manager 2, is the title, do you see that?
14   A.   Yes.
15   Q.   Anyway, the time frame where you assumed
16 that role moving forward, as it relates to the IT
17 part of the business practice, can you explain
18 what -- from a business practice perspective, why
19 Capsugel uses a combination of employees and
20 contractors to do the IT work?
21   MS. UREMOVICH:  Objection to the extent
22 it calls for speculation.  You can answer, if you
23 can.
24   A.   I think it's -- it's a standard IT, you
25 know, practice in any company that it has a right

Page 104

1  mixture of on site and offshore resources.  That's
2  the norm in these days in terms of operating mode.
3  And we have differences again there between projects
4  which is essentially new building versus support,
5  support mean keeping the lights on, day-to-day
6  activities.
7    Q.   Right.
8    A.   As you would have seen in most places
9  the preferred choice of -- has always been offshore
10 for support activities.
11   Q.   Okay.  Is it fair to say at least from
12 what's been depicted on Plaintiff's Exhibit 3, that
13 from a staffing standpoint, the number of actual
14 employees is relatively small when compared to
15 else -- either offshore or outside contractors?
16   MS. UREMOVICH:  Objection to the extent
17 it calls for speculation.  You can answer if you can.
18   A.   So we're a private equity firm.  So they
19 had basically the operating model, keep the
20 employees, you know, in terms of how lean we are as
21 an organization.  That's -- that was always how
22 Capsugel operated.
23   MS. UREMOVICH:  Speak up just a little
24 bit.
25   A.   It was just an operating model of

Page 105

1  Capsugel and the -- and the parent at that time.
2    Q.   Okay.  And that was basically determined
3  when Capsugel spun off from --
4    A.   From Pfizer.
5    Q.   -- from Pfizer.  So, really, it was to
6  keep it lean on the employee overhead side and then
7  utilize out -- outside contractor services to
8  complete the work?
9    A.   Correct.
10   Q.   Projects?
11   A.   Yes.
12   Q.   Be more accurate, complete the project?
13   A.   Projects.
14   Q.   And obviously from a cost standpoint
15 it's cheaper to use offshore labor?
16   MS. UREMOVICH:  Objection.  It calls for
17 speculation.
18   A.   Yes.
19   Q.   Okay.
20   MR. CLARK:  Thank you for your time and
21 patience.  I'll pass the witness.
22   MS. UREMOVICH:  We'll reserve our
23 questions until the time of trial.  And again the
24 witness has the opportunity to read and sign and I
25 think we're good to go.

**APP. 060**

***** CONFIDENTIAL *****

## Page 106

1   MR. CLARK:  Thank you very much.
2   Appreciate your patience.
3   THE VIDEOGRAPHER:  This concludes the
4   deposition.  The time is 1:10 p.m.  Going off the
5   record.
6   (Whereupon the deposition concluded at
7   1:10 p.m.)
8
9
10
11   _____
     MURALIDHAR N. NUGGEHALLI
12
13   Subscribed and sworn to
     before me this _____ day
14   of _____, 2019.
15   _____
     Notary Public
16
17
18
19
20
21
22
23
24
25

## Page 107

1   CERTIFICATE
2
3   I, VIOLA S. ZBOROWSKI, a Notary Public and
4   Certified Shorthand Reporter of the State of New
5   Jersey, License No. 30X100103000, do hereby certify
6   that prior to the commencement of the examination,
7   MURALIDHAR N. NUGGEHALLI was duly sworn by me to
8   testify the truth, the whole truth and nothing but
9   the truth.
10   I DO FURTHER CERTIFY that the foregoing is a
11   true and accurate transcript of the testimony as
12   taken stenographically by and before me at the time,
13   place and on the date hereinbefore set forth.
14   I DO FURTHER CERTIFY that I am neither a
15   relative nor employee nor attorney nor counsel of any
16   of the parties to this action, and that I am neither
17   a relative nor employee of such attorney or counsel,
18   and that I am not financially interested in the
19   action.
20
21
22
23   _____
     Notary Public of the State of New Jersey
24   My Commission expires October 2, 2021
25   Dated:  6/14/19

## Page 108

1   ERRATA SHEET
2   CASE NAME: CPM Consulting vs. Capsugel
     DATE OF DEPOSITION: 6/13/19
3   WITNESS' NAME: MURALIDHAR N. NUGGEHALLI
     PAGE/LINE(S)/   CHANGE        REASON
4   _____/_____/_____
5   _____/_____/_____
6   _____/_____/_____
7   _____/_____/_____
8   _____/_____/_____
9   _____/_____/_____
10  _____/_____/_____
11  _____/_____/_____
12  _____/_____/_____
13  _____/_____/_____
14  _____/_____/_____
15  _____/_____/_____
16  _____/_____/_____
17  _____/_____/_____
18  _____
     MURALIDHAR N. NUGGEHALLI
19
20  SUBSCRIBED AND SWORN TO
     BEFORE ME THIS_____DAY
21  OF_____, 2019.
     _____
22  NOTARY PUBLIC
23  MY COMMISSION EXPIRES_____
24
25

**APP. 061**

# EXHIBIT C



EXHIBIT _4_
WIT: _____
DATE: _5-14-19_
Terri Etekochay, CSR, RPR

AGREEMENT NO. _____

### ROBERT HALF TECHNOLOGY
### SUBCONTRACTOR SERVICES AGREEMENT

This Robert Half Technology Subcontractor Services Agreement (this "Agreement") is entered into as of April 3, 2017, by and between CPM Consulting LCC  ("Subcontractor") and Robert Half Nevada Staff, Inc., through its division Robert Half Technology ("Robert Half Technology").

1.    **SERVICES**

a.      From time to time, on an as needed basis, Subcontractor agrees to provide its staff ("Personnel") to provide information technology services (the "Services"), as are described in a mutually agreed to and signed Work Schedule, in the form attached hereto as Exhibit A (the "Work Schedule").  Unless Robert Half Technology expressly agrees to Subcontractor's use of contractors in writing, Subcontractor shall only assign employees and shall not assign independent contractors (e.g., 1099s or other subcontractors) as Personnel.  Subcontractor shall provide the Services directly to the client and/or clients of Robert Half Technology ("Client").  Subcontractor, in Subcontractor's sole discretion, shall determine the means and manner of performing the Services.

b.      Subcontractor is not authorized (i) to perform Services outside of the scope of the Work Schedule, (ii) to sign contracts or statements (including SEC documents), (iii) to make management decisions, (iv) to sign, endorse, wire, transport or otherwise convey cash, securities, checks, or any negotiable instruments or valuables, (v) to operate machinery (other than office machines) or automotive equipment or (vi) to make decision for any major acquisition, purchase or policy decision relating to Client's business.

c.      Robert Half Technology and Client shall provide no training, tools, equipment or other materials to Subcontractor.

d.      At any time, Robert Half Technology may arrange for other subcontractors or Robert Half Technology's own employees to provide the same or similar services to Client.

2.    **COMPENSATION**

a.      Subcontractor shall be paid weekly, only for hours actually worked, at an hourly rate as indicated on the Work Schedule, without reduction for income tax withholdings or other employee deductions.  No amount will be deducted or withheld from Subcontractor's compensation for state, local or federal taxes.  Subcontractor and Personnel shall receive no other compensation or benefits for services provided hereunder.  In order to be paid, Subcontractor must submit a time card signed by an authorized representative of Client to Robert Half Technology each week in accordance with such procedures as may be established by Robert Half Technology from time to time.

b.      All expenses incident to Subcontractor's performance of the Services under this Agreement shall be borne by Subcontractor, unless approved in advance in writing by Robert Half Technology.

Robert Half Nevada Staff, Inc. Confidential
© 2016, All Rights Reserved

11/2016

     c.     Notwithstanding any other provision of this Agreement, should Subcontractor fail to make prompt payment of wages or fees to Personnel performing services hereunder, Robert Half Technology, may at its election, contract directly with Personnel for the performance of the Services.

     d.     In no event shall Subcontractor or Personnel be entitled to participate in any employee benefit programs or fringe benefits which may be offered by Client, Robert Half Technology, or their respective affiliates.

     e.     Subcontractor shall not, and shall cause Personnel to not, disclose Subcontractor's or Personnel's rate of pay to any third party, including without limitation, any Client, customer or co-worker. Any such disclosure may result in Subcontractor's and/or Personnel's immediate termination.

**3.     RELATIONSHIP/TERM/GUARANTEE**

     a.     Subcontractor and Personnel shall function under this Agreement solely as independent contractors performing services for Robert Half Technology and/or Client, and not as employees, agents, representatives, partners or joint venturers of Robert Half Technology and/or Client or their respective affiliates.

     b.     Subcontractor acknowledges and agrees that this Agreement and/or any Work Schedule may be terminated at any time by Robert Half Technology with or without cause for no reason or any reason, and that nothing in this Agreement or otherwise shall confer upon Subcontractor or Personnel any right to provide Services to Robert Half Technology or any Client or restrict the right of Robert Half Technology to terminate this Agreement at any time.

     c.     If for any reason Client or Robert Half Technology is dissatisfied with Personnel, Subcontractor will remove such person or persons immediately and, if requested by Robert Half Technology, provide a replacement or replacements as soon as practicable. If Client notifies Robert Half Technology of its dissatisfaction prior to the conclusion of such person's or persons' third day of work, Subcontractor will not charge Robert Half Technology for the first 24 hours worked by such person or persons. If Robert Half Technology is required to credit or pay Client for the Services, Robert Half Technology may seek repayment from Subcontractor or withhold the guarantee payment from Subcontractor's fee.

**4.     CONFIDENTIAL INFORMATION/INTELLECTUAL PROPERTY**

     a.     Subcontractor acknowledges, that in the course of Subcontractor's provision of Services, Subcontractor and Personnel may be provided with, create or have access to, Confidential Information belonging to Robert Half Technology, Client or other parties. Confidential Information includes any and all information which any party may consider proprietary or otherwise wish to keep confidential, including, but not limited to, business plans, marketing strategies, customer lists, computer programs, schematics, source code, object code, cost or profit figures and projections, credit information, current, future or proposed products or services, plans and technology, business forecasts, financial records, accounting records, litigation documents and procurement requirements, and technical information included in or on tracings, flowcharts, software program code, drawings, field notes, calculations, specifications and engineering data. Subcontractor agrees, and shall cause Personnel, to hold in strict confidence all Confidential Information which Subcontractor or Personnel uses or to which Subcontractor

or Personnel gain access during the course of performance hereunder, and Subcontractor shall not use, reproduce, publish, disclose or otherwise make known to any person or entity any Confidential Information, except to the extent required in the performance of Subcontractor's and Personnel's of the Services.

   b.   Subcontractor agrees not to disclose, indirectly or directly, to Robert Half Technology or any Client any information or data the disclosure of which would constitute a violation of any obligation to, or infringe the rights of, any third party.

   c.   Subcontractor agrees that all intellectual property, including, but not limited to, any inventions, works of authorship, copyrights or other intellectual property (e.g., all writings, artwork, graphics, ideas, market research, strategies, source code and documentation) ("Intellectual Property Rights"), conceived, developed, originated, fixed or reduced to practice by Subcontractor and Personnel during Subcontractor's and Personnel's provision of Services shall be the sole and complete property of Client, whether as a work made for hire or otherwise. Subcontractor hereby assigns and conveys Subcontractor's and Personnel's entire right, title and interest to any and all Intellectual Property Rights to Client or to its customer, as the case may be. Subcontractor and Personnel agree to execute all applications or registrations for the Intellectual Property Rights and any other instruments deemed necessary or helpful for Client to secure and enforce its rights. Subcontractor shall make no charge or claim for additional compensation or any other consideration for signing such documents or providing such assistance. Subcontractor shall, immediately upon creation and without prior request, disclose to Client all such Intellectual Property Rights.

   d.   Upon the termination or completion of Services to any Client, Subcontractor agrees immediately to return, all information, data and any other materials supplied by or obtained from Client in the course of Subcontractor's and Personnel's Services, along with all copies thereof in Subcontractor's and Personnel's possession and control. If Subcontractor or any of Subcontractor's Personnel fail to return any of Client's information, data or other materials, Robert Half Technology may withhold all or a portion of the Subcontractor's fee until satisfactory evidence of the return of such information, data or materials is provided to Robert Half Technology.

   e.   Subcontractor acknowledges and agrees that the disclosure of any Confidential Information or any other violation of the terms of this Section 4 would cause immediate and irreparable injury, loss and damage to Robert Half Technology, Client and/or its customers and that an adequate remedy at law for such injury, loss and damage does not exist, and that in the event of such disclosure or threatened disclosure, Robert Half Technology, Client and/or its Customers shall be entitled to institute and prosecute proceedings in a court of competent jurisdiction to obtain temporary and/or permanent injunctive relief to enforce a provision of this Agreement, without the necessity of proof of actual damage or loss or the posting of a bond.

5.   **LIMITATION ON EMPLOYMENT WITH CLIENTS**

   Subcontractor agrees, and shall cause Personnel to agree, as a condition of this Agreement and the assignment of Subcontractor and Personnel to Client that Subcontractor and Personnel will not solicit or accept an offer of employment with, or otherwise directly or indirectly provide, on a full-time, part-time or temporary basis, information technology services to Client or its affiliates until the expiration of

twelve months after termination of this Agreement without payment to Robert Half Technology of a finder's fee in the amount of $25,000 per assignment. Subcontractor shall, and shall cause Personnel to, immediately notify Robert Half Technology if Client or any of its affiliates solicits Subcontractor and/or Personnel.

## 6.     REPRESENTATIONS AND WARRANTIES OF SUBCONTRACTOR

a.     Subcontractor represents and warrants that Personnel are the employees or contractors of Subcontractor, and Personnel are not, and shall not be deemed to be, employees of Robert Half Technology or Client. Subcontractor represents and warrants that it shall be solely responsible to pay, when due, salaries, wages (including but not limited to any overtime and/or double time as required under applicable law) and other forms of compensation or reimbursement and all applicable federal, state and local withholding taxes and unemployment taxes, as well as social security, state disability insurance and all other payroll charges payable to, or on behalf of, Personnel. On or before commencement of Services, Subcontractor shall deliver to Robert Half Technology an original Personnel Agreement ("Personnel Agreement") executed by all Personnel named in each Work Schedule in the form of Exhibit B attached to this Agreement.

b.     Subcontractor represents and warrants that it is a corporation or limited liability company duly incorporated/organized, validly existing and in good standing under the laws of its state of incorporation/organization and in every state where required. If Subcontractor is not a corporation or limited liability company (e.g., Subcontractor is either a partnership or a sole proprietorship), Subcontractor represents and warrants that it has been an independent business providing information technology services for two years or more.

c.     Subcontractor shall maintain the following policies of insurance covering Subcontractor and Personnel at all times while performing Services and for one year thereafter:

i.     Workers' Compensation and Employers' Liability Insurance as prescribed by law,

ii.     Commercial General Liability (Bodily Injury and Property Damage) Insurance, in an amount not less than $1,000,000 per occurrence,

iii.     Professional Liability or Errors and Omissions Insurance covering all Services provided or contemplated hereby, in an amount not less than $1,000,000 per claim, and

iv.     A Fidelity Bond in an amount not less than $1,000,000.

The foregoing insurance shall provide (a) that it may not be terminated without 30 business days' prior written notice to Robert Half Technology, (b) that Client, Robert Half Technology and their respective directors, officers, shareholders, employees and affiliates are additional insureds, (c) that it is primary coverage with respect to all insureds and (d) a waiver of subrogation against Client, Robert Half Technology, and their respective directors, officers, shareholders, employees and affiliates. Subcontractor has provided or will, prior to commencement of any Services, provide to Robert Half Technology certificates of insurance and other documentary evidence as to the representations set forth in this Section 6, including certificates of incorporation.

Robert Half Nevada Staff, Inc. Confidential
© 2016, All Rights Reserved

11/2016

d.      Subcontractor certifies that it is fully in compliance, if applicable, with Executive Order 11246, The Rehabilitation Act of 1973, as amended, and the Vietnam Era Veterans Readjustment Assistance Act of 1974. Subcontractor further certifies that it has maintained records sufficient to document its compliance with these requirements.

e.      Both parties agree to comply with all applicable equal employment opportunity laws, including Title VII of the 1964 Civil Rights Act, the Civil Rights Act of 1991, the Americans with Disabilities Act, and, if applicable, the affirmative action requirements of Executive Order 11246, the Rehabilitation Act of 1973, as amended, and the Vietnam Era Veterans Readjustment Assistance Act of 1974, as amended.

f.      Subcontractor represents and warrants that all Services shall be of the highest professional standards, quality and workmanship and shall be provided using Subcontractor's and Personnel's independent skill and judgment in the means and manner that are most suitable to perform the work contemplated hereunder. While on the site of Client's business, Subcontractor shall, and shall cause Personnel to, abide by Client's applicable rules and regulations at all times.

g.      Subcontractor represents and warrants that all information provided by Subcontractor and Personnel to Robert Half Technology or Client or upon which Robert Half Technology or Client has relied, including, but not limited to, resumes, interviews and references, is and will be complete, true and correct in all respects.

h.      Subcontractor shall fully comply, and shall cause Personnel to fully comply, with the employment eligibility verification and other provisions of the Immigration Reform and Control Act of 1986 and regulations promulgated thereunder, as such may be amended from time to time, and Subcontractor shall not provide to Robert Half Technology any Personnel if Subcontractor knows, or has any reason to believe, that such Personnel is not authorized to perform the Services required under the applicable Work Schedule in the United States.

i.      Subcontractor represents and warrants that Subcontractor's and Personnel's execution and delivery of this Agreement and the performance of its duties hereunder do not, and will not, breach or conflict with any obligation of Subcontractor and Personnel to a previous employer, client or other party or any obligation to keep confidential any information acquired by Subcontractor and Personnel prior to the date hereof.

j.      Subcontractor represents and warrants that all Personnel have agreed in writing that Subcontractor either employs or contracts with the Personnel. Within one (1) day written request from Robert Half Technology, Subcontractor must provide written evidence that the Personnel agreed to be employed or to contract with Subcontractor. If Subcontractor cannot provide such evidence, Robert Half Technology may hire or engage the Personnel directly.

7.    **INDEMNITY**

a.      Subcontractor is solely and entirely responsible and liable for the Services, and Robert Half Technology shall have no liability whatsoever for the Services. Subcontractor shall indemnify, defend and hold Client, Robert Half Technology and their respective directors, officers, shareholders, employees and affiliates, harmless from and against, any and all liabilities, losses, damages, settlements,

claims, costs and expenses, including, but not limited to, reasonable attorneys' fees, and any and all actions, suits, proceedings, demands, penalties, assessments or judgments, cost and expenses (collectively, "Losses"), arising out of or related to (i) the provision of Services by Subcontractor or Personnel or the breach of this Agreement, or (ii) the failure of Subcontractor to perform obligations under this Agreement, including but not limited to its obligation to pay all wages and compensation to Personnel.

      b.     Subcontractor agrees that Robert Half Technology will not be responsible for any losses, damages, expenses or claims arising from any personal injury, thefts or other property damage sustained in connection with the transportation or handling of cash or negotiable instruments by Subcontractor and Personnel. Subcontractor assumes the risk for all such activities.

## 8.     NON-SOLICITATION

      a.     Except as provided by this Agreement, Robert Half Technology shall not directly solicit for hire or employment, on a full-time, part-time or temporary basis, any employees who have been assigned to a Client, until six months after the commencement of the employee's assignment with Robert Half Technology. Notwithstanding the foregoing, Subcontractor acknowledges that Robert Half Technology is a personnel services firm specializing in the placement of individuals on a permanent, temporary, and contract consulting basis. The restrictions on solicitation of employment or hiring contained in this Section 8 shall not apply to solicitations or hiring by employees of Robert Half Technology who had no contact with Subcontractor's employees in conjunction with the Services and who were not specifically instructed to solicit such Subcontractor employee, by name, by an employee of Robert Half Technology who did have such contact. At the end of the six month period, Robert Half Technology can solicit, hire or engage such Personnel directly without payment of any fee or additional compensation to Subcontractor and Subcontractor shall release such Personnel from any restrictive covenants that would prevent said Personnel from working for or with Robert Half Technology.

b.     During the term of this Agreement and for six months thereafter, Subcontractor shall not solicit for hire or offer employment to, on a full-time, part-time or temporary basis, any employees or former employees of Client, Robert Half Technology and their respective affiliates.

## 9.     MISCELLANEOUS

      a.     The obligations contained in Section 4 and 5 of this Agreement shall be binding upon Subcontractor and Subcontractor's Personnel. Subcontractor will advise its Personnel of the terms of this Agreement and will obtain the written agreement of Personnel in the form of agreement attached hereto as Exhibit B.

      b.     This Agreement constitutes the entire agreement between the parties with respect to the matters contained herein and supersedes any and all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, with respect to the subject matter hereof. If any provision of this Agreement is held to be invalid or unenforceable, such invalidity or unenforceability shall not affect or impair the validity or enforceability of the remaining provisions of this Agreement.

c.   Subcontractor may not, without the express written permission of Robert Half Technology, assign, subcontract work, delegate or pledge any rights or obligations hereunder.

d.   No amendment or modification of this Agreement shall be valid unless evidenced by a written instrument executed by the parties hereto. No waiver by Robert Half Technology of any provision or condition of this Agreement shall be deemed a waiver of any similar or dissimilar provision or condition at the same time or any prior or subsequent time.

e.   This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflict of laws provisions.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.

Subcontractor                                          Robert Half Nevada Staff, Inc., through its division
                                                       Robert Half Technology

CPM Consulting LLC
Corporate Name

By: _Martino Rivaplata_____                       By: _____
   Signature                                             Signature

Martino Rivaplata                                      Amy Phetkanya
Printed Name                                           Printed Name

SR. SAP HANA MODELER                                   Regional Manager
Title                                                  Title

20-5767450
Federal ID Number

EXHIBIT A
WORK SCHEDULE

This Work Schedule is issued pursuant to the Robert Half Technology Subcontractor Services Agreement dated as of April 3, 2017, by and between CPM Consulting LLC ("Subcontractor") and Robert Half Nevada Staff, Inc., through its division Robert Half Technology ("Robert Half Technology"),

Description of Work: SAP HANA Data Modeler

Client Name: Capsugel

Work Location: Morristown, NJ

Personnel Name: Martino Rivaplata

Hourly Pay Rate: $165/Hr.

Expected Start Date: April 3, 2017

Expected Project Length: 6 months +

Client Project Manager and Phone Number: Muralidhar Nuggehalli 862-345-0779

Robert Half Technology Contact and Phone Number: Russ Neidhardt/ 702-369-3825 x 29855

Travel Arrangements and Other Expenses: Subject to prior approval of Client: N/A

Accepted By:

Subcontractor

CPM Consulting LLC

Corporate Name

By: _____

Signature

Martino Rivaplata
Printed Name

SR. SAP HANA MODELER
Title

Robert Half Nevada Staff, Inc., through its division Robert Half Technology

By: _____
Signature

Amy Phetkanya
Printed Name

Regional Manager
Title

**EXHIBIT B**
**PERSONNEL AGREEMENT**

This Personnel Agreement (this "Agreement") is entered into as of April 3, 2017, by and   between Martino Rivaplata ("Consultant") and Robert Half Nevada Staff, Inc., through its division Robert Half Technology ("Robert Half Technology").

1.    **SUBCONTRACTOR AGREEMENT - CONSULTING SERVICES**

       a.      Consultant is an employee or potential employee of CPM Consulting LLC ("Subcontractor").  Subcontractor has agreed to provide certain services (the "Services"), including the services of Consultant, to client and/or clients of Robert Half Technology ("Client") pursuant to the Robert Half Technology Subcontractor Services Agreement dated as of April 3 , 2017 (the "Subcontractor Agreement"), and Consultant has been informed of the scope and nature of such Services and agrees to this Agreement in consideration for being considered to perform some or all of such Services.

       b.      Consultant represents and warrants that the performance of Consultant's Services for Client under the Subcontractor Agreement do not, and will not, breach or conflict with any obligation of Consultant to a previous employer, client or other party or any obligation to keep confidential any information acquired by Consultant prior to the date hereof.  Consultant further agrees not to make use of any third party intellectual property, proprietary information, ideas or material in connection with Subcontractor's engagement with Robert Half Technology.

       c.      Consultant understands and agrees that he or she is solely the employee of Subcontractor, and Consultant shall not, in any event, be deemed to be an employee of Client, Robert Half Technology or their respective affiliates or be entitled to participate in any employee benefit programs or fringe benefits which may be offered by Client, Robert Half Technology and their respective affiliates.

       d.      Consultant agrees to not disclose Consultant's rate of pay to any third party, including, but not limited to, any Client, customer or co-worker.  Any such disclosure may result in Consultant's immediate termination.

       e.      Consultant represents and warrants that all information provided by Consultant to Subcontractor, Robert Half Technology and/or Client, including, but not limited to, resumes, interviews and references, is complete, true and correct in all respects.

2.    **CONFIDENTIAL INFORMATION/INTELLECTUAL PROPERTY**

       a.      Consultant acknowledges that in the course of Subcontractor's engagement by Robert Half Technology, Consultant may be provided with, or have access to, Confidential Information belonging to Robert Half Technology, Client or other parties.  "Confidential Information" means any and all information which any party may consider proprietary or otherwise wish to keep confidential, including, but not limited to, business plans, marketing strategies, customer lists, computer programs, schematics, source code, object code, cost or profit figures and projections, credit information, current, future or proposed products or services, plans and technology, business forecasts, financial records, accounting records, litigation documents and procurement requirements and technical information included in, or on, tracings, flow charts, software program code, drawings, field notes, calculations,

specifications and engineering data. Consultant agrees to hold in strict confidence all Confidential Information which Consultant uses or to which Consultant gains access during or in connection with the performance of Services, and Consultant shall not use, reproduce, publish, disclose or otherwise make known to any person or entity any Confidential Information, except to the extent required in the performance of Consultant's Services.

b.   Contractor agrees that all intellectual property, including, but not limited to, any inventions, works of authorship, copyrights or other intellectual property (e.g., all writings, artwork, graphics, ideas, market research, strategies, source code and documentation) ("Intellectual Property Rights"), conceived, developed, originated, fixed or reduced to practice by Contractor during Contractor's provision of Services shall be the sole and complete property of Client, whether as a work made for hire or otherwise. Consultant hereby assigns and conveys Consultant's entire right, title and interest to any and all Intellectual Property Rights to Client or to its customer, as the case may be. Consultant agrees to execute all applications or registrations for the Intellectual Property Rights and any other instruments deemed necessary or helpful for Client or its customer to secure and enforce its rights. Consultant shall make no charge or claim for additional compensation or any other consideration for signing such documents or providing such assistance. Consultant shall, immediately and without prior request, disclose to Client all such Intellectual Property Rights.

c.   Upon the termination of Consultant's assignment to any Client, Consultant agrees immediately to return to Client all information, data and any other materials supplied by, obtained from or created for Client in the performance of the Services, along with all copies thereof in Consultant's possession and/or control.

d.   Consultant acknowledges and agrees that the disclosure of any Confidential Information or any other violation of the terms of this Section 2 would cause immediate and irreparable injury, loss and damage to Robert Half Technology, Client and/or its customers and their respective affiliates and that an adequate remedy at law for such injury, loss and damage does not exist, and that in the event of such disclosure or threatened disclosure, Robert Half Technology, Client and/or its customers shall be entitled to obtain a temporary and/or permanent injunctive relief to enforce a provision of this Agreement, without the necessity of proof of actual damage or loss or the posting of a bond.

e.   The provisions of this Section 2 shall be binding upon Consultant and Consultant's heirs, executors, administrators, successors and assigns, and that Section 2 shall survive the termination of this Agreement for any reason.

3.   **LIMITATION ON EMPLOYMENT WITH CLIENTS**

Except as provided by this Agreement, or as may be consented to by Robert Half Technology in writing, Consultant agrees, as a condition of the assignment of Consultant to Client, that Consultant will not solicit or accept an offer of employment with, directly or indirectly, on a full-time, part-time or temporary basis, or otherwise provide information technology services to Client or its affiliates until expiration of twelve months after termination of Consultant's assignment with Client. Consultant shall immediately notify Robert Half Technology if Client or any its affiliates solicits Consultant with an offer of employment.

4.   MISCELLANEOUS

a.   This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, with respect to the subject matter hereof. If any provision of this Agreement is held to be invalid or unenforceable, such invalidity or unenforceability shall not affect or impair the validity or enforceability of the remaining provisions of this Agreement.

b.   Consultant may not without the express written permission of Robert Half Technology assign, subcontract work or pledge any rights or obligations hereunder. No amendment or modification of this Agreement shall be valid unless evidenced by a written instrument executed by the parties hereto. No waiver by Robert Half Technology of any provision or condition of this Agreement shall be deemed a waiver of any similar or dissimilar provision or condition at the same time or any prior or subsequent time.

c.   This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflict of laws provisions.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.

Consultant

By: _____
Signature

Martino Rivaplata
Printed Name

SR. SAP HANA MODELER
Title

Robert Half Nevada Staff, Inc., through its division
Robert Half Technology

By: _____
Signature

Amy Phetkanya
Printed Name

Regional Manager
Title