**Not for Publication**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CPM CONSULTING LLC and MARTINO RIVAPLATA,

    *Plaintiffs*,

v.

CAPSUGEL US LLC,

    *Defendant*.

Civil Action No. 19-16579

**OPINION**

**John Michael Vazquez, U.S.D.J.**

This case concerns allegations that Defendant Capsugel US LCC ("Capsugel" or "Defendant") violated Plaintiff Martino Rivaplata's rights under the New Jersey Law Against Discrimination ("LAD") when it ended Rivaplata's consulting project early. The matter is presently before the Court by way of Defendant's motion for summary judgment. D.E. 82. Plaintiff filed a brief in opposition, D.E. 86, to which Defendant replied, D.E. 91. The Court reviewed all submissions[1] made in support and in opposition to the motion, and considered the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons stated below, Defendant's motion is **GRANTED in part** and **DENIED in part**.

---

[1] In this opinion, Defendant's brief in support of its motion for summary judgment (D.E. 82-2) shall be referred to as "Def. Br."; Plaintiff's brief in opposition (D.E. 86) shall be referred to as "Plf. Opp."; and Defendant's reply brief (D.E. 91) shall be referred to as "Def. Reply."

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

Plaintiff, an IT consultant, has extensive experience working in the industry. In approximately March 2017, after conducting interviews, Defendant selected Plaintiff, through non-party staffing agency Robert Half Technology & The Creative Group ("Robert Half"), as the most qualified candidate for a position helping Defendant integrate its IT system with another company's following an acquisition. DSOMF ¶¶ 3, Rivaplata Decl. ¶ 4. Defendant then corresponded with its point of contact at Robert Half and together, they drafted a Statement of Work that set forth the details of the engagement (the "SOW"). DSOMF ¶ 4. Capsugel and Robert Half are parties to the SOW, and it provides that Robert Half will assign Plaintiff to work on Defendant's approximately three-month IT project. Def. App'x, Ex. A-4 at 1. The SOW was executed on April 3, 2017. *Id.*

The same day, Robert Half and Plaintiff CPM Consulting LLC ("CPM") entered into a separate agreement, the Subcontractor Services Agreement (the "Subcontractor Agreement"). Boyan Cert., Ex. C. Plaintiff is the sole member of CPM, which is an entity through which Plaintiff performs his consulting services.[3] Plf. Decl. ¶ 3. Exhibit A to the Subcontractor Agreement states that Plaintiff is expected to work on an IT project for Capsugel in Morristown, New Jersey for "6 months +."[4] Boyan Cert., Ex. C at 8.

---

[2] The background facts are drawn from Defendant's statement of undisputed material facts ("DSOMF"), D.E. 76, and Plaintiff's response, D.E. 78; Plaintiff's supplemental statement of undisputed material facts ("PSOMF"), D.E. 79; Defendant's appendix to its motion for summary judgment ("Def. App'x"), D.E. 82-3, 82-4; the Certification of James W. Boyan III ("Boyan Cert.") and supporting exhibits, D.E. 87; and the Declaration of Martino Rivaplata ("Plf. Decl."), D.E. 90.

[3] The sole claim asserted by CPM for tortious interference was dismissed on August 9, 2019. D.E. 59. Consequently, Plaintiff Rivaplata is the only remaining Plaintiff in this matter.

[4] The Court discusses further details about the two contracts in the analysis section below.

There is no indication that Capsugel was involved in drafting or negotiating the terms of the Subcontractor Agreement. Moreover, it does not appear that Capsugel even knew the precise terms of the Subcontractor Agreement. Specifically, Plaintiff concedes that he did not give Capsugel a copy of the Subcontractor Agreement, but he believes that his contact at Robert Half provided his supervisor at Capsugel, Muralidhar Nuggehalli, with a copy of the agreement. Boyan Cert., Ex. A at T40:10-43:4. Nuggehalli, however, testified that he never saw the Subcontractor Agreement before this litigation. Boyan Cert., Ex. B at T53:18-54:10. Plaintiff fails to provide any evidence, outside of his own belief, indicating that Robert Half provided Capsugel with a copy of the Subcontractor Agreement.

Plaintiff contends that his contact at Robert Half advised him that the Capsugel project would last longer than six months and could easily last up to a year. PSOMF ¶ 3. In addition, Plaintiff represents that Nuggehalli told Plaintiff during his interview that there was "tons of work" and indicated that the project would last from six months to a year. *Id.* ¶¶ 7-8. Based on these representations, and his experience in the industry, Plaintiff relocated from Texas to Morristown, New Jersey and entered into a one-year lease for an apartment near Capsugel's office. *Id.* ¶ 9; *see also* Plf. Decl. ¶¶ 9-10.

Plaintiff began working at Capsugel on April 3, 2017. Plaintiff's work was divided between two teams, the BPC and the HANA teams. With the BPC team, Plaintiff had weekly meetings about his work progress, plus additional follow-up progress updates. Plaintiff also had daily interaction with, and supervision from, two Capsugel employees. Plf. Decl. ¶¶ 13, 19. Nuggehalli supervised Plaintiff's work on the HANA team, which also had at least weekly meetings. In addition, Plaintiff received emails from Nuggehalli and another employee, Yokesh Sivakumar, who reviewed his work and confirmed that Plaintiff's tasks had been appropriately

3

completed. *Id.* ¶ 20. According to Plaintiff, all of the individuals that he worked with on a daily basis were of Indian descent, including two offsite contractors who were located in India. PSOMF ¶ 11; Plf. Decl. ¶ 12; DSOMF ¶ 8. Plaintiff alleges that on two occasions during a meeting with the HANA team, he was told that he did not need to stay because it was "an all Indians meeting." PSOMF ¶ 15; Plf. Decl. ¶ 15.

In June 2017, a Robert Half employee sent an email to Nuggehalli asking if Capsugel planned to extend Plaintiff's project, as "he is set to end his contract with [Capsugel] on June 30th." Def. App'x Ex. A-6. On June 15, 2017, Nuggehalli responded to the email stating that "the integration work is now coming to a close and lot of the work pending is being assigned to the business and Lona [sic] IT teams."[5] *Id.* And on or about June 14, 2017 Nuggehalli and another Capsugel employee told Plaintiff that his services were no longer needed. DSOMF ¶ 10; PSOMF ¶ 17. Nuggehalli told Plaintiff to transition his work to Capsugel's existing IT team, "who were all Indian nationals." PSOMF ¶ 18. Plaintiff maintains that there was still a lot of work left remaining on his two projects when Capsugel ended his assignment. PSOMF ¶ 20. Capsugel contends that Plaintiff completed his deliverables, had performed to expectations, and that its "pre-existing IT team could handle the maintenance of Rivaplata's deliverables." DSOMF ¶ 9. Plaintiff's assignment with Capsugel ended on June 30, 2017. DSOMF ¶ 12.

Plaintiff and CPM initially filed their Complaint in the District Court of Dallas County, Texas, asserting a claim under the LAD for national origin discrimination and a claim alleging that Capsugel tortiously interfered with CPM's contract with Robert Half. On November 6, 2017, Defendant removed the matter to the United States District Court for the Northern District of Texas

---

[5] At the time, Capsugel was being acquired by a company called Lonza, and Plaintiff was helping with a project to consolidate reporting deliverables for the acquisition before a June/July 2017 deadline. DSOMF ¶ 2.

4

based on the Court's diversity jurisdiction, under 28 U.S.C. § 1332. D.E. 1. On August 9, 2019, after Defendant filed multiple motions to dismiss and Plaintiffs filed amended complaints, the District Court granted Capsugel's motion to dismiss the tortious interference claim in the Second Amended Complaint, and to transfer the LAD claim to this Court. D.E. 59. The matter was transferred to this Court on August 12, 2019. D.E. 60.

Before the matter was transferred, Defendant's motion for summary judgment as to the LAD claim was fully briefed. D.E. 47. After a conference with Magistrate Judge Clark after the transfer, Defendant submitted a letter requesting leave to re-file its motion for summary judgment. D.E. 75. On December 5, 2019, this Court granted Defendant's request and Defendant subsequently filed its motion for summary judgment. D.E. 82.

## II.     SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for

trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

### III. ANALYSIS

#### A. Employee versus Independent Contractor

The LAD makes it illegal

> [f]or an employer, because of the race, creed, color, national origin, ancestry, age . . . disability . . . of any individual . . . to refuse to hire or employ or to bar or to discharge . . . from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment[.]

N.J.S.A. 10:5-12(a). The prohibitions of N.J.S.A. 10:5-12(a) only apply to employees.

"[I]ndependent contractors are not to be considered 'employees'" with respect to this subsection of the LAD, and "are therefore not entitled to avail themselves of its protections." *Pukowsky v. Caruso*, 312 N.J. Super. 171 (App. Div. 1998). Here, Defendant argues that Plaintiff was an independent contractor so he is not entitled to the protections of the LAD. Def. Br. at 5-7.

To determine whether a plaintiff is an employee under the LAD, courts apply the *Pukowsky* test. This test requires a court to review the following twelve factors:

> (1) the employer's right to control the means and manner of the worker's performance; (2) the kind of occupation-supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the business of the "employer;" (10) whether the worker accrues retirement benefits; (11) whether the "employer" pays social security taxes; and (12) the intention of the parties.

*Pukowsky*, 312 N.J. Super. at 182-83. The *Pukowksy* test requires a "principled application" of the factors. Accordingly, rather than simply looking at which category has the majority of the factors, courts should consider "which factors are more important under the peculiar circumstances of each case." *Chrisanthis v. County of Atlantic*, 361 N.J. Super. 448, 456 (App. Div. 2003). The first factor - the employer's right to control the means and manner of the worker's performance - is the most important. *Id.* (quoting *Franz v. Raymond Eisenhardt & Sons, Inc.*, 732 F. Supp. 521, 528 (D.N.J. 1990)).

Defendant focuses on contract language, arguing that it clearly establishes an independent contractor relationship. Def. Br. at 6-7; *see also* Def. Reply at 3-4. Capsugel and Robert Half were parties to the first relevant contract, the SOW. The SOW provides that Robert Half will assign Plaintiff to work on Defendant's approximately three-month project. Def. App'x, Ex. A-4 at 1. According to the SOW, Defendant was responsible for supervising Plaintiff's work on the

7

project, while Robert Half was responsible for workers' compensation, social security, and other payroll charges. *Id.* at 2. In addition, Plaintiff was required to submit a weekly time sheet to Defendant for Defendant's "verification and approval," but Robert Half then billed Capsugel for Plaintiff's work. *Id.* Finally, either party could terminate the SOW at any time by providing ten days' written notice. *Id.* at 1.

The second contract at issue is the Subcontractor Agreement. Boyan Cert. Ex. C. Pursuant to the Subcontractor Agreement, CPM and Plaintiff "shall function under this Agreement solely as independent contractors performing services for [Robert Half] and/or Client not as employees, agents, representatives, partners or joint venturers of [Robert Half] and/or Client." *Id.* at ¶ 3(a); *see also id.* ¶ 6(a) (representation that CPM and its personnel "shall not be deemed to be[] employees of [Robert Half] or Client"); *id.*, Ex. B ¶ 1(c) (acknowledgment from Plaintiff individually that he is not an employee of Defendant). Defendant was Robert Half's client for purposes of the Subcontractor Agreement. *Id.*, Ex. A.

Accordingly, Plaintiff himself and CPM repeatedly acknowledged through the Subcontractor Agreement that Plaintiff was not a Capsugel employee. The Subcontractor Agreement expressly provides that Plaintiff is an independent contractor (as to both Robert Half and the "Client," here Capsugel). Similarly, the structure of the contracts – the SOW between Robert Half and Defendant, and the Subcontractor Agreement between Robert Half and Plaintiff/CPM – supports a finding of an independent contractor relationship between Plaintiff and Defendant. But while this language and structure are important to the Court's analysis, it is not determinative. *See D'Annunzio v. Prudential Ins. Co. of Am.*, 192 N.J. 110, 127 (2007) (concluding, when addressing whether plaintiff could assert a CEPA claim, that there were "many

facts that support[ed] the creation of an employment relationship . . . , notwithstanding that [the plaintiff's] agreement described him as an independent contractor.").

Plaintiff counters that there is sufficient evidence by which a reasonable jury could determine that Plaintiff was an employee. Plf. Opp. at 7. The Court agrees. Here, Plaintiff relocated to New Jersey to physically work at Capsugel's office. PSOMF ¶ 9. Capsugel provided the workplace and equipment. Capsugel also controlled the timing and scope of Plaintiff's work through meetings with Plaintiff's supervisors. Plaintiff had at least weekly meetings with his supervisors where they discussed work that needed to be done, in addition to "follow up progress meetings." Rivaplata Decl. ¶¶ 13, 14, 18-19. Plaintiff's supervisors also determined when Plaintiff successfully completed a specific project. *Id.* ¶¶ 18-19, 21. Accordingly, the first, second and fourth *Pukowsky* factors suggest that Plaintiff was a Capsugel employee. As discussed, the first factor, the employer's ability to control the means and manner of the employee's work, is the most important factor. Finally, the sixth factor also weighs towards a determination that Plaintiff was an employee because Capsugel approved Plaintiff's timesheets before they were submitted to Robert Half. *Id.* ¶ 22; *see also* Boyan Cert., Ex. C. at 2.

In sum, even though the contracts suggest that the parties did not intend to hire Plaintiff as an employee, Plaintiff provides sufficient facts demonstrating that in actuality, his daily work environment amounted to an employee/employer relationship. To be sure, there is also evidence that supports a different conclusion, but the Court is not permitted to make such findings at the summary judgment stage. As a result, the Court cannot conclude as a matter of law that Plaintiff is an independent contractor who is not entitled to the protections of the LAD. Defendant's motion for summary judgment is denied on these grounds.

### B. National Origin Discrimination

Because a reasonable jury could conclude that Plaintiff is an employee, the Court turns to the parties' arguments as to Plaintiff's national origin discrimination LAD claim. Specifically, Plaintiff alleges that he was discriminated against because he is American and the majority of people he worked with were Indian nationals.[6]

Where a plaintiff does not present direct evidence of discrimination in a LAD claim, courts apply the three-step, burden-shifting standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Under this burden-shifting framework, a plaintiff must first establish a *prima facie* case of discrimination." *Palatnik v. Home Depot, Inc.*, No. 04-1229, 2006 WL 680981, at *8 (D.N.J. Mar. 10, 2006). If a plaintiff puts forth a *prima facie* discrimination case, there is a rebuttable presumption of unlawful discrimination. To rebut this presumption at the second step, a defendant must produce evidence of a legitimate non-discriminatory reason for its decision. *Id*. At the third step, a plaintiff must prove, by a preponderance of the evidence, that the employer's articulated reason was not the real reason for the employment action but rather was a mere pretext for discrimination. *Id.*

To plead a *prima facie* discrimination claim, a plaintiff must allege that he (1) is a member of a designated protected class; (2) was qualified for and performing the essential functions of the job; (3) suffered termination or adverse employment action; and (4) others not in the protected

---

[6] While not addressed by the parties, under Title VII, "the term 'national origin' refers to the country where a person was born, or more broadly, the country from which his or her ancestors came." *English v. Misys Int'l Banking Sys., Inc.*, No. 05-2540, 2005 WL 1703199, at *5 (D.N.J. July 20, 2005) (quoting *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973)). LAD claims are generally "analyzed under Title VII standards." *Id.* (citing *Schurr v. Resorts Int'l Hotels, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999)). Plaintiff is now a United States citizen but was born in Peru. Boyan Cert., Ex. A at T37:4-5. Accordingly, Plaintiff's place of national origin is likely Peru rather than America as he asserts.

class did not suffer similar adverse employment decisions. *Victor v. State*, 203 N.J. 383, 408-09 (2010). The goal at the *prima facie* stage is to "eliminate the most common nondiscriminatory reasons for the defendant's action." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir. 2010). Thus, the burden of establishing a *prima facie* case is "not onerous." *Id.* (quoting *Tx. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Defendant argues, among other things, that Plaintiff did not suffer an adverse employment decision. Rather, according to Defendant, Plaintiff completed his three-month project and Defendant did not extend the project. Def. Br. at 11. Plaintiff does not address this specific argument; Plaintiff simply contends that he was terminated. Plf. Opp. at 9.

Capsugel's argument is supported by the evidence. According to the SOW, the estimated duration length for Plaintiff's project was three months.[7] Def. App'x, Ex. A-4 at 1. Plaintiff's assignment with Capsugel ended after approximately three months. DSOMF ¶ 12. While the Subcontractor Agreement indicates that the project was intended to last "6+ months," Capsugel was not a party to the Subcontractor Agreement. Boyan Cert., Ex. C at 7. Moreover, Plaintiff provides no evidence (outside of his unsubstantiated belief) demonstrating that Capsugel was aware of the precise terms of the Subcontractor Agreement before this suit was filed, let alone had the ability control the terms of the agreement. Finally, Plaintiff was not party to any agreement with Capsugel. As a result, based on the SOW, Capsugel only contracted to hire Plaintiff for a three-month project. And as the three-month deadline approached, Capsugel decided that it did not need additional help from Plaintiff because Plaintiff completed his deliverables. Consequently, Capsugel did not need to extend the length of the project with Plaintiff. DSOMF ¶¶ 9-10. Plaintiff

---

[7] Plaintiff argues that the SOW was "a contract for an indefinite term" and that it only expired after the parties took certain affirmative steps. *See* Plf. Opp. at 10. But the SOW clearly states that estimated project duration was three months. Def's App'x, Ex. A-4.

11

fails to explain why the failure to extend a contract amounts to an adverse employment action. Consequently, there is no genuine dispute of material fact as to Plaintiff suffering an adverse employment decision.

Because there is no genuine dispute of material facts as to a necessary element of Plaintiff's claim, Plaintiff fails to establish a *prima facie* employment discrimination claim. Defendant's motion, therefore, is granted on these grounds.

### C. Refusal to Contract

Plaintiff also asserts a claim pursuant to N.J.S.A. 10:5-12(l), which prohibits individuals from refusing to do business with another individual because of that individual's protected status. *See Rubin v. Chilton*, 359 N.J. Super. 105, 110 (App. Div. 2003) (explaining that N.J.S.A. 10:5-12(l) "is directed at refusals to do business with persons because of a protected characteristic"). Specifically, N.J.S.A. 10:5-12(l) provides that it is unlawful

> for any person to refuse to buy from, sell to, lease from or to, license, contract with, or trade with, provide goods, services or information to, *or otherwise do business with any other person* on the basis of the race, creed, color, national origin, ancestry[.]

N.J.S.A. 10:5-12(l) (emphasis added). Unlike an employment discrimination claim asserted pursuant to N.J.S.A. 10:5-12(a), independent contractors can assert claims under subsection (l) because the subsection is "exclusively related to non-employee relationships." *Rubin*, 359 N.J. Super. at 111 (rejecting the defendant's argument that N.J.S.A. 10:5-12(l) does not apply to independent contractors as a *non sequitur*). In addition, a plaintiff is not required to set forth a *prima facie* discrimination claim when asserting a claim under N.J.S.A. 10:5-12(l). *See, e.g.*, *id.* at 111; *J.T.'s Tire Serv., Inc. v. United Rentals N.A., Inc.*, 411 N.J. Super. 236, 240-41 (App. Div. 2010).

Plaintiff argues that there is ample evidence to support his claim that Capsugel refused to work with Plaintiff after the initial three-month period because of his national origin. Plf. Opp. at 12. But as discussed, Capsugel's contract with Robert Half demonstrates that Capsugel contracted for Plaintiff to work on an approximately three-month long project. After three months, Plaintiff finished his deliverables and Capsugel made the business decision to not renew the contract or extend the length of Plaintiff's project. Plaintiff provides no case law demonstrating that the decision to not renew a contract or extend a project that was set to expire amounts to discrimination. Obviously, Capsugel originally agreed to do business with Plaintiff for the initial three-month period. As a result, Plaintiff fails to establish that Capsugel refused to do business or contract with Plaintiff.

Plaintiff's sole case that he relies on in support of his argument, *J.T.'s Tire Service, Inc. v. United Rentals North America, Inc.*, 411 N.J. Super. 236 (App. Div. 2010) is distinguishable. *See* Plf. Opp. at 12-13. There, the plaintiff alleged that the defendant stopped doing business with it after the plaintiff's sole shareholder rebuffed the defendant's employee's sexual advances. Both parties had done business with each other since 1998, and shortly before the defendant ceased its business with the plaintiff company, the defendant was buying $29,000 worth of tires per month. *J.T.'s Tire Service, Inc.*, 411 N.J. Super. at 238. Accordingly, the court determined that the plaintiff stated a claim pursuant to N.J.S.A. 10:5-12(l) because the plaintiff sufficiently alleged that the defendant's stoppage of business was *quid pro quo* sexual harassment. *Id.* at 241-42. In reaching this conclusion, the court recognized that Section (l) of the LAD prohibits "refusals to do business with independent contractors based on age, sex or handicap," and "discriminatory terminations of contracts." *Id.* at 240. In addition, the subsection also "prohibits sex discrimination in the form of refusals to buy from or otherwise do business with a person because of her gender." *Id.* Here,

by comparison, there was no longstanding business relationship, and Defendant expressly anticipated that the project would last three months in the SOW. Although Plaintiff expected the project to last longer, he fails to provide any evidence demonstrating that Defendant held the same expectation or made any promises or representations to that effect. Plaintiff has also not pointed to any other relevant evidence, for example, that another contractor was hired after he left to perform the same or substantially similar duties. Thus, no contract was terminated, and Defendant did not have any further business with Plaintiff.

Because there is not genuine issue of material fact, summary judgment is also granted to Defendant as to this claim.

## IV. CONCLUSION

For the reasons states above, Defendant's motion for summary judgment (D.E. 82) is **GRANTED in part** and **DENIED in part**. An appropriate order accompanies this Opinion.

Dated: September 21, 2020

_____
John Michael Vazquez, U.S.D.J.